1   Michael A. Caddell (SBN 249469)
    mac@caddellchapman.com
2   Cynthia B. Chapman (SBN 164471)
    cbc@caddellchapman.com
3   CADDELL & CHAMPMAN
    628 East 9th Street
4   Houston, TX 77007-1722
    Tel: (713) 751-0400
5   Fax: (713) 751-0906

6

7   Foster C. Johnson (SBN 289055)
    fjohnson@azalaw.com
8   Joseph Ahmad (*pro hac vice forthcoming*)
    AHMAD, ZAVITSANOS, & MENSING, PLLC
9   1221 McKinney Street, Suite 2500
    Houston, TX 77010
10  Tel: (713) 655-1101
    Fax: (713) 655-0062

11  *Attorneys for Plaintiffs*

12           **IN THE UNITED STATES DISTRICT COURT**

13        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 14  JANE DOE, JAN DOE, JOHN DOE, AND JAMES DOE, individually and on behalf of all others similarly situated,<br><br>16<br>*Plaintiffs*,<br>17<br>*v.*<br>18<br>19  TENET HEALTHCARE CORPORATION, DOCTORS MEDICAL CENTER OF MODESTO, INC.,DESERT REGIONAL MEDICAL CENTER, INC., TWIN CITIES COMMUNITY HOSPITAL, INC.,<br>22<br>23  *Defendants*. | CASE NO. 1:23-cv-1106-TLN-CKD<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

24

25          Plaintiffs Jane Doe, Jan Doe, John Doe, and James Doe ("Plaintiffs"), individually and on

26   behalf of all other similarly situated patients, bring suit against Defendants Tenet Health Care

27

28

Corporation, Doctors Medical Center of Modesto, Inc., Desert Regional Medical Center, Inc., and Twin Cities Community Hospital, Inc. ("Defendants" or "Tenet Healthcare"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

## I. SUMMARY OF ALLEGATIONS

1.      This case arises from Tenet Healthcare's systematic violation of the medical privacy rights of patients and users of Tenet Healthcare's services, exposing highly sensitive personal information to Facebook without those patients' or users' knowledge or consent.

2.      As recently as July 21, 2023, Tenet Healthcare regularly disclosed information about prospective and actual patients—including their status as actual or potential patients, their actual or potential physicians, their actual or potential medical treatments, the hospitals they visited or may visit, and their personal identities—to Facebook, Google, and other third parties without their prospective or actual patients' knowledge, authorization, or consent.

3.      Tenet Healthcare breached confidentiality and violated Plaintiffs' privacy when it did not seek—and certainly did not receive—consent for disclosure of personal and medical information before it unlawfully disclosed Plaintiffs' personally identifiable information ("PII") and protected health information ("PHI") (collectively "Personal Health Information").

4.      Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences including, but certainly not limited to, discrimination in the workplace or denial of insurance coverage.

5.      Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to any unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

6.     Protected and highly sensitive medical information collected by healthcare entities includes many categories, from intimate details of an individual's treatment to any unique identifying code which can connect the individual to the collecting entity.

7.     Recognizing this, and in order to implement the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") in 2001, which require that healthcare providers safeguard and protect their patients' Personal Health Information.[1]  Under HIPAA, healthcare providers are prohibited from disclosing individuals' Personal Health Information without express written authorization.

8.     Tenet Healthcare disclosed this protected health information through the deployment of various digital marketing and automatic software tools embedded on Tenet websites that purposefully and intentionally disclose personal health information to Facebook, Google, and other third parties who exploit that information for advertising purposes. Tenet Healthcare's use of these tools caused personally identifiable information and the contents of communications exchanged between actual and prospective patients with Tenet Healthcare to be automatically redirected to Facebook, Google, and other third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, and their rights under California and federal law.

9.     Tenet Healthcare disclosed its patients' personal health information to Facebook, Google, and other third parties to improve its return on marketing dollars and, ultimately, increase its profits.

10.     Tenet Healthcare's conduct in disclosing such protected health information to Facebook, Google, and other third parties violates California law and federal, including the

---

[1] https://aspe.hhs.gov/standards-privacy-individually-identifiable-health-information#:~:text=The%20Privacy%20Rule%20establishes%20a%20federal%20requirement%20that%20most%20doctors,health%20care%20operations%20(TPO).

California Invasion of Privacy Act ("CIPA"), CAL. PENAL CODE §§ 630, et seq.; the California Confidentiality of Medical Information Act ("CMIA"), CAL. CIVIL CODE §§ 56.06, 56.10, 56.101; the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), CAL. PENAL CODE § 502; Invasion of Privacy and Violation of the California Constitution, ART. 1, § 1, and the Electronic Communications Privacy Act, 18 U.S.C. § 25198 et seq..

11. Plaintiffs continue to desire to search for health information on Tenet Healthcare's websites and patient portals. Plaintiffs will continue to suffer harm if the websites are not redesigned. If the websites and patient portals were redesigned to comply with applicable laws, Plaintiffs would use Tenet Healthcare's websites and patient portals to search for health information in the future.

12. On behalf of herself and all similarly situated persons, Plaintiffs seek an order enjoining Tenet Healthcare from further unauthorized disclosures of personal information; awarding statutory damages in the amount of at least $5,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## II. PARTIES

### A. Plaintiffs

13. Plaintiff Jane Doe is a resident of Stanislaus County, California.

14. Plaintiff Jane Doe has used Tenet Healthcare's Web Properties, including the Doctors Medical Center website and patient portal to search for doctors and medical treatment.

15. Plaintiff Jane Doe's use of the Doctors Medical Center website and patient portal entailed providing Jane Doe's sensitive medical information, such as the conditions for which she was seeking treatment, her status as a patient, and the names of her treating physicians.

16. Plaintiff Jan Doe is a resident of San Bernardino County, California.

17. Plaintiff Jan Doe has used Tenet Healthcare's Web Properties, including the Desert Care Network website and Desert Care Network/Hi-Desert Medical Center patient portal to search for doctors and medical treatment.

18.     Plaintiff Jan Doe's use of the Desert Care Network website and patient portal entailed providing her sensitive medical information, such as the conditions for which she was seeking treatment, her status as a patient, and the names of her treating physicians.

19.     Plaintiff John Doe is a resident of San Luis Obispo County, who has been treated by Tenet Healthcare at Twin Cities Community Hospital. Plaintiff John Doe has used Tenet Healthcare's Web Properties, including the Tenet Health Central Coast website and patient portal to search for medical treatment and pay medical bills.

20.     Plaintiff John Doe's use of the Tenet Healthcare Central Coast website and patient portal entailed providing his sensitive medical information, such as the condition that he was being treated for and his status as a patient.

21.     Plaintiff James Doe is a resident of Riverside County, California.

22.     Plaintiff James Doe has used Tenet Healthcare's Web Properties, including the Desert Care Network website and the Desert Care Network/Desert Regional Medical Center patient portal to search for doctors and medical treatment.

23.     Plaintiff James Doe's use of the Desert Care Network website and patient portal entailed providing his sensitive medical information, including such details as his medical condition and his status as a patient.

**B. Defendants**

24.     Defendant Tenet Healthcare Corporation is a Nevada Corporation with its principal place of business at 14201 Dallas Parkway, Dallas, TX 75254.  Tenet Healthcare Corporation began operation in California in 1969.[2]  Today, Tenet Healthcare Corporation owns more than 465 ambulatory surgery centers and surgical hospitals, 61 hospitals and approximately 110 additional outpatient centers across the United States, including many in California.  The California hospitals and medical systems that Tenet Healthcare Corporate owns and operates include Desert Regional Medical Center, Inc., Doctors Medical Center of Modesto, Inc., Doctors

---

[2] https://www.tenethealth.com/about

Hospital of Manteca, Inc., Fountain Valley Regional Hospital and Medical Center, Inc, Lakewood Regional Medical Center, Inc., Los Alamitos Medical Center, Inc., Placentia-Linda Hospital, Inc., San Ramon Regional Medical Center, LLC, and Twin Cities Community Hospital, Inc.  Tenet Healthcare Corporation also owns and operates multiple websites and patient portals offering services in California, including the following websites:

- https://www.tenethealthcentralcoast.com/
- https://www.tenethealthcentralcoast.com/portal
- https://www.tenethealthpacificcoast.com/
- https://www.desertcarenetwork.com
- https://www.dmc-modesto.com/
- https://www.doctorsmanteca.com/
- https://www.emanuelmedicalcenter.org/
- https://www.fountainvalleyhospital.com/
- https://www.lakewoodregional.com/
- https://www.losalamitosmedctr.com/
- https://www.placentialinda.com/
- https://www.sanramonmedctr.com/













25.     Each of the above websites is copyrighted to Tenet Healthcare Corporation.  These websites and their accompanying patient portals are referred to herein as the Tenet Health "Web Properties."

26.     The website that Tenet Healthcare Corporation operates located at https://www.tenethealthcentralcoast.com/ offers California citizens services for multiple hospitals in California, including Sierra Vista Regional Medical Center, Twin Cities Community Hospital, Selma Carson Diagnostic Center, and multiple branches of Tenet Health Central Coast Primary & Specialty Care.  This website also offers patients access to a patient portal located at https://www.tenethealthcentralcoast.com/portal.  The website states that "Tenet Health Central Coast is an integrated healthcare system consisting of two acute care hospitals and several affiliated entities, including primary and specialty care, outpatient imaging and laboratories across the Central Coast."[3] The website further provides that "Unifying our resources under the Tenet Health Central Coast brand gives us the opportunity to enhance care coordination and access to the specialized services we bring to the region."

27.     The website that Tenet Healthcare Corporation maintains at https://www.tenethealthpacificcoast.com/ directs California citizens to services at Tenet Healthcare owned facilities in California, including Fountain Valley Regional Hospital, Lakewood Regional Medical Center, Los Alamitos Medical Center, and Placentia-Linda Hospital. The website states that "Tenet Health Pacific Coast is a community built on care" whose "integrated system across the greater Los Angeles County and Orange County area, includes four acute care hospitals, ambulatory surgery centers, clinics and ancillary services."[4]  Tenet Healthcare Corporation also owns both Emanuel Medical Center in Turlock, CA, and the website for Emanuel Medical Center located at https://www.emanuelmedicalcenter.org/.[5]

---

[3] https://www.tenethealthcentralcoast.com/about

[4] https://www.tenethealthpacificcoast.com/

[5]      https://investor.tenethealth.com/press-releases/press-release-details/2014/Tenet-Completes-Acquisition-of-Emanuel-Medical-Center-in-Turlock-Calif/default.aspx

28.     The     website     that     Tenet     Healthcare     Corporation     maintains     at https://www.desertcarenetwork.com/ is copyrighted by Tenet Healthcare and directs California citizens to services at Tenet Healthcare facilities in California, including Desert Regional Medical Center, Hi-Desert Medical Center, JFK Memorial Hospital, Advanced Wound Healing Center at Desert Regional Medical Center, and the El Mirador Surgery Center.  The website states that "[b]oth Desert Regional Medical Center and Hi-Desert Medical Center are former district-run hospitals that are now operated by Tenet under 30-year lease agreements."[6]  Tenet Healthcare Corporation has managed the operations of Hi-Desert Medical Center, including its website and patient portal, since July 2015.

29.     Doctors Medical Center of Modesto, Inc. is a California corporation whose principal place of business is located at 1441 Florida Avenue, Modesto, California 95350. Doctors Medical Center "is a full-service, comprehensive healthcare facility" that treats more than 100,000 emergency patients each year and is the largest hospital between Stockton and Fresno.[7] Tenet Healthcare operates multiple medical facilities, including Doctors Medical Center Modesto, Darroch Brain & Spine Institute of Doctors Medical Center, Doctors Behavioral Health Center, Modesto Radiology Imaging, and Valley Heart Institute of Doctors Medical Center.  Doctors Medical Center operates a website located at https://www.dmc-modesto.com/.  Doctors Medical Center also separately operates a patient portal which may be accessed at https://www.dmc-modesto.com/portal.  Doctors Medical Center of Modesto is owned by Tenet Healthcare Corporation.[8]

30.     Twin Cities Community Hospital, Inc. ("Twin Cities") is a California corporation whose place of business is located at 1100 Las Tablas Road, Templeton, California 93465  Twin Cities operates a 122-bed acute care hospital, with a medical staff of more than 200 physicians

---

[6] https://www.desertcarenetwork.com/about/community-outreach/collaborating-with-our-healthcare-district-partners

[7] https://www.dmc-modesto.com/about

[8]         https://investor.tenethealth.com/press-releases/press-release-details/2014/Tenet-Completes-Acquisition-of-Emanuel-Medical-Center-in-Turlock-Calif/default.aspx

and 400 caregivers.  Twin Cities offers a broad array of medical, surgical, and outpatient services, including emergency care, obstetrics, orthopedics, wound care, and stroke treatment.  Twin Cities advertises its services to the public through a website located at https://www.tenethealthcentralcoast.com/locations/detail/twin-cities-community-hospital.  Twin Cities separately operates a patient portal which may be accessed at https://www.tenethealthcentralcoast.com/portal.  Twin Cities is owned by Tenet Healthcare Corporation.

31.    Desert Regional Medical Center, Inc. ("Desert Regional") is a California corporation whose principal place of business is located at 1150 North Indian Canyon Drive, Palm Springs, California 92262.  Desert Regional operates a hospital in Palm Springs, CA.  Desert Regional offers a broad array of medical services, including emergency care, bariatric surgery, cardiovascular treatment, gastroenterology, and gynecology services.  Desert Regional advertises its services to the public through a website located at https://www.desertcarenetwork.com/locations/detail/desert-regional-medical-center.  Desert Regional also operates a patient portal which may be accessed at https://www.desertcarenetwork.com/portal.  Desert Regional is owned by Tenet Healthcare Corporation.

## II.  JURISDICTION AND VENUE

32.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 putative class members defined below, and minimal diversity exists because at least one class member and one Defendant are citizens of different states.

33.    This Court has federal question jurisdiction pursuant to 29 U.S.C. § 1331 because this complaint alleges violation of federal laws and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining state common-law and statutory claims as these state law claims

are part of the same case or controversy as the federal statutory claim over which the Court has original jurisdiction.

34.    This Court has personal jurisdiction over Tenet Healthcare Corporation because (1) Tenet Healthcare Corporation both purposely directed its activities towards citizens of the state of California and purposely availed itself of the privilege of conducting activities within the state of California, thereby invoking the benefits and protections of California law; (2) Plaintiffs' and the Class Members' claims both arise out of and relate to Tenet Healthcare Corporation's California-related activities; and (3) the exercise of this Court's jurisdiction comports with fair play and substantial justice.  Specifically, Tenet Healthcare Corporation owns and operates multiple websites that are accessible and marketed to California citizens, including https://www.tenethealthcentralcoast.com/ and https://www.tenethealthpacificcoast.com/, which contain source code that surreptitiously intercepts, records, and discloses patients' PHI and PII to third parties located in California, such as Facebook and Google, without patients' consent.  These websites direct California citizens to do business with Tenet-owned hospitals located in California, including Fountain Valley Regional Hospital, Lakewood Regional Medical Center, Los Alamitos Medical Center, and Placentia-Linda Hospital.  Likewise, Tenet Healthcare Corporation is listed as the copyright owner for each of the following websites:

- https://www.desertcarenetwork.com/
- https://www.dmc-modesto.com/
- https://www.doctorsmanteca.com/
- https://www.emanuelmedicalcenter.org/
- https://www.fountainvalleyhospital.com/
- https://www.lakewoodregional.com/
- https://www.losalamitosmedctr.com/
- https://www.placentialinda.com/
- https://www.sanramonmedctr.com/

Tenet Healthcare Corporation acted intentionally by installing source code on the above websites that resulted in the unauthorized disclosure of patients' personal health information to third parties. The websites that Tenet Healthcare Corporation owns and operates are specifically targeted at California citizens. The websites are not passive—they contain numerous interactive features: i.e., features where a user can exchange information with the host computer. These interactive features include search functions, "Find A Doctor" functions, bill pay functions, patient portals, and online appointment making features that are designed to encourage users to provide Tenet Healthcare with PHI and PII that Tenet Healthcare then barters to third parties in violation of numerous California laws. Tenet Healthcare Corporation uses these websites to sell medical services to California citizens. Indeed, the websites are replete with marketing and advertising materials that are designed to encourage California citizens to visit and obtain services in California from "Tenet Healthcare" branded hospitals located in California. In other words, Tenet Healthcare Corporation specifically targeted California citizens with websites designed to obtain (and disclose) their personal healthcare information.

35.     Tenet Healthcare Corporation violated California law by surreptitiously intercepting, recording, and disclosing patients' personal health information for its own commercial gain, including enhanced advertising and website analytics benefits that it received from Facebook and Google in return for access to patients' PHI and PII. The fact that Tenet Healthcare Corporation targeted California citizens with its websites indicates that Tenet Healthcare Corporation knows about its California user base and that Tenet Healthcare Corporation exploits that base for commercial gain by exploiting California citizens' personal health information without those citizens knowledge or consent. As described below, it is widely known and understood that installing tracking pixels on websites results in the disclosure of substantial information about those websites' users. Indeed, the very purpose of installing tracking pixels is to share user information with third parties. Given these facts, it was certainly

foreseeable to Tenet Healthcare Corporation that its conduct would harm California citizen's statutorily protected rights against the unauthorized disclosure of their PHI and PII to third parties.

36.     As Tenet Healthcare Corporation's 2022 annual report confirms, California citizens are integral to Tenet Healthcare Corporation's business model and profitability.[9]  Tenet Healthcare Corporation's 2022 annual report states, for example, that "Approximately, half of the outpatient centers in our Hospital Operations segment at December 31, 2022 were in Texas and California, the same states where we had the largest concentrations of licensed hospital beds."[10] Tenet Healthcare Corporation owns and operates approximately 13 California hospitals, including Doctors Medical Center of Modesto, Doctors Hospital of Manteca, Emmanuel Medical Center, Fountain Valley Regional Hospital and Medical Center, Hi-Desert Medical Center, John F. Kennedy Memorial Hospital, Lakewood Regional Medical Center, Los Alamitos Medical Center, Placentia Linda Hospital, San Ramon Regional Medical Center, Tenet Health Central Coast Sierra Vista Regional Medical Center, and Tenet Health Central Coast Twin Cities Community Hospital. Tenet Healthcare Corporation owns and operates "Tenet Healthcare" branded websites that advertise services for each of these hospitals and result in the unauthorized disclosure of patient personal health information to third parties.  Because Tenet Healthcare Corporation's actions resulted in the unauthorized disclosure of the personal health information of hundreds of thousands California citizens, a jurisdictionally significant amount of the harm caused by Tenet Healthcare Corporation took place in California.

37.     This Court has general personal jurisdiction over defendants Desert Regional Medical Center, Inc., Doctors Medical Center of Modesto, Inc., and Twin Cities Community Hospital, Inc. because they are California corporations and limited liability companies whose principal businesses are located in California. Additionally, these defendants are subject to

---

[9] *See* 2022 Tenet Healthcare Corporation Annual Report, located at https://investor.tenethealth.com/financials-and-sec-filings/default.aspx, at 4.

[10] *See* 2022 Tenet Healthcare Corporation Annual Report, located at https://investor.tenethealth.com/financials-and-sec-filings/default.aspx, at 6.

specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' and Class Members' claims occurred in this State.

38.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because Doctors Medical Center of Modesto transacts business in this District, because Doctors Medical Center of Modesto is subject to the Court's personal jurisdiction with respect to this action, because Tenet Healthcare Corporation is subject to the Court's personal jurisdiction with respect to this action, and because a substantial portion of the events and omissions giving rise to the claims occurred in this District.

### III. FACTUAL BACKGROUND

39.     Plaintiff Jane Doe is an individual with a Facebook account who has been a patient of Tenet Healthcare since 2018 and has received medical treatment at Tenet Healthcare owned facilities, including Doctors Medical Center of Modesto.  Beginning in 2018, Plaintiff Jane Doe began regularly using the Tenet Healthcare website and patient portal located at https://www.dmc-modesto.com.  Among other things, Plaintiff used the website to look for OBGYNs and pediatricians who could provide ongoing care. She entered data on the website, including sensitive medical information and details about her medical condition, including her pregnancy.   Plaintiff Jane Doe also used the website and patient portal to view her medical records and test results. Plaintiff Jane Doe used the Doctors Medical Center of Modesto website and patient portal as recently as May 2023.

40.     Plaintiffs Jan Doe, John Doe, and James Doe are also patients of Tenet Healthcare who maintain Facebook accounts, who have received treatment at Tenet Healthcare facilities, including Desert Regional Medical Center, Twin Cities Community Hospital, and Hi-Desert Medical Center.  Like Plaintiff Jane Doe, Plaintiffs Jan Doe, John Doe, and James Doe also regularly used Tenet Healthcare websites and patient portals to research medical treatments, search for doctors, make appointments, and review their medical records.   During their interactions with Tenet Healthcare's websites and patient portals, Plaintiffs Jan Doe, John Doe,

and James Doe also entered data, including sensitive information about their medical conditions, treatment, and patient status.

41.    Unbeknownst to Plaintiffs, Tenet Healthcare had embedded computer code on all of its websites that took every search term Plaintiffs entered and every page of the sites they visited and sent that information directly to Facebook and Google, two of the largest and most profitable advertising companies on the planet.

42.    Tenet Healthcare accomplished this by installing Facebook's "Meta Pixel" tool on every page of its websites.

43.    The Meta Pixel worked like a listening device. Each time Plaintiff Jane Doe typed a search term, the Meta Pixel recorded the information she entered and transmitted it to Facebook, along with identifiable information that let Facebook know exactly who Jane Doe was.

44.    Facebook then took this information and added it to all of the other information it keeps about consumers, matching Jane Doe's interest in medical care with her Facebook profile, name, address, interests, and other websites she had visited. This information then became available for Facebook's advertisers to use when Facebook sold them targeted advertising services.

45.    Plaintiffs were surprised and troubled that information they believed they were communicating only to their healthcare providers for the purpose of obtaining medical treatment had been sent to Facebook, Google, and other third parties.  Plaintiffs subsequently learned that thousands of Tenet Healthcare's patients had similarly had their privacy rights violated. Most of these patients were likely not even aware of this privacy violation, much less able to hire counsel to stop the illegal conduct.

46.    Plaintiffs therefore now bring these claims to correct Tenet Healthcare's privacy violations and obtain relief for themselves and thousands of similarly situated patients.

# IV. CLASS ACTION ALLEGATIONS

**A. Defendants routinely disclosed the personal health information of patients and users of their services to Facebook, Google, and other third parties.**

47.    Medical patients and those seeking medical treatment in California such as Plaintiffs have a legal interest in preserving the confidentiality of their communications with health care providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendants without their express written consent and authorization.

48.    As health care providers, Defendants have common-law and statutory duties to protect the confidentiality of patient information and communications.

49.    Defendants expressly and impliedly promise patients that they will maintain and protect the confidentiality of personally identifiable patient information and communications.

50.    Defendants encourage patients to use digital tools on their websites to seek and receive health care services.  Plaintiffs and Class Members provided their private information to Defendants' websites with the reasonable understanding that Defendants would secure and preserve the confidentiality of that information.

51.    Defendants operate websites for current and prospective patients, including the following:

- https://www.tenethealthcentralcoast.com/
- https://www.tenethealthcentralcoast.com/portal
- https://www.tenethealthpacificcoast.com/
- https://www.desertcarenetwork.com/home
- https://www.dmc-modesto.com/
- https://www.doctorsmanteca.com/
- https://www.emanuelmedicalcenter.org/
- https://www.fountainvalleyhospital.com/

- https://www.lakewoodregional.com/
- https://www.losalamitosmedctr.com/
- https://www.placentialinda.com/
- https://www.sanramonmedctr.com/

52. Defendants' websites are designed for interactive communication with patients and users, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issue treatment options, and joining support groups.

53. Defendants also maintain patient portals through their websites, which allow patients to make appointments, access medical records, view lab results, and exchange communications with health care providers.

54. Plaintiffs and Class Members who visited and used Defendants' Web Properties (collectively, the "Users") understandably thought they were communicating only with their trusted healthcare providers. Unbeknownst to Plaintiffs and Class Members, however, Defendants had embedded undetectable tracking software on their Web Properties, which automatically transmits to Facebook, Google, and other thirds paries intimate details about their medical symptoms, conditions and treatments.

55. Operating as designed and as implemented by Defendants, these tracking pixels allow the Personal Health Information that Plaintiffs and Class Members submitted to Defendants in furtherance of their health treatment to be unlawfully disclosed to Facebook, Google, and other third parties, alongside the individual's unique and persistent identifiers, including their Facebook ID ("FID"), IP address, and email addresses.

56. Simply put, by installing tracking pixels on its Web Properties, Defendants effectively planted a bug on Plaintiffs' and Class Members' web browsers and compelled them to unknowingly disclose their confidential and extremely sensitive communications to Facebook.

57. The information sent to third parties as a result of Defendants' Meta Pixels and other tracking software included the private information that Plaintiffs and Class Members

submitted to Defendants' Web Properties related to their past, present, or future health conditions, including, for example, the type and date of a medical appointment and physician. Such private information would allow the third party (e.g., Facebook or Google) to know that a specific patient was seeking confidential medical care and the type of medical care being sought. This disclosure would also allow a third party to reasonably infer that a specific patient was being treated for a specific type of medical condition such as cancer, pregnancy, or HIV.

58.     In addition to tracking pixels, Defendants, on information and belief, also installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on its Web Properties' servers.

59.     Unlike the Meta Pixel, which coopts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including private information, records and stores that information on the website owner's servers and then transmits the data to Facebook from the website owner's servers.

60.     Indeed, Facebook markets CAPI as a better measure of ad performance, which helps website owners to better understand how digital advertising impacts both online and offline results.

61.     Because CAPI is located on the website owner's servers (rather than a bug placed on website users' browsers), it allows website owners like Tenet Health to circumvent any ad blockers or similar technologies that patients might employ to prevent Tenet Health from sharing their Personal Health Information with Facebook.

62.     Despite the clear and unequivocal prohibition on the disclosure of PHI without consent, Defendants chose to use the Pixel and CAPI data for marketing purposes in an effort to bolster its profits. In other words, despite professing to being committed to maintaining its patients' privacy, Defendants put their own desires for profit over their patients' privacy rights.

63.     The Meta Pixel and CAPI are routinely used to target specific customers by utilizing data to build robust profiles for the purposes of retargeting and future marketing. Facebook also uses Plaintiffs' and Class Members' private information to create targeted advertisements based on the medical conditions and other information disclosed to Defendants.

64.     The information that Defendants' Pixel and CAPI sent to Facebook included the private information that Plaintiffs and Class Members submitted to Defendants' websites, including for example, the type of medical treatment sought, the individual's particular health condition and the fact that the individual attempted to or did book a medical appointment.

65.     Such information allows a third party (e.g., Facebook) to know that a specific patient was seeking confidential medical care. Facebook, in turn, sells Plaintiffs' and Class Members' private information to third-party marketers who geo-target Plaintiffs' and Class Members' Facebook pages based on communications obtained via the Meta Pixel and CAPI.

66.     Healthcare patients simply do not anticipate that their trusted healthcare provider will send PHI or other confidential medical information to an unauthorized third party—let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without patients' informed consent.

67.     Neither Plaintiffs nor any other Class Member signed a written authorization permitting Tenet Healthcare to send their private information to Facebook.

68.     Plaintiffs and Class Members exchanged numerous communications with Defendants. Plaintiffs' and Class Members' communications included logging in and out of patient portals, exchanging communications about doctors and health conditions, and using button functionality from Defendants' websites.

69.     Notwithstanding prospective and current patients' reasonable expectations of privacy and Defendants' legal duties of confidentiality, Defendants disclosed (and continue to disclose) the contents of Plaintiffs' and Class Members' communications and protected healthcare information via automatic mechanisms embedded in the websites operated by Defendants without

patients' knowledge, authorization, or consent.  In doing so, Defendants systematically violated the medical privacy rights of Plaintiffs and Class Members by causing the unauthorized disclosure of their communications to be transmitted to Facebook, Google, and other third-party marketing companies.

70.    The private information provided by Plaintiffs and Class Members has been—and likely will be—further disseminated to additional third parties.

71.    While Defendants intentionally incorporated the Meta Pixel into their websites, Defendants never disclosed to Plaintiffs or Class Members that they shared patients' sensitive and confidential communications with Facebook.  As a result, Plaintiffs and Class Members were unaware that their private information was being surreptitiously transmitted to Facebook when they visited Defendants' websites.

72.    By design, none of the tracking mechanisms employed by Defendants are visible to patients visiting Defendants' websites.

73.    Defendants did not warn or otherwise disclose to Plaintiffs and Class Members that Defendants regularly bartered patients' confidential medical communications to Facebook, Google, and other third parties for marketing purposes.

74.    Plaintiffs and Class Members never consented, agreed, or otherwise authorized Defendants to disclose their confidential medical communications.

75.    Defendants intercepted and disclosed the following non-public private information to Facebook, Google, and other third parties:

a.  Plaintiffs' and Class Members' status as patients;

b.  Plaintiffs' and Class Members' communications with Defendants via their websites;

c.  Information about when Plaintiffs' and Class Members' requested and/or made appointments made through Defendants' websites, including Plaintiffs' personally identifiable information;

d.  Plaintiffs' and Class Members' use of Defendants' patient portal;

e.  Plaintiffs' and Class Members' searches for information regarding specific medical conditions and treatments, their medical providers, and their physical location.

76.  Defendants interfered with Plaintiffs' and Class Members' privacy rights when they implemented technology that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential information to Facebook, Google, and other third parties.

77.  Defendants also breached their obligations to patients in multiple other ways, including (1) failing to obtain their consent to disclose their private information to Facebook and other third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure their websites were safe and secure, (3) failing to remove or disengage software code that was known and designed to share patients' private information with third parties, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' private information to Facebook and other third-party advertising companies, (5) failing to warn Plaintiffs and Class Members that Defendants were routinely bartering their private information to Facebook via the Meta Pixel, and (6) otherwise ignoring Defendants' common and statutory obligations to protect the confidentiality of patient's protected health information.

78.  Plaintiffs and Class Members have suffered injury because of Defendants' conduct.  Their injuries include invasion of privacy and the continued and ongoing risk of irreparable harm from the disclosure of their most sensitive and personal information.

**B.  The nature of Defendants' unauthorized disclosure of patients' health care information.**

79.  Defendants' disclosure of current and prospective patients' personal healthcare information occurs because Defendants intentionally deployed source code (known as tracking pixels) on the websites they operate, which cause current and prospective patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

80.  These pixels are snippets of code that track internet and app users as they navigate through a website, logging which pages they visit, which buttons they click, and certain

information they enter into forms. In exchange for installing the pixels, third party platforms (*e.g.,* Facebook and Google) provide website owners analytics about the advertisements they have placed as well as tools to target people who have visited their Web Properties.

81.     While the information captured and disclosed without permission may vary depending on the pixel(s) embedded, these "data packets" can be extensive, sending, for example, not just the name of a physician and field of medicine, but also the first name, the last name, email address, phone number and zip code and city of residence entered into the booking form. In addition, that data is linked to a specific internet protocol ("IP") address.

82.     The Meta Pixel, for example, sends information to Facebook via scripts running in a person's internet browser.  Each data packet comes labeled with an IP address that can be used in combination with other data to identify an individual or household.

83.     The Meta Pixel allows Facebook to track people and the actions they take on websites.  When Meta Pixel is installed on a hospital website or patient portal like those maintained by Defendants, the information that Facebook receives may include such information as the patient's home address, their name, their search location, as well as their doctor's specialty, name, and gender. When combined with other information that Facebook receives via the Meta Pixel (such as Plaintiffs' appointment information and information about the kinds of treatments that patients research on the hospital's website, Facebook learns about patients' past and future medical conditions, their past and future medical treatment, and when and where they are receiving treatment for those conditions.

84.     In addition, if the person is (or recently has) logged into Facebook when they visit a particular website when a Meta Pixel is installed, some browsers will attach third-party cookies—another tracking mechanism—that allow Meta to link pixel data to specific Facebook accounts.

85.     With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering

private information, like Facebook, implement workarounds that cannot be evaded by savvy users. Facebook's workaround, for example, is called Conversions API (CAPI). CAPI is an effective workaround because it does not intercept data communicated from the user's browser. Instead, Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]." Thus, the communications between patients and Defendants, which are necessary to use Defendants' websites, are actually received by Defendants and stored on its server before CAPI collects and sends the private information contained in those communications directly from Defendants to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

86.    While there is no way to confirm with certainty that a Web host like Tenet Healthcare has implemented workarounds like CAPI without access to the host server, companies like Facebook instruct companies to use the CAPI in addition to the Pixel, and share the same events using both tools because such a redundant event setup allows website owners to share website events with Facebook that the pixel may lose. Thus, it is reasonable to infer that Facebook's customers who implement the Meta Pixel in accordance with Facebook's documentation will also implement the CAPI workaround.

87.    The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner.

88.    Thus, without any knowledge, authorization, or action by a user, website owners like Defendants can use their source code to commandeer a user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

89.    By design, third parties receive and record the exact contents of these communications before the full response from Defendants has been rendered on the screen of the

patient's or user's computer device and while the communication with Defendants remains ongoing.

90.    For example, when Plaintiffs or a Class Member accessed Defendants' website pages hosting the Meta Pixel, the Meta Pixel software directed their browsers to send a message to Facebook's servers.  The information that Defendants sent to Facebook included the private information that Plaintiffs and Class Members communicated to Defendants' websites, such as the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing.  Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer.

91.    Websites like those maintained by Defendants are hosted by a computer server through which the businesses in charge of the website exchange and communicate with internet users via their web browsers.

92.    Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smart phone, via the client device's web browser.

93.    Web browsers are software applications that allow users to exchange electronic communications over the internet.  Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

94.    Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

**HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests.  In

addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

**Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies" which means they can store and communicate data when visiting one website to an entirely different website.

**HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

95.     A patient's HTTP Request essentially asks the Defendants' websites to retrieve certain information (such as a physician's "Book an Appointment" page), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendants' Web Properties).

96.     In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

97.     In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

98.     A web page consists primarily of "Markup" and "Source Code." The markup of a web page comprises the visible portion of that web page. Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen. The source code of a web page is a set of instructions that commands the browser to take certain actions, either when the web page loads or when a specified event triggers the code.

99.    For example, typing https://www.dmc-modesto.com/ into a web browser sends an http request to the website, which returns a HTTP response in the form of the home page of the website:



100.    The patient visiting this particular web page only sees the Markup, not the Defendants' Source Code or underlying HTTP Requests and Responses.

101.    Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen.

102.    In addition to controlling a website's Markup, Source Code executes a host of other programmatic instructions and can command a website visitor's browser to send data transmissions to third parties via pixels or web bugs,[11] effectively open a spying window through which the webpage can funnel the visitor's data, actions, and communications to third parties, along with patients' personally identifiable information like their Facebook IDs.

---

[11] These pixels or web bugs are tiny image files that are invisible to website users. They are purposefully designed in this manner, or camouflaged, so that users remain unaware of them.

103.    For example, Defendants' websites include software code that transmits HTTP requests *directly* to Facebook, including patients' private health information, every time a patient interacts with a page on their websites.

104.    In essence, Defendants encourage their patients to use a tapped device, and once the Webpage is loaded into a patient's browser, the software-based wiretap is quietly waiting for private communications on the Webpage to trigger the tap, which intercepts those communications intended only for Defendants and transmits those communications to third parties, including Facebook and Google.

105.    Third parties, like Facebook, place third-party cookies in the web browsers of users logged into their services.

106.    These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third-party can uniquely identify the patient associated with the Personal Information intercepted.

107.    The basic command that web browsers use to exchange data and user communications is called a GET request. For example, when a patient types "heart failure treatment" into the search box on Defendants' websites and hits 'Enter,' the patient's web browser makes a connection with the server for the Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

108.    The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

109.    In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

110.    Unbeknownst to most users, however, the website's server may also transmit the user's communications to third parties.  For example, the Meta Pixel that Defendants installed on their websites is programmed to manipulate user's browsers so that their communications with Defendants were automatically, contemporaneously, and surreptitiously sent to Facebook.  When Plaintiffs and Class Members visited Defendants' websites for the first time, the Meta Pixel source code that Defendants had installed on their websites instructed Plaintiffs' and Class Members' browsers to begin sending duplicate GET and POST requests to Facebook every time that Plaintiffs and Class Members subsequently interacted with part of Defendants' websites, such as browsing new pages, filling out forms, or enter entering search terms in a search box.

111.    The Meta Pixel was triggered each time Plaintiffs and Class Members communicated with Defendants via Defendants' websites and patient portals. This resulted in Plaintiffs' and Class Members' communications being intercepted, duplicated, and secretly transmitted to Facebook at the same time the communications (in the form of HTTP GET requests and HTTP POST requests) were transmitted to Defendants.

112.    In other words, as a result of the source code that Defendants installed on their websites, *two* communications originate from a patient's browser once the patient initiates an action on Defendants' websites—one (as intended) sent to Defendants and a second (undetectable to patients like Plaintiffs and Class Members) that was simultaneously sent to Facebook. Accordingly, at the same time Plaintiffs' and Class Members' browsers sent communications to Defendants, a duplicate of those communications was simultaneously sent to Facebook as a result of the instructions that their browser's had previously received from Defendants' websites.

113.    Given that the two communications are literally generated and sent at the same time, the duplication is occurring while the intended communications are in transit.  Effectively, it is as if Defendants planted a bugging device inside Plaintiffs' and Class Members' telephones, so that when they placed a call, the bug simultaneously sent a radio signal to Facebook in the next room, allowing Facebook to listen in and record the call. In this way, Defendants aided Facebook

to read, learn, and exploit the contents of Plaintiffs' and Class Members' communications that they sent (and Defendants received) within the state of California.

114.    Google warns website developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.

115.    For example, when a patient searches for information about "pregnancy," data about the patient's search, including the search term and the patient's Facebook ID, is surreptitiously forwarded to Facebook without the patient's knowledge.

116.    Worse, the Personal Health Information that Defendants' Meta Pixel sent to Facebook was sent alongside Plaintiffs' and Class Members' Facebook IDs (c_user cookie or "FID") thereby allowing individual patients' communications with Defendants, and the private information contained in those communications, to be linked to their unique Facebook accounts.

117.    A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

118.    The Meta Pixel allows Defendants to optimize the delivery of ads, measure cross-device conversions, create custom audiences and decrease advertising and marketing costs.

119.    The private information Defendants' Meta Pixel sent to Facebook was sent alongside Plaintiffs' and Class Members' Facebook ID (c_user cookie or "FID") thereby allowing individual patients' communications with Defendants, and the Personal Health Information contained in those communications, to be linked to their unique Facebook accounts.

120.    A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests,

work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

121. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

122. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

123. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

124. These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

125. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must include the third-party source code directly in their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

126. More significantly, tracking pixels such as the Meta Pixel tool allow Defendants and Facebook to secretly track, intercept, record, and transmit every patient communication made on Defendants' websites. When patients visit Defendants' websites, unbeknownst to them, the web page displayed on the patient's browser includes the Meta Pixel as embedded code, which is not visible to patients or other visitors to Defendants' websites. This code is triggered when a

patient or visitor interacts with the web page. Each time the Meta Pixel is triggered, the software code is executed and sends patient's private information directly to Facebook.

127. Notably, this transmission only occurs on webpages that contain the Meta Pixel. Thus, Plaintiffs' and Class Members' private information would not have been disclosed to Facebook via the Meta Pixel but for Defendants' decisions to install the Meta Pixel on their Web Properties.

128. Similarly, Plaintiffs' and Class Members' private information would not have been disclosed to Facebook via CAPI but for Defendants' decision to install and implement that tool on their Web Properties.

129. By installing and implementing both tools, Defendants caused Plaintiffs' and Class Members' communications to be intercepted and transmitted to Facebook via the Pixel, and it caused a second improper disclosure of that information via CAPI.

130. The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on which they surreptitiously installed. Instead, these pixels lie in wait until they are triggered by an event, at which time they effectively open a channel through the website funnels data about users and their actions to third parties via a hidden HTTP request that is never shown to or agreed to by the user.

131. For example, a patient can trigger an HTTP request by interacting with the search bar on Defendants' websites by typing a term such as "pregnancy" into the search bar and then hitting enter. Defendants' server in turn sends an HTTP response, which results in the search results being displayed.

132. This is not the only HTTP request, however, that is created by a patient's interaction with Defendants' websites. In fact, at the very same time the web page is instructed to send an HTTP request to Defendants requesting search results, the source code, acting as a tap, is triggered, such that Defendants' websites are also instructed to send an HTTP request directly

to Facebook, Google, and other third parties, informing them of the patient's exact search and the patient's identifiable information.

**C. Tracking pixels provide third parties with a trove of personally identifiable information.**

133.    The only reason for installing tracking pixels on a hospital website is to share information about patient communications with third parties like Facebook and Google.  Indeed, that is the specific purpose for which tracking pixels are designed.  Tenet Health purposely installed tracking pixels on its websites and patient portals to surreptitiously share its patients' communications with third parties like Facebook and Google.

134.    Tracking pixels are especially pernicious because they result in the disclosure of personally identifiable information.

135.    For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[12]

136.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

137.    Facebook tracks every IP address ever associated with a Facebook user.

138.    Google also tracks IP addresses associated with Internet users.

139.    Facebook, Google, and other third-party marketing companies track IP addresses for use of tracking and targeting individual homes and their occupants with advertising by using IP addresses.

---

[12] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

140.    Because of their uniquely identifying character, IP addresses are considered protected personally identifiable information. 45 CFR § 164.514.  Tracking pixels can (and typically do) collect website visitors' IP addresses.

141.    HIPAA further provides information is personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

142.    Consequently, Defendants' disclosure of Plaintiffs' and Class Members' IP addresses violated HIPAA and industry-wide privacy standards.

143.    Likewise, internet cookies also provide personally identifiable information.

144.    In the early years of the internet, advertising on websites followed the same model as traditional newspapers.  Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early internet paid for ads to be placed on specific web pages based on the type of content displayed.

145.    Computer programmers eventually developed 'cookies'—small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server.  Eventually some cookies were designed to acquire and record an individual internet user's communications and activities on websites across the internet.

146.    Cookies are designed to operate as a means of identification for internet users.  Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies.  These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history.  To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

147.    Cookies are considered personal identifiers.  45 CFR § 164.514.  Tracking pixels can collect cookies from website visitors.

148.    In general, cookies are categorized by (1) duration and (2) party.

149.    There are two types of cookies classified by duration.

150.    "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie.  The user's web browser typically deletes session cookies when the user closes the browser.

151.    "Persistent cookies" are designed to survive beyond a single internet-browsing session.  The party creating the persistent cookie determines its lifespan.  As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites.  Persistent cookies are also called "tracking cookies."

152.    Cookies are also classified by the party that uses the collected data.

153.    "First-party cookies" are set on a user's device by the website with which the user is exchanging communications.  First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

154.    "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications.  For example, the same patient who visits a Defendant's website will also have cookies on their device from third parties, such as Facebook and Google.  Unlike first-party cookies, third-party cookies are not typically helpful to the user.  Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

155.    Data companies like Facebook have developed methods for monetizing and profiting from cookies.  These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's communications and habits.  To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

156.    Traditionally, first-party and third-party cookies were kept separate.  An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server.  For example, although Defendants can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Defendants are not permitted direct access to Facebook third-party cookie values.  The reverse *was* also true:  Facebook was not provided direct access to the values associated with first-party cookies set by companies like Defendants.  But Data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

157.    JavaScript source code developed by third party data companies and placed on a webpage by  developers such as Defendants can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company.  This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user.  Once the cookie synching operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is associated with a cookie identifier number.  The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

158.    In effect, cookie synching is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies.  By designing these special third-party cookies that are set for first-party websites, Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking.

159.    The Facebook cookie used for cookie synching is named _fbp.

160.    On information and belief, the letters fbp are an acronym for Facebook Pixel.

161.    The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

162.    The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

163.    Defendants require patients using their patient portals to have enabled first-party cookies to gain access to the patient portals.

164.    The _fbp cookie is used as a unique identifier for patients by Facebook.

165.    If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie.  Facebook also uses IP addresses and user-agent information to match the health information it receives from Defendants with Facebook users.

166.    Defendants engage in cookie synching with Facebook, Google, and other third parties.

167.    Defendants' cookie disclosures include the deployment of cookie synching techniques that cause the disclosure of the first-party cookie values that Defendants assign to patients to also be made to third parties.

168.    Defendants use and cause the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

169.    A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint."  A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

170.    These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.  As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have

installed to generate a unique identifier which can then be used to match a user across websites."[13] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[14]    Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[15]

171.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[16]

172.    Browser-fingerprints are personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

173.    Defendants use and cause the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

174.    A fourth kind of personally identifiable information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered.  A Facebook ID is an identifying number string that is connected to a user's Facebook profile.  Anyone with access to a user's Facebook ID can locate a user's Facebook profile.

175.    Unique identifiers such as a person's Facebook ID are likewise capable of collection through pixel trackers.

176.    Each of the individual data elements described above is personally identifiable on their own.  However, Defendants' disclosures of such personally identifiable data elements do not

---

[13] https://www.blog.google/products/chrome/building-a-more-private-web/

[14] https://pixelprivacy.com/resources/browser-fingerprinting/

[15] https://www.blog.google/products/chrome/building-a-more-private-web/

[16]https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

**D. Facebook's Business Model: Exploiting Users' Personal Information for Profit**

177.    Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

178.    Facebook describes itself as a "real identity" platform.[17] This means that users are permitted only one account and must share "the name they go by in everyday life."[18] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[19]

179.    In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[20] Facebook has since evolved into one of the largest advertising companies in the world.[21] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[22] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[23]

180.    Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion

---

[17]    https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.

[18] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/

[19] https://www.facebook.com/help/406644739431633

[20] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/

[21] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/

[22] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[23] https://www.facebook.com/business/ads/ad-targeting

users.[24]  Facebook generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising.

181.    Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

182.    Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

183.    Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[25] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

184.    Defendants used the Meta Pixel on their Web Properties for their own purposes of marketing and profits.

---

[24] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

[25] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

185.    In exchange for disclosing patients' personally identifiable information, Defendants receive compensation from Facebook in the form of enhanced advertising services and more cost-efficient marketing on Facebook.

186.    Based on information and belief, Defendants were advertising their services on Facebook, and the Meta Pixel was used to help Defendants which types of ads and platforms were getting the most engagement.

187.    Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

188.    Upon information and belief, Defendants re-targeted patients and potential patients to get more patients to use their services. These patients include Plaintiffs and Class Members.

189.    By utilizing the Meta Pixel, the cost of advertising and retargeting was reduced, thereby benefitting and enriching Defendants.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

190.    To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

191.    One of Facebook's most powerful tools is called the "Meta Pixel."

192.    The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[26] Once activated, the Meta Pixel "tracks the people and type of actions they take."[27] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[28] The Meta Pixel

---

[26] https://developers.facebook.com/docs/meta-pixel/

[27] https://www.facebook.com/business/goals/retargeting

[28] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

code works by sending Facebook a detailed log of a user's interaction with a website such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled.[29]

193.   When a patient uses their healthcare provider's website or application where the Meta Pixel is present, the Meta Pixel transmits the content of their communications to Facebook, including but not limited to (1) signing up for a patient portal, (2) signing-in and -out of a patient portal, (3) taking actions inside a patient portal, (4) making or scheduling appointments, (5) exchanging communications related to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions, (6) conduct a search on a Facebook partner website, and (7) other information that qualifies as personal health information under state and federal laws.

194.   In many circumstances, Facebook also obtains information from health care providers that identify a Facebook user's status as a patient and other health information that is protected by state and federal law.  This occurs through tools that Facebook encourages health care providers to use to upload customer (i.e., patient) lists for use in its advertising systems.

195.   The information transmitted from a health care provider's website or application is sufficient to uniquely identify a patient under federal law (such as IP addresses and device identifiers that Facebook associates with a patient's Facebook account), and may also include a patient's demographic information, email address, phone number, computer ID address, contact information, appointment type and date, treating physicians, button and menu selections, the content of buttons clicked, information typed into text boxes, and information about the substance, purport, and meaning of patient requests for information from their health care providers.

---

[29] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

196. When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[30] This information is disclosed to Facebook regardless of whether a user is logged into their Facebook account at the time.

197. The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

198. The transmission is invisible.

199. The transmission is made without any affirmative action taken by the patient.

200. The transmission occurs without any notice to the patient that it is occurring.

201. Facebook collects the transmitted identifiable health information and uses "cookies" to match it to Facebook users, allowing Facebook to target ads to a person who, for example, has used a patient portal and has exchanged communications about a specific condition, such as cancer.

202. The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identifiable information of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[31] When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them. Thus, the URL provides significant information regarding a user's browsing history, including identifiable information for the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

203. These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this

---

[30] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

[31] *In re Facebook*, 956 F.3d at 596.

manner, Facebook tracks users' browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[32]

204.    For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifiable information like IP addresses, Facebook IDs, user agent information, device identifiers, and other data. All of this personally identifiable data is available each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

205.    These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible.  Facebook's Meta Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[33]

206.    In exchange for installing its Meta Pixel, Facebook provides website owners like Defendants with analytics about the ads they have placed on Facebook and Instagram and tools to target people who have visited their websites.[34]  The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[35]

---

[32] *In re Facebook*, 956 F.3d at 596.

[33] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

[34] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

[35] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

207.    Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

208.    Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[36] According to Facebook, the Meta Pixel is an analytics tool that allows businesses to measure the effectiveness of their advertising by understanding the actions people take on their websites."[37]

209.    Facebook warns web developers that its Pixel enables Facebook "to match your website visitors to their respective Facebook User accounts."[38]

210.    Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[39]

211.    Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[40] Facebook builds user profiles on users that include the user's real name, address, location, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, such as IP addresses and the Facebook ID. Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

---

[36] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/

[37] https://www.oviond.com/understanding-the-facebook-pixel

[38] https://developers.facebook.com/docs/meta-pixel/get-started

[39] https://developers.facebook.com/docs/meta-pixel/get-started

[40] https://developers.facebook.com/docs/meta-pixel/

212.    Facebook tracks non-Facebook users through its widespread internet marketing products and source code and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[41]

213.    For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.  The information is sent in data packets, which include personally identifiable data.

214.    For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[42]  HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[43]  Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[44]

215.    Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID.  Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile.  Facebook stores this information on its servers, and, in some instances, maintains this information for years.[45]

216.    Facebook has a number of ways to exploit the data is being forwarded from third-party websites through the Meta Pixel.

217.    If a user has a Facebook account, the user data may be collected and linked to the individual user's Facebook account.  For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common

---

[41] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/

[42] https://developers.facebook.com/docs/meta-pixel/

[43] https://developers.facebook.com/docs/meta-pixel/

[44] https://developers.facebook.com/docs/meta-pixel/

[45]  https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

218.    Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[46]   The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[47]

219.    Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching.[48]  Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data.  Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

220.    While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[49]  In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[50]

221.    Facebook also receives personally identifiable information in the form of user's unique IP addresses that stay the same as users visit multiple websites.  When browsing a third-party website that has embedded Facebook code, a user's IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets.  The IP address enables Facebook to keep track of the website page visits associated with that address.

---

[46] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/

[47] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/

[48] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[49] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[50] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

222.    Facebook also places cookies on visitors' computers.  It then uses these cookies to store information about each user.  For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID.  The c_user cookie value is the Facebook equivalent of a user identification number.  Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

223.    The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie.  One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#."  For example, the c_user cookie for Mark Zuckerberg is 4.  Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

224.    Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser.  Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers.  Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[51] The fbp cookie, for example, is a Facebook identifier that is set by Facebook source code and associated with Defendants' use of the Facebook Tracking Pixel program.  The fbp cookie emanates from Defendants' Web Properties but is transmitted to Facebook through cookie synching technology that Facebook employs. These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[52]

225.    Facebook also uses browser fingerprinting to uniquely identify individuals.  Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more.  Together, these attributes create a fingerprint that is highly distinctive.  The

---

[51] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.

[52] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.wexnermedical.osu.edu, and target users with advertising based on their web activity.

226.    Facebook then sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its official website.  This allows Facebook to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[53]   Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising.  Indeed, Facebook utilizes precisely the type of Personal Health Information that Defendants bartered to Facebook so that Facebook can identify, target, and market products and services to individuals.

**F. Defendants have embedded the Meta Pixel tool on their websites, resulting in the capture and disclosure of patients' and users' protected health information to Facebook.**

227.    A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

228.    Facebook's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what

---

[53] https://www.facebook.com/business/ads/ad-targeting

the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[54] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

229.    Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[55] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[56] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

230.    Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[57] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[58]

231.    For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

232.    Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Facebook code embedded

---

[54] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[55] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[56] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/

[57] https://instapage.com/blog/meta-pixel

[58] https://instapage.com/blog/meta-pixel

on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

233.    Defendants are among the hospital systems who have embedded Meta Pixel on their websites. When a prospective or actual patient enters their personal information through Defendants' websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what such patient is being treated for, is immediately and instantaneously transmitted to Facebook via the Meta Pixel. The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.  Thus, without its patients' consent, Defendants have effectively used their source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Facebook to listen in on and receive all their communications with Defendants, including patients' most private and sensitive health data.

234.    This data, which can include health conditions (e.g., addiction, HIV, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifying information ("Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

235.    The tracking pixels that Defendants installed on their websites and patient portals have unique identifiers, which can be used to identify the exact website pages that Defendants' patients visited.

236.    The tracking pixels that Defendants installed on their websites were triggered each time that Plaintiffs and the Class Members communicated with Defendants via Tenet Health websites and patient portals.  Upon triggering these pixels, Plaintiffs' and Class Members' communications were intercepted, duplicated, and secretly transmitted to Facebook, Google, and other third parties at the same time that Plaintiffs' and Class Members' communications were dispatched to Defendants.  Source code on Defendants' websites commanded Plaintiffs' and Class Members' browsers to create two simultaneous communications once Plaintiffs and Class

Members initiated an action on Defendants' websites: one, as intended, to Defendants; and a second, undetectable duplicate transmitted to third parties like Facebook and Google.

237.    The various websites operated by Defendants share an essentially identical design and configuration. On information and belief, each individual website at issue is built from a common template that Tenet Healthcare Corporation provides and requires, which the individual hospital defendants, including Doctors Medical Center of Modesto, Twin Cities, and Desert Regional, simply adopt with minor cosmetic changes. The underlying source code, however, including the installation of hidden tracking pixels is the same across Defendants' websites, which results in patients' personal health information being transmitted without their knowledge or consent every time they visit Defendants' websites.

238.    For example, a visitor searching for a doctor on the Doctors Medical Center of Modesto website is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's location, and the patient's gender and language preferences:

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL



239.    All this data is disclosed to Facebook simultaneously in real time as visitors transmitted their information, along with other data, such as the patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. The website also discloses other personally identifiable information to Facebook, such as patient and user IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.  The website also discloses the same kind of information to Google Analytics and Google Double Click every time a patient fills out the above form.  The identical kinds of unauthorized disclosures are made every time a patient interacts with the "Find A Doctor" function at any of the Tenet Health Web Properties.

240.    As the HHS has explained, such information is protected health information, even if a visitor has no prior relationship with a hospital system like Tenet Health, because the information connects the individual to a HIPAA-covered entity and thus relates to the provision of care to an individual.

241.    Defendants disclose such personally identifiable information and sensitive medical information even when patients or users are searching for doctors to assist them with conditions such as cancer or pregnancy:



242.    Likewise, a prospective or current patient who desires an appointment with a doctor is asked to fill out an extensive online questionnaire, which includes information such as the patient's name, the patient's social security number, the patient's address and phone number, the patient's marital status, the patient's insurance coverage, and related information:

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL



243.    When a patient submits these forms, information is acquired by Defendants and forwarded to Facebook, via tracking devices that Defendants have installed on their websites. The information that is transmitted when patients make appointments to see treating physicians through Defendants' websites, includes personally identifying information such as patients' names and contact information, as well as details about their appointments.

244.    Likewise, Defendants also offer online assessments of medical conditions, including "Bariatric Surgery," "Breast Cancer," "Colorectal Cancer," "Hip Pain," and "Heart Health."





245.    When a patient fills out these assessments, Defendants share information about these forms with Facebook and Google, including information about the specific assessment that a patient is completing, along with personally identifiable information such as their IP addresses and Facebook IDs.

246.    Likewise, Tenet Healthcare's website located at http://www.tenethealthcentralcoast.com offers patients the ability to make OB/GYN appointments directly through its website at https://www.tenethealthcentralcoast.com/services/obstetrics:

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

# **Request an OB/GYN Referral**

First Name: *

Jancie

Last Name: *

Doe

Email: *

janicedoe@gmail.com

Zip Code: *

99302

Phone: *

999-999-9999

Date of Birth: *

06/04/2023

SUBMIT

247.    When a patient filled out this form and clicked "submit," shared all of the patients' details with third parties, including the patient's name, email address, telephone number, date of birth, zip code, and phone number.

248.    In other words, third parties like Facebook and Google learned not just that patients were seeking treatment, but where and typically when they were seeking treatment, along with other information that patients would reasonably assume that Defendants are not sharing with third party marketing companies.

249.    Defendants also disclosed patient information from across their websites including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for services offered by Defendants, communications made by patients using the website's Bill Pay function, communications made when patients access Defendants' patient portal, and communications made when patients are researching specific medical conditions such as COVID-19.

250.    Facebook's Meta Pixel collects and forwards this data to Facebook, including the full referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and

even the type of browser used.  In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient. The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

251.    The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendants' websites.  The path identifies where a file can be found on a website.  For example, a patient reviewing information about the "Services" that Doctors Medical Center of Modesto offers patients such as information about weight loss will generate a URL with the path https://www.dmc-modesto.com/services/bariatric-surgery.

252.    Likewise, a query string provides a list of parameters.  An example of a URL that provides a query string is https://www.dmc-modesto.com/search?indexCatalogue=dmc-modesto-search&searchQuery=pregnancy&wordsMode=AllWords.   The query string parameters in this search indicate that a search was done at the Doctors Medical Center website for information about pregnancy.  In other words, the Meta Pixel captures information that connects a particular user to a particular healthcare provider.

253.    Defendants also provide Facebook and Google with details about online forms that patients fill out in the form of POST requests.  All the information that patients provide when filling out these forms is also disclosed to Facebook and Google.

254.    As the above demonstrates, knowing what information a patient is reviewing on Defendants' websites can reveal deeply personal and private information.  For example, a simple search for "pregnancy" on Defendants' websites tells Facebook that the patient is likely pregnant. Indeed, Facebook might know that the patient is pregnant before the patient's close family and friends.  But there is nothing visible on Defendants' websites that would indicate to patients that, when they use Defendants' search function, their personally identifiable information and the precise content of their communications with Defendants are being automatically captured and made available to Facebook, who can then use that information for advertising purposes even

when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

255.    The amount of data collected is significant.  Via the Meta Pixel, when patients interact with their websites, Defendants disclose a full-string, detailed URL to Facebook, which contains the name of the website, folder and sub-folders on the webserver, and the name of the precise file requested.  For example, when a patient types a search term into the search bar on Defendants' websites, the website returns links to information relevant to the search term.  When patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

256.    The contents of patients' search terms shared with Facebook plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Defendants' websites.  Worse, no matter how sensitive the area of the Defendants' websites that a patient reviews, the referral URL is acquired by Facebook along with other personally identifiable information.

257.    The nature of the collected data is also important.  Defendants' unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition.  Facebook is then able to correlate that history with the time of day and other user actions on Defendants' websites.  This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

258.    Tenet Healthcare also discloses the same kind of patient data described above to other third parties involved in internet marketing, including Google, YouTube, Marketo, insight.adsrvr.org, heapanalytics.com, Cloudfare, New Relic, and siteimproveanalytics.com via tracking software that Tenet Healthcare has installed on its websites.  As with the Facebook Meta Pixel, Defendants provide patients and prospective patients with no notice that Defendants are disclosing the contents of their communications to these third parties.  Likewise, Defendants do

not obtain consent from patients and prospective patients before forwarding their communications to these companies.

259.    These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[59]  Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers.  Defendants routinely disclose patients' Personal Health Information to such Google services as Google Analytics, Google DoubleClick, and Google AdWords.

260.    Google cookies provide personally identifiable data about patients who visit Defendants' websites to Google.  Defendants transmit personally identifiable Google cookie data to Google.

261.    Google warns web-developers that Google marketing tools are not appropriate for health-related webpages and websites.  Indeed, Google warns web developers that "Health" is a prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

262.    Defendants deploy Google tracking tools on nearly every page of their websites, resulting in the disclosure of communications exchanged with patients to be transmitted to Google.  These transmissions occur simultaneously with patients' communications with Defendants and include communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, payments, and registrations and logins to Defendants' patient portal.

263.    By compelling visitors to their websites to disclose personally identifiable data and sensitive medical information to Facebook, Defendants knowingly disclose information that allows Facebook and other advertisers to link patients' and visitors' Personal Health Information

---

[59] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

to their private identities and target them with advertising. (or do whatever else Facebook may choose to do with this data, including running "experiments" on its customers by manipulating the information they are shown on their Facebook pages).[60] Defendants intentionally shared the Personal Health Information of their patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

264.    For example, Tenet Healthcare facilitated the disclosure of Plaintiff Jane Doe's Personal Health Information, including sensitive medical information, to Facebook and Google without her consent or authorization when she entered information on the website that Tenet Healthcare maintain at https://www.dmc-modesto.com/, with the result that Plaintiff's Personal Health Information was improperly accessed and reviewed by one more third parties.

265.    Plaintiff Jane Doe is an individual with a Facebook account who is also a patient of Tenet Healthcare and who has received treatment by Tenet Healthcare's doctors at Tenet Healthcare's medical facilities, including Doctors Medical Center of Modesto. Plaintiff Jane Doe became a Tenet Healthcare patient in 2018. Beginning in 2018, Plaintiff Jane Doe began regularly using the Doctors Medical Center of Modesto website and patient portal. Plaintiff Jane Doe used the Doctors Medical Center website and patient portal as recently as May 2023. During her interactions with the Doctors Medical Center website and patient portal, Plaintiff Jane Doe entered data, including sensitive medical information, such as details about her medical condition and search for a doctor. Plaintiff used the website for, among other things, to search for a doctor and review information related to her medical condition.

266.    For example, Plaintiff Jane Doe used the Doctors Medical Center website to find OB/GYN doctors and other health care professionals to obtain medical care for her pregnancy and for childbirth. Plaintiff Jane Doe used each of the following features on the Doctors Medical Center of Modesto website—the "Find A Doctor" function, the "Search" function, the "Services"

---

[60]    https://www.theatlantic.com/technology/archive/2014/06/everything-we-know-about-facebooks-secret-mood-manipulation-experiment/373648/

function—all of which had tracking pixels installed on them, resulting in the disclosure of her Personal Health Information to third parties without her consent.  The information that Plaintiff Jane Doe transmitted included queries about her pregnancy and related information that confirmed that she was pregnant and expecting to give birth.

267.    When interacting with the Doctors Medical Center of Modesto website, Plaintiff also communicated such specific details as her name, her patient status, the name of her specific treating physician, her browsing history, and the name of the specific medical conditions (pregnancy and childbirth) that she was seeking treatment for. All this information was shared with Facebook and Google by Tenet Healthcare as a result of tracking pixels that Tenet Healthcare installed on its websites and patient portals, including information about her pregnancy.

268.    Plaintiff Jane Doe has also regularly used the Doctors Medical Center patient portal since 2018.  Plaintiff Jane Doe also used the Doctors Medical Center of Modesto patient portal to review her medical records and test results.  During her interactions with the Doctors Medical Center patient portal, Plaintiff Jane Doe entered medical data, including information related to her pregnancies, into the patient portal.

269.    Unbeknownst to Plaintiff Jane Doe, Tenet Healthcare had installed tracking pixels on the "Portal" button on its webpage that patients like Jane Doe used to navigate to the patient portal.

Careers    About    Portal    Financial Resources    Bill Pay    | Find an ER |

270.    Plaintiff Jane Doe clicked on this button every time that she used the Doctors Medical Center of Modesto website to navigate to the patient portal.  When she did, Tenet Healthcare surreptitiously sent information to Facebook and Google confirming Plaintiff Jane Doe's patient status, including additional information—such as her IP address, Facebook ID, and browser fingerprint—that allowed Facebook and Google to identify her.

271.    Tenet Healthcare also installed tracking pixels on the webpage and login button for its patient portal:

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1
2
3
4
5
6
7
8
9



10
11    272.    Plaintiff Jane Doe visited this page and clicked on the login button every time that

12  she accessed the Doctors Medical Center patient portal.  Every time that she visited the patient

13  portal page, Tenet Healthcare surreptitiously transmitted information about Plaintiff Jane Doe to

14  Facebook and Google, including personally identifying information. Every time that Plaintiff

15  clicked on the login button to the patient portal, Tenet Healthcare surreptitiously confirmed

16  Plaintiff's patient status to Google, along with her personally identifying information, such as her

17  IP address and browser fingerprint.

18    273.    Tenet Health also installed tracking pixels inside its patient portal that

19  surreptitiously forward patient interactions to third parties, including Google.  Once Plaintiff Jane

20  Doe gained access to the patient portal, Tenet Healthcare continued to share information about

21  her interactions with Google, including actions such as reviewing medical records related to her

22  pregnancy.  Tenet Healthcare also shared information such as her IP address and browser

23  fingerprint that could be used to personally identify her.

24    274.    The kind of information that Tenet Healthcare shared about Plaintiff Jane Doe's

25  interactions with its website and patient portal could be combined with other information in

26  Facebook's possession, like Plaintiff's name, date of birth, and phone number, to more effectively

27  target Plaintiff with advertisements or sell Plaintiff's data to third parties.

28

275.    Indeed, after conducting searches for treatment options on the Doctors Medical Center of Modesto website, Plaintiff Jane Doe began receiving advertisements on her Facebook related to searches for medical information that she conducted on Doctors Medical Center of Modesto's website, including advertisements that related to her child's birth.

276.    Plaintiff Jan Doe has had a Facebook account since 2009.  Plaintiff Jane Doe has been a patient of Tenet Healthcare since 2016, and she has received treatment by Tenet Healthcare's doctors at facilities operated by Tenet Healthcare, including Hi-Desert Medical Center. Plaintiff Jan Doe has received treatment for multiple medical issues, including lung health and gastroenterology-related issues.  Since becoming a patient in 2016, Plaintiff has used the Desert Care Network website and the patient portals for the Desert Care Network and Hi-Desert Medical Center 3-4 times a year.  Plaintiff Jan Doe used both the website and the patient portal as recently as 2023.

277.    Plaintiff Jan Doe has used the Desert Care Network website to search for doctors, make emergency room appointments, and research details about potential medical treatments. During her interactions with the website, Plaintiff Jan Doe entered medical information about herself, including information relating to her inflammation issues and her searches for ophthalmologists, orthopedic surgeons, and rheumatologists who could provide her with treatment. Unbeknownst to Plaintiff Jan Doe, Tenet Healthcare had installed tracking pixels on every page of the Desert Care Network website.  As a consequence, Tenet Healthcare shared every communication that Plaintiff Jan Doe made with Facebook and Google, including individually identifying information such as her Facebook ID, IP address, and browser fingerprint and information about her inflammation-related conditions and searches for treating physicians.

278.    For example, the Desert Care Network website allows patients to make emergency room appointments:

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

279.     Every time that Plaintiff Jan Doe made an emergency room appointment through the website, Tenet Healthcare shared information confirming that Plaintiff Jan Doe had made an appointment with Google via tracking pixels, including personally identifying information such as Plaintiff Jan Doe's device identifiers, IP address, and browser fingerprint that Google could use to identify her.

280.     Plaintiff Jan Doe also regularly uses two different patient portals offered by Tenet Healthcare: the Hi-Desert patient portal (which she began using in 2016) and the Desert Care Network/Hi-Desert Medical Center patient portal (which she began using in 2019).  Plaintiff used both of these portals as recently as 2023.  Plaintiff uses these portals to review her medical records.

281.     Unbeknownst to Plaintiff Jan Doe, Tenet Healthcare installed tracking pixels on the buttons of its Desert Care Network website that patients use to navigate to and log into its patient portals.  Plaintiff Jan Doe clicked on these buttons every time that she used the Desert Care Network website to access her patient portals.  When she did so, Tenet Healthcare disclosed sensitive information about her to Facebook and Google, including her patient status, her Facebook ID, her IP address, and her browser fingerprint.

282.    Likewise, Tenet Healthcare also installed tracking pixels inside Plaintiff Jan Doe's patient portals.  During her interactions with her patient portals, Plaintiff Jan Doe entered medical information, including information related to her lung health and gastrointestinal issues, into the patient portals.  Tenet Healthcare shared details about these communications with third parties (including Google) as well, including information like her IP address, device identifiers, and browser fingerprints that could be used by Google to personally identify her.

283.    After visiting the Desert Care Network website and patient portal, Plaintiff Jan Doe began receiving targeting advertising on her Facebook page directed towards her medical conditions.

284.    Plaintiff John Doe is also an individual with a Facebook account.  Plaintiff John Doe has been a patient of Tenet Healthcare since 2023 and has received treatment by Tenet Healthcare doctors at Twin Cities Community Hospital.  Plaintiff John Doe began using the Tenet Healthcare website located at www.tenethealthcentralcoast.com in the spring of 2023 to search for billing options and would care treatment for a foot ulcer.  Plaintiff has used the website and the associated Tenet Health Central Coast/Twin Cities Community Hospital patient portal approximately 1-2 times a month since April of 2023.

285.    Like Tenet Healthcare's other websites, the Tenet Health Central Coast website offers a Search Box function on the main menu of its website:

| Find a Doctor | Find a Location | Services | Patients | Events | Health Assessments | Q |

286.    Among other things, Plaintiff John Doe used the Search Box function available on the Tenet Health Central Coast website to search for billing and treatment options.  During these interactions, Plaintiff John Doe typed a number of terms into the Search Box, including "Bills," "Billing," and "wound care."

287.     Plaintiff John Doe also used the Tenet Health Central Coast patient portal to pay and review bills.  During his interactions with Tenet Healthcare's patient portal, Plaintiff John Doe entered sensitive information, including information relating to his wound care and foot ulcer issues, into the patient portal.

288.     Unbeknownst to Plaintiff John Doe, Tenet Healthcare had installed tracking pixels on every page of its websites that resulted in all his communications with Tenet Healthcare being transmitted to Facebook and Google, including the specific search terms that he entered, the treatment options he reviewed, data about his treatment for would care, and other information (such as his Facebook ID, his IP address, and his browser fingerprint) that allowed Facebook and Google to personally identify him.

289.     Likewise, also unbeknownst to Plaintiff John Doe, Tenet Healthcare had also installed tracking pixels on the buttons of its Tenet Health Central Coast website that patients use to navigate to and log into its patient portals.  Plaintiff John Doe clicked on these buttons every time that he used the website to access his patient portal.  When he did so, Tenet Healthcare disclosed sensitive information about John Doe to Facebook and Google, including his patient status, his Facebook ID, his IP address, and his browser fingerprint.  Tenet Healthcare also installed tracking pixels inside its patient portal, resulting in information about John Doe's interactions inside the patient portal also being sent to third parties, including Google.

290.     After visiting the Tenet Health Central Coast website and patient portal, Plaintiff John Doe began receiving targeted advertising on his Facebook page related to his treatment for wound care.

291.     Plaintiff James Doe is also an individual with a Facebook account.  Plaintiff James Doe is a patient of Tenet Healthcare, who has received treatment for Tenet Healthcare doctors at facilities including Desert Regional Medical Center.  Plaintiff James Doe has been treated by Tenet Healthcare for a stomach virus and for anxiety-related issues.

292.   Plaintiff James Doe has been a Tenet Healthcare patient since 2020 and uses the Desert Care Network website multiple times a year to search for doctors, look up emergency room information, and research treatment options.   Plaintiff James Doe has used the Desert Care Network website as recently as January 2022.   During his interactions with the Desert Care Network website, Plaintiff James Doe entered medical data related to his health conditions, including information related to the anxiety-related issues for which he sought treatment.

293.   During his interactions with the Desert Care Network, Plaintiff James Doe also used the Search Box feature on multiple occasions.   For example, Plaintiff James Doe specifically entered the terms "IHP," "ER Insurance," and "Emergency Room" when using the Search Box feature that Tenet Healthcare offered.

294.   Unbeknownst to James Doe, Tenet Healthcare installed tracking pixels on its Desert Care Network website that shared all his communications with Facebook and Google, including the specific search terms that he entered and his individually identifying information such as his Facebook ID, IP address, and browser fingerprint.

295.   After visiting Tenet Healthcare's website, Plaintiff James Doe began receiving targeted advertising on his Facebook page, including advertisements for clinical trials and for the specific medication he had been prescribed by Tenet Healthcare (Clonazepam) related to the anxiety issues for which he had sought information on the Desert Care Network website.

296.   Because Defendants embedded the Meta Pixel on their websites, Defendants disclosed intimate details about Plaintiffs' and the Class Members' interactions with their websites, including when Plaintiffs and Class Members selected options from drop down menus. Each time the Meta Pixel was triggered, it caused Plaintiffs' and Class Members' information to be secretly transmitted to Facebook's servers, as well as additional information that captures and discloses the communications' content and Plaintiffs' and Class Members' identities.   For example, when Plaintiffs and Class Members visited Defendants' websites, their personal health information was transmitted to Facebook, including such engagement as using the website's

search bar, making appointments, using the website's Find a Doctor function, and typing content into online forms.  During these same transmissions, Defendants' websites would also provide Facebook with Plaintiffs' and Class Members' Facebook ID, IP addresses, device IDs, and other information that Plaintiffs and Class Members provided.  This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect the privacy of patients.

297.    Defendants knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiffs' and Class Members' Personal Health Information, including sensitive medical information and personally identifying data. Defendants were also aware that such information would be shared with Facebook simultaneously with patients' interactions with their websites. Defendants were also aware that installing the Meta Pixel tool would result in one or more unauthorized persons at Facebook and Google viewing the Personal Health Information of Defendants' patients, including the Personal Health Information of Plaintiffs and Class Members. Defendants' decision to affirmatively communicate and share their patients' Personal Health Information with Facebook, Google, and those companies' employees violates the numerous protections afforded by California law.

298.    One or more persons at Facebook and Google viewed Plaintiffs' and Class Members' Personal Health Information as a consequence of Defendants' installation of the Meta Pixel on its Web Properties. After Plaintiffs' and Class Members' Personal Health Information had been intercepted and collected, individuals at Facebook processed, analyzed, and assimilated Plaintiffs' and Class Members' Personal Health Information into data sets like "Core Audiences" and "Custom Audiences" for the purpose of targeting Plaintiffs and Class Members with advertising.

299.    Defendants also knew that installing the Meta Pixel on their website would result in their patients' Personal Health Information being improperly accessed by Facebook and its employees so that Facebook could sell advertising.  Defendants made the decision to barter their

patients' Personal Healthcare Information to Facebook because they wanted access to the Meta Pixel tool.  While that bargain may have benefited Defendants and Facebook, it also betrayed the privacy rights of Plaintiffs and Class Members.

**G. Defendants' interception and disclosure of patient communications permits Facebook, Google, and other third-party advertising companies to engage in cross-device targeting across multiple devices.**

300.    In addition to enabling Defendants to advertise to patients and potential patients on non-Defendant websites, Defendants' misuse and exploitation of patient data and communications also facilitates third parties' ability to target advertisements on other computing devices that a patient uses.  This is called cross-device targeting.

301.    Third parties including Facebook and Google have established a unique ID for individuals that tie together their desktop, laptop, and smartphone computing devices.  For example, even if a patient has never visited Defendants' websites on their smartphone, cross-device tracking and marketing allows Defendants and other third parties to target patients on that device.  In other words, a patient or potential patient who visited Defendants' websites on his desktop, but never on his smartphone, can nevertheless be targeted with advertisements by both Defendants and other third parties on his smartphone.

302.    Defendants' and other third parties' use of cross-device targeting demonstrates that the data Defendants disclose to third parties is personally identifiable because it enables patients to be tracked across multiple devices that patients own—even if a patient has never communicated with Defendants on one or more of their devices.

303.    Defendants have made the decision that access to the targeted advertising (including retargeting and cross-device tracking) that is enabled by their disclosure of patient data and communications is of commercial benefit to Defendants.

304.    Defendants obtain additional revenue from their deployment of third-party tracking tools through which they disclose personally identifying patient data and communications to third parties, including Google and Facebook.

305.    Any additional revenue that Defendants obtained from their unauthorized misuse of their own patients' Personal Health Information is unearned and is the rightful property of the patients (including Plaintiffs and Class Members) from whom it was obtained.

306.    Defendants' unauthorized disclosure and misuse of Plaintiffs' and Class Members' Personal Health Information is a form of theft, for which the victims are entitled to recover anything acquired with the stolen assets, even if the items acquired have a value that exceeds the value of that which was stolen.

**H.  Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

307.    Plaintiffs and Class Members had no idea when they interacted with Defendants' websites that their personal data, including sensitive medical data, was being collected and simultaneously transmitted to Facebook. That is because, among other things, the Meta Pixel tool is seamlessly and secretly integrated into Defendants' websites and is invisible to patients visiting those websites.

308.    For example, when Plaintiffs  Jane Doe visited Tenet Healthcare's websites  there was no indication that the Meta Pixel was embedded on that website or that it would collect and transmit their sensitive medical data to Facebook.  Nor did Plaintiffs  receive any notice or indication when they visited the websites that their Personal Health Information was being collected, transmitted, and monitored by Facebook for advertising purposes.

309.    It is against the law for Defendants to disclose individually identifying health information without giving appropriate notice to the patient and obtaining written consent.

310.    Defendants do not have a legal right to share Plaintiffs' and Class Members' Protected Health Information with Facebook, because this information is protected from such disclosure by law. *See, e.g.*, CAL. CIV. CODE §§ 56 *et seq.*; 45 C.F.R. § 164.508. Defendants are also not permitted to disclose patients' Protected Health Information to advertising and marketing companies like Facebook and Google without express written authorization from patients.

311.     In 2001, pursuant to HIPAA, the United States Department of Health and Human Services established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule"), which require that healthcare providers safeguard and protect their patients' Personal Health Information.[61]  Under HIPAA, healthcare providers are prohibited from disclosing individuals' Personal Health Information without express written authorization.

312.     In December 2022, the Office for Civil Rights at HHS issued a Bulletin reminding healthcare providers that they are prohibited from transmitting their patients' individually identifiable health information via tracking technology like the Meta Pixel without a patient's authorization and other protections like a business associate agreement with the recipient of the patient data:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[62]

313.     As the bulletin makes clear, the disclosure of Plaintiffs' and Class Members' Personal Health Information via the tracking pixels contravenes both the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" which govern how health care providers must safeguard and protect Personal Health Information.

314.     The bulletin also discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to

---

[61]https://aspe.hhs.gov/standards-privacy-individually-identifiable-health-information#:~:text=The%20Privacy%20Rule%20establishes%20a%20federal%20requirement%20that%20most%20doctors,health%20care%20operations%20(TPO).

[62] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html,    HHS.GOV (emphasis added) (last visited May 12, 2023).

the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, **discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.** Such disclosures can reveal incredibly sensitive information about an individual, **including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[63]

315. Plaintiffs and Class Members face the same risks the government is warning about. Defendants have shared Plaintiffs' and Class Members' search terms about health conditions for which they seek doctors; their contacts with doctors to make appointments; the names of their doctors; the frequency with which they take steps to obtain healthcare for certain conditions; and where they seek medical treatment. This information is, as described by the OCR bulletin, "highly sensitive." The Bulletin goes on to make clear how broad the government's view of protected information is. It explains: "This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, *or any unique identifying code.*"[64]

316. Crucially, the government's Bulletin also provides that HIPAA protects the medical information of both patients and *prospective patients* from unauthorized disclosures:

All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care

---

[63]    *Id.* (emphasis added.)
[64]    *Id.* (emphasis added.)

services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[65]

317.    Likewise, after it became public knowledge that healthcare companies had been sharing their customers' medical information with Facebook and Google via tracking technologies, the FTC instituted a series of enforcement actions, including lawsuits against BetterHelp, GoodRx, Premom, and Vitagene.  These lawsuits, which resulted healthcare companies paying millions of dollars in fines, underscore that healthcare companies violate federal law by failing "to get consumers' affirmative express consent for the disclosure of sensitive health information."[66]

318.    In July 2023, the HHS and the FTC issued a joint letter to approximately 130 hospitals to emphasize the risks and concerns about the use of technologies, such as the Facebook Meta Pixel, which can track a user's online activities. The joint letter emphasized the HHS and the FTC's concerns about the "serious privacy and security risks related to the use of online tracking technologies" on websites that "impermissibly disclos[e] consumers' sensitive personal healthy information to third parties."[67]  As the agencies noted in an accompanying press release, "When consumers visit a hospital's website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties."[68]

319.    Defendants failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications by third parties for their own direct marketing uses. Moreover, no *additional* privacy breach by Facebook is necessary for harm to have accrued to Plaintiffs and Class Members; the secret disclosure by Defendants of their patients'

---

[65]    *Id.*

[66]    https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases

[67] July 20, 2023 Office of Civil Rights Memo re "Use of Online Tracking Technologies."

[68]    https://www.hhs.gov/about/news/2023/07/20/hhs-office-civil-rights-federal-trade-commission-warn-hospital-systems-telehealth-providers-privacy-security-risks-online-tracking-technologies.html

Personal Health Information to Facebook means that a significant privacy injury has *already occurred.*

320.    Likewise, a prospective or current patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendants expressly promised that they  would not sell, rent, license, or trade their personally identifiable information for marketing purposes without express authorization.

321.    Accordingly, Defendants lacked authorization to intercept, collect, and disclose Plaintiffs' and Class Members' Personal Health Information to Facebook or aid in the same.

**I.  The disclosures of patients' Personal Health Information are unnecessary.**

322.    There is no information anywhere on the websites operated by Defendants that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are the disclosures of patient Personal Health Information to Facebook necessary for Defendants to maintain their healthcare website or provide medical services to patients.

323.    For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook. Likewise, it is possible for Defendants to provide medical services to patients without sharing their Personal Health Information with Facebook so that this information can be exploited for advertising purposes.

324.    Despite these possibilities, Defendants willfully chose to implement Meta Pixel on their websites and aid in the disclosure of personally identifiable information and sensitive

medical information about their patients, as well as the contents of their communications with Defendants, to third-parties, including Facebook.

**J. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

325.   Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendants' surreptitious interception, collection, and disclosure of Personal Health Information to Facebook violated Plaintiffs' and Class Members' privacy interests.

326.   As patients, Plaintiffs had a reasonable expectation of privacy that their health care provider and its associates would not disclose their Personal Health Information to third parties without their express authorization.

327.   The original Hippocratic Oath, circa 400 B.C., provided that physicians must pledge, "What I may see or hear in the course of treatment or even outside of the treatment in regard to the life of man, which on no account must be spread abroad, I will keep to myself holding such things shameful to be spoken about."[69]

328.   The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[70]  Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.  For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care.  However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust….Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should … [m]inimize intrusion on privacy when the patient's privacy must be balanced

---

[69] *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 671 n.1 (Mo. 1993).

[70] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html

against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[71]

329.   The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." [72]

330.   Patient health information is specifically protected by law. The prohibitions against disclosing patient Personal Health Information include prohibitions against disclosing personally identifiable data such as patient names, IP addresses, and other unique characteristics or codes. *See, e.g.*, CAL. CIV. CODE § 56.05 ("medical information"); 45 C.F.R. § 164.514.

331.   Plaintiffs' and Class Members' reasonable expectations of privacy in their Personal Health Information are grounded in, among other things, Defendants' status as health care providers, Defendants' common-law obligation to maintain the confidentiality of patients' Personal Health Information, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Defendants' express and implied promises of confidentiality.

332.   Given the application of these laws to Defendants, Plaintiffs and the Members of the Class had a reasonable expectation of privacy in their protected health information.

333.   Indeed, several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

---

[71]   https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).

[72]   https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).

334.    Polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

335.    For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[73]

336.    Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[74]

337.    "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557 (2009).

338.    The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying

---

[73] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

[74] https://www.wired.co.uk/article/apple-ios14-facebook

about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[75]

339.    Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's Personal Health Information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**K. Plaintiffs' and Class Members' Personal Health Information that Defendants collected, disclosed, and used has economic value, and its disclosure has caused Plaintiffs and Class Members harm.**

340.    Plaintiffs' Personal Health Information that Defendants collected, monitored, disclosed, and used is Plaintiffs' property, has economic value, and its illicit disclosure has caused Plaintiffs harm.

341.    It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendants have collected and disclosed from Plaintiffs and Class Members.

342.    For example, Facebook does not offer its Meta Pixel to companies like Defendants solely for Defendants' benefit.  "Data is the new oil of the digital economy," and Facebook has built its business on harvesting and refining that "digital oil."[76]  For just this reason, the significant volumes of patients' Personal Health Information that Defendants provide to Facebook is actively reviewed, analyzed, examined, curated, and exploited by Facebook.  Facebook acquires this health data to transform it into a monetizable commodity, just like an oil company acquires crude oil for the purpose of transforming it into gasoline.  While Facebook offers its Meta Pixel free of

---

[75] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

[76] https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/#:~:text=Data%20in%20the%2021st%20Century,is%20more%20valuable%20than%20ever.

charge to Defendants, the "price" that Defendants pay for using the pixel is the patient data that they provide to Facebook.

343.    Data harvesting is the fastest growing industry in the nation. As software, data mining, and targeting technologies have advanced, the revenue from digital ads and the consequent value of the data used to target them have risen rapidly.

344.    In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[77]

345.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[78] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[79]

346.    In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[80] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[81]

347.    Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider

---

[77] https://ig.ft.com/how-much-is-your-personal-data-worth/

[78] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[79] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[80] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

[81] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[82]

348.    Further demonstrating the financial value of Class Members' medical data, CNBC has reported that hospital executives have received a growing number of bids for user data:

> Hospitals, many of which are increasingly in dire financial straits, are weighing a lucrative new opportunity: selling patient health information to tech companies. Aaron Miri is chief information officer at Dell Medical School and University of Texas Health in Austin, so he gets plenty of tech start-ups approaching him to pitch deals and partnerships. Five years ago, he'd get about one pitch per quarter. But these days, with huge data-driven players like Amazon and Google making incursions into the health space, and venture money flooding into Silicon Valley start-ups aiming to bring machine learning to health care, the cadence is far more frequent. "It's all the time," he said via phone. "Often, once a day or more."

> * * *

> [H]ealth systems administrators say [the data] could also be used in unintended or harmful ways, like being cross-referenced with other data to identify individuals at higher risk of diseases and then raise their health premiums, or to target advertising to individuals.[83]

349.    The CNBC article also explained:

> [D]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers. Just one company alone, IQVIA, said on its website that it has access to more than 600 million patient records globally that are nonidentified, much of which it accesses through provider organizations. The buyers, which include pharma marketers, will often use it for things like clinical trial recruiting But hospital execs worry that this data may be used in unintended ways, and not always in the patient's best interest.

350.    Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[84] and has paid

---

[82]    https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/;    *see    also* https://slate.com/technology/2022/06/health-data-brokers-privacy.html

[83]    Christina Farr, *Hospital execs say they are getting flooded with requests for your health data* (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html, CNBC.COM (last visited April 30, 2023).

[84]    https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-

teenagers and adults up to $20 per month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[85]

351.    A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[86]

352.    Defendants' unauthorized disclosure harmed Plaintiffs and Class Members, robbing them of the value of their Personal Health Information.  Conservative estimates suggest that in 2018, internet marketing companies like Facebook and Google earned $202 per American user from mining and selling their data.  More recent estimates are as high as $434 per user.

353.    Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendants have deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook without consideration for Plaintiffs' and the Class Members' property.

**L.  Defendants are enriched by making unlawful, unauthorized, and unnecessary disclosures of patients' and users' protected health information.**

354.    In exchange for disclosing Personal Health Information about its patients and users, Defendants are compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions. For example, one hospital system, Aurora Advocate Health, recently explained that it had installed the Meta Pixel tool and similar technologies "to gather information that we review in aggregate so that we can better understand patient needs and preferences."[87]   Likewise, a second hospital system, WakeMed, recently explained that it had installed the Meta Pixel tool "to optimize the functionality of our websites so that we can improve the user experience."[88]

---

prounuciations-app

[85] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

[86] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

[87]    https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3

[88]https://www.wakemed.org/patients-and-visitors/patient-rights-and-privacy-policies/meta-pixel-

355.    Similarly, retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Hospital systems using the Meta Pixel can also take advantage of retargeting to display ads to "target audiences" composed of visitors to their websites.

356.    Once an individual's data is disclosed and shared with a third-party marketing company, however, the advertiser is able to show ads to the user elsewhere on the internet.

357.    Retargeting allows third party advertisers to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website.  Using the Meta Pixel, a company could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

358.    Worse, once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendants lose the ability to control how that information is subsequently disseminated and exploited.

359.    The monetization of the data being disclosed by Defendants, both by Defendants and Facebook, demonstrates the inherent value of the information being collected.

**M.  Facebook's history of egregious privacy violations.**

360.    Defendants knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

361.    Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

---

privacy#:~:text=Protecting%20the%20privacy%20and%20security,(now%20Meta)%20in%20error.

362.    In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

363.    In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[89]

364.    Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.

365.    In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytica may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

366.    Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[90] Some companies were even able to read users' private messages.

---

[89] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter

[90] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html

367.    In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[91] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

368.    On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the receipt of sensitive data."[92]

369.    The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[93] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and

---

[91] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/

[92] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf

[93] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

1    Flurry. The FTC reported that Flo "took no action to limit what these companies could do with

2    users' information."[94]

3        370.    More recently, Facebook employees admitted to lax protections for sensitive user

4    data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that

5    "We do not have an adequate level of control and explainability over how our systems use data,

6    and thus we can't confidently make controlled policy changes or external commitments such as

7    'we will not use X data for Y purpose.'"[95]

8        371.    These revelations were confirmed by an article published by the Markup on June

9    16, 2022, which found during the course of its investigation that Facebook's purported "filtering"

10   failed to discard even the most obvious forms of sexual health information. Worse, the article

11   found that the data that the Meta Pixel was sending Facebook from hospital websites not only

12   included details such as patients' medications, descriptions of their allergic reactions, details about

13   their upcoming doctor's appointments, but also included patients' names, addresses, email

14   addresses, and phone numbers.[96]

15       372.    Despite knowing that the Meta Pixel code embedded in their websites was sending

16   patients' Personal Health Information to Facebook, Defendants did nothing to protect patients and

17   users from egregious intrusions into patient privacy, choosing instead to benefit at those patients'

18   and users' expense.

19   **N. Defendants' failure to inform their patients and prospective patients that their Personal
     Health Information has been disclosed to Facebook or to take any steps to halt the
20   continued disclosure of patients' Personal Health Information is malicious, oppressive,
     and in reckless disregard of Plaintiffs' and Class Members' rights.**

21
22       373.    Hospital systems, like other businesses, have a legal obligation to disclose data

23   breaches to their customers.  *E.g.* Cal. Civ. Code § 1798.82.

24

25   ───────────────
     [94] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

26   [95] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes

27   [96]  https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-
     websites

28

374.    After publication of the Markup's investigative article in June 2022, hospital systems around the United States began self-reporting data breaches arising from their installation of pixel technology on their websites.[97]

375.    For example, in August 2022, Novant Health informed approximately 1.3 million patients that their medical data was disclosed to Facebook due to the installation of the Facebook Meta Pixel on the hospital system's websites.[98]   Novant Health's data breach announcement conceded that the Meta Pixel tool installed on its websites "allowed certain private information to be transmitted to Meta from the Novant Health website."[99] Novant Health further admitted that the information about its patients that was disclosed to Facebook included "an impacted patient's: demographic information such as email address, phone number, computer IP address, and contact information entered into Emergency Contacts or Advanced Care Planning; and information such as appointment type and date, physician selected, button/menu selections, and/or content typed into free text boxes."[100]

376.    Likewise, in October 2022, Advocate Aurora Health informed approximately 3 million patients that their Personal Health Information had been disclosed to Facebook via the Meta Pixel installed on Advocate Aurora Health's website.[101]

377.    Advocate Aurora Health's data breach notification conceded that patient information had been transmitted to third parties including Facebook and Google when patients used the hospital system's website.[102]

---

[97]        https://www.scmagazine.com/analysis/breach/pixel-fallout-expands-community-health-informs-1-5m-of-unauthorized-disclosure

[98]  https://www.scmagazine.com/analysis/breach/1-3m-novant-health-patients-notified-of-unintended-disclosure-via-facebook-pixel

[99]  https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx

[100]        https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx

[101]        https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3

[102] https://www.advocateaurorahealth.org/

378.    Advocate Aurora Health further admitted that a substantial amount of its patients' Personal Health Information has been shared with Facebook and Google including patients' "IP address; dates, times, and/or locations of scheduled appointments; your proximity to an Advocate Aurora Health location; information about your provider; [and] type of appointment or procedure."[103]  Even more troubling, Advocate Aurora Health admitted that "[w]e cannot confirm how vendors used the data they collected."[104]

379.    Advocate Aurora Health claimed that, in conjunction with its data breach notice, the hospital system had "disabled and/or removed the pixels from our platforms and launched an internal investigation to better understand what patient information was transmitted to our vendors."[105]  Advocate Aurora Health also promised its 3 million patients that the company had instituted an "enhanced, robust technology vetting process" to prevent such disclosures of its patients' Personal Health Information in the future.[106]

380.    Similarly, in October 2022, WakeMed notified more than 495,000 patients that their Personal Health Information had been transmitted to Facebook through the use of tracking pixels installed on its websites.[107]  In announcing this data breach, WakeMed admitted that the Facebook Meta Pixel tool had been installed on its website resulting in the transmission of patient information to Facebook.[108]  WakeMed further admitted that "[d]epending on the user's activity, the data that may have been transmitted to Facebook could have included information such as: email address, phone number, and other contact information; computer IP address; emergency contact information; information provided during online check-in, such as allergy or medication

---

[103] https://www.advocateaurorahealth.org/pixel-notification/faq

[104] https://www.advocateaurorahealth.org/pixel-notification/faq

[105] https://www.advocateaurorahealth.org/pixel-notification/faq

[106] https://www.advocateaurorahealth.org/pixel-notification/faq

[107] https://healthitsecurity.com/news/wakemed-faces-data-breach-lawsuit-over-meta-pixel-use

[108]     https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

information; COVID vaccine status; and information about an upcoming appointment, such as appointment type and date, physician selected, and button/menu selections."[109]

381.   WakeMed also conceded that it had no idea what Facebook had done with the Personal Health Information that WakeMed had disclosed about its patients.[110]  Like the other hospital systems who have come clean about their use of the Meta Pixel tool, WakeMed promised its patients that it had "proactively disabled Facebook's pixel" and had "no plans to use it in the future without confirmation that the pixel no longer has the capacity to transmit potentially sensitive or identifiable information."[111]

382.   In November 2022, the fallout from hospital systems' use of the Meta Pixel tool expanded when Community Health Network informed 1.5 million of its patients that their personal health information had been routinely transmitted and disclosed to Facebook since at least April 2017.[112]

383.   In its data breach notice, Community Health admitted that it had "discovered through our investigation that the configuration of certain technologies allowed for a broader scope of information to be collected and transmitted to each corresponding third-party tracking technology vendor (e.g., Facebook and Google) than Community had ever intended."  Community Health further conceded that its use of the Meta Pixel and related third-party tracking technologies had resulted in surreptitiously recording and transmitting a wide range of patient engagements with its websites, including "scheduling an appointment online or directly with a provider" and "seeking treatment at a Community or affiliated provider location."[113]

---

[109]      https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

[110]      https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

[111]      https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

[112]      https://healthitsecurity.com/news/community-health-network-notifies-1.5m-of-data-breach-stemming-from-tracking-tech; *see also* https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

[113] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

384.    Community Health, like WakeMed, Novant, and Advocate Aurora Health, also promised its patients that it had disabled or removed the third-party tracking technologies that it had installed on its website and had instituted new "evaluation and management processes for all website technologies moving forward."[114]  Community Health, however, also conceded that it had no idea how Facebook or other third parties had exploited the patient Personal Health Information that had been disclosed to them via the pixel technology.

385.    Unlike Community Health, WakeMed, Novant, Advocate Aurora Health, and other responsible hospital systems who have informed their patients of the serious privacy violations resulting from the installation of Facebook's Meta Pixel tool on their websites, Defendants have done nothing.  Indeed, not only have Defendants hidden these privacy violations from their patients, but Defendants continue to collect, transmit, and disclose their patients' Personal Health Information to Facebook despite widespread knowledge in the health care community that such collection and disclosure of patient Personal Health Information is patently illegal and in violation of patients' fundamental privacy rights.

386.    As these data breach announcements demonstrate, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites results in the disclosure of patients' Personal Health Information Facebook.  There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the privacy rights involved.

387.    Even after being warned by the Department of Health and Human Services in December 2022 that their conduct was illegal, Defendants refused to remove the tracking pixels installed on their websites.

388.    Defendants' decision to hide their use of the Meta Pixel tool from their patients and their refusal to remove such technologies from their websites after learning that its patients' Personal Health Information was being routinely collected, transmitted, and exploited by

---

[114] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

Facebook is malicious, oppressive, and in reckless disregard of Plaintiffs' and Class Members' rights. Defendants' conduct in intentionally concealing their use of the Meta Pixel tool from patients was knowing, willful, and malicious. Defendants were aware that installing the Meta Pixel would result in the unauthorized disclosure of their patients' personal health information to Facebook. Defendants nevertheless chose to install the Meta Pixel on their websites, while leading their patients to believe that their privacy rights would be respected. Defendants' deception, including the significant misrepresentations made to the public in their Privacy Practices was also fraudulent and oppressive. Despite promising patients that they would never disclose their personal health information for marketing purposes without their consent, Defendants routinely bartered their patients' personal health information to Facebook and Google in return for advertising benefits.

## O. Tolling, Concealment, and Estoppel

389. The applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the facts alleged herein.

390. Defendants seamlessly and secretively incorporated Meta Pixel and other trackers into their websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendants had knowledge that their websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiffs and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

391. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

392. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 16, 2022, following the release of The Markup's investigation.

393.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendants' illegal interception and disclosure of patients' and users' Personal Health Information has continued unabated through the date of the filing of Plaintiffs' Original Complaint. What's more, Defendants were under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendants are therefore estopped from relying on any statute of limitations defenses.

## V. CLASS DEFINITION

394.    Defendants' conduct violates the law and breaches express and implied privacy promises.

395.    Defendants' unlawful conduct has injured Plaintiffs and Class Members.

396.    Defendants' conduct is ongoing.

397.    Plaintiffs bring this action individually and as a class action against Defendants.

398.    Plaintiffs bring this action pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure individually and on behalf of the following proposed Class and Subclass:

> **The Tenet Healthcare Class:** For the period July 21, 2018, to the present, all individuals who are, or were, patients or prospective patients of Tenet Healthcare or any of its affiliates and who exchanged communications at Defendants' websites, including Defendants' patient portals.

> **The California Subclass:** For the period July 21, 2018, to the present, all California citizens who are, or were, patients or prospective patients of Tenet Healthcare or any of its affiliates and who exchanged communications at Defendants' websites, including Defendants' patient portals.

> **The Patient Subclass:** For the period July 21, 2018, to the present, all California citizens who are, or were, patients of Tenet Healthcare or any of its affiliates and who exchanged communications at Defendants' websites, including Defendants' patient portals.

399.    Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action or appellate judge assigned to this case and any members of their staff and

immediate families; (2) any jurors assigned to hear this case as well as their immediate families; (3) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiffs' counsel and Defendants' counsel.

400.     Plaintiffs and Class Members satisfy the numerosity, commonality, typicality, adequacy, and predominance requirements for suing as representative parties.

401.     **Numerosity:** The exact number of members of the Class is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands of individuals. The exact number of Class Members can be determined by review of information maintained by Defendants. The proposed class is defined objectively in terms of ascertainable criteria, such that the Court may determine the constituency of the class for the purposes of the conclusiveness of any judgment that may be rendered.

402.     **Predominant Common Questions:** The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class include, but are not limited to, the following:

      (a)     Whether Defendants violated Plaintiffs' and Class Members' privacy rights;

      (b)     Whether Defendants' acts and practices violated California's Constitution, Art. 1, § 1;

      (c)     Whether Defendants' acts and practices violated California's Confidentiality of Medical Information Act, CIVIL CODE §§ 56, *et seq.*;

      (d)     Whether Defendants' acts and practices violated the California Invasion of Privacy Act, CAL. PENAL CODE §§ 630, *et seq.*;

(e)     Whether Defendants' acts and practices violated the California Comprehensive Computer Data Access and Fraud Act, CAL. PENAL CODE § 502;

(f)     Whether Defendants' acts and practices violated California's Online Privacy Protection Act, CAL. BUS. & PROF. CODE §§ 22575, *et seq*;

(g)     Whether Defendants' acts and practices violated California's Unfair Competition Law, CAL. BUS. & PROF. CODE §§ 17200, *et seq*;

(h)     Whether Defendants' acts and practices violated CAL. CIVIL CODE §§ 1798.81.5, § 1798.81.5;

(i)     Whether Defendants' acts and practices violated CAL. CIVIL CODE § 1798.83;

(j)     Whether Defendants' acts and practices violated CAL. CIVIL CODE §§ 1709 & 1710;

(k)     Whether Defendants were unjustly enriched;

(l)     Whether Defendants' acts and practices violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*;

(m)     Whether Defendants' acts and practices constituted trespass to chattels;

(n)     Whether Plaintiffs and the Class Members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and,

(o)     Whether Plaintiffs and the Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

403.     **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class. The claims of Plaintiffs and the members of the Class arise from the same conduct by Defendants and are based on the same legal theories.

404.    **Adequate Representation:** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiffs have no interest that is in conflict with the interests of the Class, and Defendants have no defenses unique to any Plaintiff. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the interests of the other members of the Class.

405.    **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

406.    **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

407.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would otherwise gain an unconscionable advantage since it would be able to exploit and overwhelm the

limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

408.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

409.    **Ascertainability and Notice:** Membership in the Class and Subclass can be determined by objective records maintained by Defendants, and adequate notice can be given to Class Members directly using information maintained in Defendants' records.

410.    **Class-Wide Injunctive Relief:** Unless a Class-wide injunction is issued, Defendants may continue to fail to properly secure the private information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendants may continue to act unlawfully as set forth in this Complaint as Defendants have acted or refused to act on grounds generally applicable to the Class. Accordingly, final injunctive or corresponding declaratory relief with regard to the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

411.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to the following:

- Whether Defendants owe a legal duty not to disclose Plaintiffs' and Class Members' Personal Health Information;

- Whether Defendants breached a legal duty to Plaintiffs and the Class Members to exercise due care in collecting, storing, using, and safeguarding their Personal Health Information;

- Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to the security of patients' Personal Health Information;

- Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Personal Health Information would be disclosed to third parties; and

- Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

412.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## VI. CLAIMS FOR RELIEF

### COUNT I—VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA") CAL. PENAL CODE §§ 630, *ET SEQ.*

413.    Plaintiffs re-allege and incorporate all preceding paragraphs.

414.    Plaintiffs bring this claim on behalf of themselves and all members of the California Subclass.

415.    The California Legislature enacted the California Invasion of Privacy Act, CAL. PENAL CODE §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

416.    CAL. PENAL CODE § 631(a) generally prohibits individuals, businesses, and other legal entities from "aid[ing], agree[ing] with, employ[ing], or conspir[ing] with" a third party to read, attempt to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or to use, or attempt to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

417.    CAL. PENAL CODE § 632(a) generally prohibits individuals, businesses, and other legal entities from recording confidential communications without consent of all parties to the communication.

418.    All alleged communications between Plaintiffs or California Subclass Members and Defendants qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

419.    Defendants used a recording device to record the confidential communications without the consent of Plaintiffs or California Subclass Members and then transmitted such information to others, such as Facebook.

420.    At all relevant times, Defendants' aiding Facebook, Google, and other third parties to learn the contents of communications and Defendants' recording of confidential communications was without authorization and consent.

421.    The Plaintiffs and California Subclass Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendants. Defendants told them they would not sell, rent, license, or trade their personally identifiable information to third parties without express consent. Defendants never received that express consent. Nor could Defendants have received consent from Plaintiffs and California Subclass Members because

Defendants never sought to, or did, obtain Plaintiffs' and California Subclass Members' consent to transmit their Personal Health Information to Facebook.

422.    Defendants engaged in and continue to engage in interception by aiding others (including Facebook and Google) to secretly record the contents of Plaintiffs' and California Subclass Members' wire communications.

423.    The intercepting devices used in this case include, but are not limited to:

(a)    Plaintiffs' and California Subclass Members' personal computing devices;

(b)    Plaintiffs' and California Subclass Members' web browsers;

(c)    Plaintiffs' and California Subclass Members' browser-managed files;

(d)    Facebook's Meta Pixel;

(e)    Internet cookies;

(f)    Defendants' computer servers;

(g)    Third-party source code utilized by Defendants; and

(h)    Computer servers of third parties (including Facebook) to which Plaintiffs' and California Subclass Members' communications were disclosed.

424.    Defendants aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or California Subclass Members and Defendants that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

425.    Defendants aided in the interception of "contents" in at least the following forms:

(a)    The parties to the communications;

(b)    The precise text of patient search queries;

(c)    Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

(d)    The precise text of patient communications about specific doctors;

(e)    The precise text of patient communications about specific medical conditions;

(f)    The precise text of information generated when patients requested or made appointments;

(g)    The precise text of patient communications about specific treatments;

(h)    The precise text of patient communications about scheduling appointments with medical providers;

(i)    The precise text of patient communications about billing and payment;

(j)    The precise text of specific buttons on Defendants' website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

(k)    The precise dates and times when patients click to Log-In on Defendants' website(s) and patient portal(s);

(l)    The precise dates and times when patients visit Defendants' websites and patient portals;

(m)    Information that is a general summary or informs third parties of the general subject of communications that Defendants send back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

(n)    Any other content that Defendants have aided third parties in scraping from webpages or communication forms at Web Properties.

426. Plaintiffs and California Subclass Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook, Google, and other third parties.

427.   No legitimate purpose was served by Defendants' willful and intentional disclosure of Plaintiffs' and California Subclass Members' Personal Health Information to Facebook, Google, and other third parties. Neither Plaintiffs nor California Subclass Members consented to the disclosure of their Personal Health Information by Defendants to Facebook, Google, and other third parties. Nor could they have consented, given that Defendants, for example, never sought Plaintiffs' or California Subclass Members' consent, or even told visitors to their websites that their every interaction was being recorded and transmitted to Facebook via the Meta Pixel tool.

428.   The tracking pixels that Defendants utilized are designed such that they transmitted each of a website user's actions to third parties alongside and contemporaneously with the user initiating the communication.   Thus, Plaintiffs and California Subclass Members' communications were intercepted in transit to the intended recipient (Defendants) before they reached Defendants' servers.

429.   Defendants willingly facilitated Facebook and Google's interception and collection of Plaintiffs' and California Subclass Members' Personal Health Information by embedding pixels on their websites and patient portals.  Moreover, Defendants had full control over these tracking pixels, including which webpages contained the pixels, what information was tracked and shared, and how events were categorized prior to transmission.

430.   Defendants gave substantial assistance to Facebook in violating the privacy rights of Defendants' patients, despite the fact that Defendants' conduct constituted a breach of the duties of confidentiality that medical providers owe their patients. Defendants knew that the installation of the Meta Pixel on their website would result in the unauthorized disclosure of its patients' communications to Facebook, yet nevertheless did so anyway.  Indeed, the only purpose of tracking pixels like the Meta Pixel and the Google Analytics pixel on their websites and patient portals is to share information with third parties. Worse, Defendants' decision to share their

patients' communications without authorization with Facebook and Google violated multiple state and federal laws.

431.    Plaintiffs' and California Subclass Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies. The private information that Defendants assisted Facebook, Google, and other third parties with reading, learning, and exploiting, including Plaintiffs' and California Subclass Members' medical conditions, their medical concerns, and their past, present, and future medical treatment.

432.    Plaintiffs and the California Subclass Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

433.    In addition to statutory damages, Defendants' breach caused Plaintiffs and California Subclass Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiffs and California Subclass Members intended to remain private is no longer private;

(b)    Defendants eroded the essential confidential nature of the doctor-patient relationship; and

(c)    Defendants took something of value from Plaintiffs and California Subclass Members and derived benefit therefrom without Plaintiffs' and California Subclass Members' knowledge or informed consent and without sharing the benefit of such value.

434.    Plaintiffs and California Subclass Members have also suffered irreparable injury from Defendants' unauthorized acts of disclosure. Their personal, private, and sensitive data has been collected, viewed, accessed, stored, and used by Defendants and Facebook without their

consent and has not been destroyed. Plaintiffs and California Subclass Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiffs continue to desire to search for health information on Defendants' websites. Plaintiffs will continue to suffer harm if the website is not redesigned. If the website were redesigned to comply with applicable laws, Plaintiffs would use Defendants' websites to search for health information in the future. Due to the continuing threat of injury, Plaintiffs and California Subclass Members have no adequate remedy at law, and Plaintiffs and California Subclass Members are therefore entitled to injunctive relief.

435.    Plaintiffs and California Subclass Members also seek such other relief as the Court may deem equitable, legal, and proper.

### COUNT II—VIOLATION OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT ("CMIA") CIVIL CODE SECTION 56.06

436.    Plaintiffs re-allege and incorporate all preceding paragraphs.

437.    Plaintiffs bring this claim on behalf of themselves and all members of the California Subclass.

438.    Defendants are providers of health care under CAL. CIVIL CODE. § 56.06, subdivision (a) and (b), because they maintain medical information and offer software to consumers that is designed to maintain medical information for the purposes of allowing their users to manage their information or for the diagnosis, treatment, or management of a medical condition.

439.    Defendants are therefore subject to the requirements of the CMIA and obligated under subdivision (d) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information disclosed to it.

440.    Defendants violated Civil Code section 56.06 because it did not maintain the confidentiality of users' medical information. Instead, Defendants disclosed Plaintiffs' and California Subclass Members' medical information to Facebook, Google, and other third parties

without consent. This information was intentionally shared with Facebook and Google, whose business is to sell advertisements based on the data that they collect about individuals, including the data Plaintiffs and the California Subclass Members shared with Defendants.

441.    As set forth above, Defendants knowingly shared information such as names, telephone numbers, email addresses, device identifiers, IP addresses, web URLs, Facebook IDs, and other data that could be used to identify Plaintiffs and California Subclass Members in combination with their health information, such as appointments, medical conditions, diagnoses, patient searches, treating physicians, and prescriptions.  This information constitutes confidential information under the CMIA.

442.    Defendants knowingly and willfully, or negligently, disclosed medical information without consent to Facebook for financial gain. Defendants' acts were knowing and willful as Defendants were aware that Facebook would collect all data inputted while using their website, yet intentionally embedded Meta Pixel anyway.  Defendants' decision to affirmatively share and communicate their patients' Personal Health Information with Facebook resulted in one or more unauthorized persons improperly accessing and reviewing Plaintiffs' and the California Subclass Members' Personal Health Information.

443.    Accordingly, Plaintiffs and California Subclass Members are entitled to: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); and (4) reasonable attorney's fees and other litigation costs reasonably incurred.

444.    In addition to statutory damages, Defendants' breach caused Plaintiffs and California Subclass Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiffs and California Subclass Members intended to remain private is no longer private;

(b)    Defendants eroded the essential confidential nature of the doctor-patient relationship; and

(c)    Defendants took something of value from Plaintiffs and California Subclass Members and derived benefit therefrom without Plaintiffs' and California Subclass Members' knowledge or informed consent and without sharing the benefit of such value.

445.    Plaintiffs and California Subclass Members also seek such other relief as the Court may deem equitable, legal, and proper.

### COUNT III—VIOLATION OF CMIA CIVIL CODE § 56.101

446.    Plaintiffs re-allege and incorporate all preceding paragraphs.

447.    Plaintiffs bring this claim on behalf of themselves and all members of the California Subclass.

448.    Civil Code § 56.101, subdivision (a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

449.    Any health care provider who "negligently creates, maintains, preservers, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36."

450.    Defendants failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information contained therein because it disclosed to Facebook, Google, and other third parties Plaintiffs' and California Subclass Members' sensitive medical information without consent, including information concerning their health status, medical diagnoses, treatment, and appointment information, as well as personally identifiable information.

451.    Defendants' failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at the least, negligent and violates Civil Code § 56.36 subdivisions (b) and (c).

452.    Accordingly, Plaintiffs and California Subclass Members may recover: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); and (4) reasonable attorney's fees and other litigation costs reasonably incurred.

453.    In addition to statutory damages, Defendants' breach caused Plaintiffs and California Subclass Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiffs and California Subclass Members intended to remain private is no longer private;

(b)    Defendants eroded the essential confidential nature of the doctor-patient relationship; and

(c)    Defendants took something of value from Plaintiffs and California Subclass Members and derived benefit therefrom without Plaintiffs' and California Subclass Members' knowledge or informed consent and without sharing the benefit of such value.

454.    Plaintiffs and California Subclass Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT IV—VIOLATION OF CMIA CIVIL CODE § 56.10**

455.    Plaintiffs re-allege and incorporate all preceding paragraphs.

456.    Plaintiffs bring this claim on behalf of themselves and all members of the California Subclass.

457.    Civil Code § 56.10, subdivision (a), prohibits a health care provider from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

458.    Defendants disclosed medical information without first obtaining authorization when it disclosed Plaintiffs' and California Subclass Members' sensitive medical information to Facebook, Google, and other third parties without consent, including information concerning their

health status, medical diagnoses, treatment, and appointment information, as well as personally identifiable information. No statutory exception applies. As a result, Defendants violated Civil Code § 56.10, subdivision (a).

459.    Defendants knowingly and willfully, or negligently, disclosed medical information without consent to Facebook for financial gain.

460.    Accordingly, Plaintiffs and California Subclass Members may recover: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); (4) punitive damages pursuant to 56.35; and (5) reasonable attorney's fees and other litigation costs reasonably incurred.

461.    In addition to statutory damages, Defendants' breach caused Plaintiffs and California Subclass Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiffs and California Subclass Members intended to remain private is no longer private;

(b)    Defendants eroded the essential confidential nature of the doctor-patient relationship; and

(c)    Defendants took something of value from Plaintiffs and California Subclass Members and derived benefit therefrom without Plaintiffs' and California Subclass Members' knowledge or informed consent and without sharing the benefit of such value.

462.    Plaintiffs and California Subclass Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT V—INVASION OF PRIVACY AND VIOLATION OF THE CALIFORNIA CONSTITUTION, ART. 1, § 1**

463.    Plaintiffs re-allege and incorporate all preceding paragraphs.

464.    Plaintiffs bring this claim on behalf of themselves and all members of the California Subclass.

465.    Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

466.    To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

467.    The right to privacy in California's constitution creates a right of action against private and government entities.

468.    Plaintiffs and California Subclass Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and user data pursuant to Article I, Section I of the California Constitution.

469.    Plaintiffs and California Subclass Members had a reasonable expectation of privacy under the circumstances, including that: (i) the data collected, used, and disclosed by Defendants included personal, sensitive medical information, decisions, and medical diagnoses; and (ii) Plaintiffs and California Subclass Members did not consent or otherwise authorize Defendants to disclose this information to others or to collect and use this private information for their own monetary gain.

470.    Plaintiffs and California Subclass Members had a reasonable expectation of privacy that their communications, identity, health information, and treatment data would remain confidential and that Defendants would not install surreptitious wiretapping technology on their websites to secretly transmit their communications to third parties, including Facebook and Google.

471.    Given the nature of the Personal Health Information that Defendants disclosed to Facebook, Google, and other third parties, such as patients' names, email addresses, phone

numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e., "Weight loss"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

472.    The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs' and California Subclass Members' rights to privacy.

473.    Plaintiffs and California Subclass Members did not consent to, authorize, or know about Defendants' disclosure of their Personal Health Information to Facebook, Google, and other third parties at the time it occurred. Plaintiffs and California Subclass Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

474.    Plaintiffs and California Subclass Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiffs continue to desire to search for health information on Defendants' websites. She will continue to suffer harm if the website is not redesigned. If the websites were redesigned to comply with applicable laws, Plaintiffs would use the Defendants' websites to search for health information in the future.

475.    Plaintiffs and California Subclass Members therefore seek injunctive relief to prevent Defendants from continuing to collect, use, and sell Personal Health Information without consent.

476.    Plaintiffs and California Subclass Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to seek just compensation, including monetary damages.

477.    Plaintiffs and California Subclass Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and California Subclass Members for the harm to their privacy interests as well as a disgorgement of

profits made by Defendants as a result of their intrusions on Plaintiffs' and California Subclass Members' privacy.

478.    Defendants' breach caused Plaintiffs and California Subclass Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiffs and California Subclass Members intended to remain private is no longer private;

(b)    Defendants eroded the essential confidential nature of the doctor-patient relationship;

(c)    Defendants took something of value from Plaintiffs and California Subclass Members and derived benefit therefrom without Plaintiffs' and California Subclass Members' knowledge or informed consent and without sharing the benefit of such value;

(d)    Plaintiffs and California Subclass Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality; and

(e)    Defendants' actions diminished the value of Plaintiffs' and California Subclass Members' personal information.

479.    Plaintiffs and California Subclass Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, which caused injury to Plaintiffs and California Subclass Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

480.    Plaintiffs and California Subclass Members seek attorney's fees in accordance with CAL. CIV. PROC. CODE § 1021.5 (West).

481.    Plaintiffs and California Subclass Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT VI—VIOLATION OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT ("CDAFA") CAL. PENAL CODE § 502

482.    Plaintiffs re-allege and incorporate all preceding paragraphs.

483.    Plaintiffs bring this claim on behalf of themselves and all members of the California Subclass.

484.    The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act, CAL. PENAL CODE § 502 ("CDAFA") to "expand the degree of protection . . . from tampering, interference, damage, and unauthorized access to [including the extraction of data from] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." CAL. PENAL CODE § 502(a).

485.    Plaintiffs' and the California Subclass Members' devices on which they accessed the hospital website, including their computers, smart phones, and tablets, constitute computers or "computer systems" within the meaning of CDAFA. *Id.* § 502(b)(5).

486.    Defendants violated § 502(c)(1)(B) of CDAFA by knowingly accessing without permission Plaintiffs' and California Subclass Members' devices in order to wrongfully obtain and use their personal data, including their sensitive medical information, in violation of Plaintiffs' and California Subclass Members' reasonable expectations of privacy in their devices and data.

487.    Defendants violated CAL. PENAL CODE § 502(c)(2) by knowingly and without permission accessing, taking, copying, and using Plaintiffs' and the California Subclass Members' personally identifiable information, including their sensitive medical information.

488.    Defendants used Plaintiffs' and California Subclass Members' data as part of a scheme to defraud them and wrongfully obtain their data and other economic benefits. Specifically, Defendants intentionally concealed from Plaintiffs and California Subclass Members that Defendants had secretly installed tracking pixels on their websites and patient portals that surreptitiously shared patient data with third party advertising companies like Facebook and Google.  Had Plaintiffs and California Subclass Members been aware of this practice, they would not have used Defendants' websites and patient portals.

489.    The computers and mobile devices that Plaintiffs and California Subclass Members used when accessing Defendants' websites all have and operate "computer services" within the meaning of CDAFA. Defendants violated §§ 502(c)(3) and (7) of CDAFA by knowingly and without permission accessing and using those devices and computer services, and/or causing them to be accessed and used, *inter alia*, in connection with Facebook's wrongful collection of such data.

490.    Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Defendants violated § 502(c)(8) by knowingly and without permission introducing a computer contaminant via Meta Pixel embedded into the hospital website which intercepted Plaintiffs' and the California Subclass Members' private and sensitive medical information.

491.    Defendants' breach caused Plaintiffs and California Subclass Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiffs and California Subclass Members intended to remain private is no longer private;

(b)    Defendants eroded the essential confidential nature of the doctor-patient relationship; and

(c)    Defendants took something of value from Plaintiffs and California Subclass Members and derived benefit therefrom without Plaintiffs' and California Subclass Members' knowledge or informed consent and without sharing the benefit of such value.

492.    Plaintiffs and California Subclass Members also seek such other relief as the Court may deem equitable, legal, and proper.

493.    Plaintiffs and the California Subclass Members seek compensatory damages in accordance with CAL. PENAL CODE § 502(e)(1), in an amount to be proved at trial, and injunctive or other equitable relief. Plaintiffs continue to desire to search for health information on Defendants' websites. They will continue to suffer harm if the websites are not redesigned. If the website were redesigned to comply with applicable laws, Plaintiffs would use Defendants' websites to search for health information in the future.

494.    Plaintiffs and California Subclass Members are entitled to punitive or exemplary damages pursuant to CAL. PENAL CODE § 502(e)(4) because Defendants' violations were willful and, upon information and belief, Defendants are guilty of oppression, fraud, or malice as defined in CAL. CIVIL CODE § 3294.

495.    Plaintiffs and the California Subclass Members are also entitled to recover their reasonable attorney's fees under § 502(e)(2).

### COUNT VII—QUASI-CONTRACT/RESTITUTION/UNJUST ENRICHMENT

496.    Plaintiffs re-allege and incorporate all preceding paragraphs.

497.    Plaintiffs bring this claim on behalf of themselves and all members of the Patient Subclass.

498.    "Common law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient; a typical cause of action involving such remedy is 'quasi-contract.'" *Munoz v. MacMillan* (2011) 195 Cal. App. 4th 648, 661,124

Cal. Rptr. 3d 664; *see also City of Oakland v. Oakland Raiders* (2022) 83 Cal. App. 5th 458, 299 Cal. Rptr. 3d 463, 478.

499.    Plaintiffs and Patient Subclass Members personally and directly conferred a benefit on Defendants by paying Defendants for health care services, which included Defendants' obligation to protect Plaintiffs' and Patient Subclass Members' Personal Health Information. Defendants were aware of receiving these payments from Plaintiffs and Patient Subclass Members and demanded such payments as a condition of providing treatment.

500.    Plaintiffs and Patient Subclass Members also conferred a benefit on Defendants in the form of valuable sensitive medical information that Defendants collected from Plaintiffs and Patient Subclass Members under the guise of keeping this information private. Defendants collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from Facebook and other third parties. Defendants had knowledge that Plaintiffs and Patient Subclass Members had conferred this benefit on Defendants by interacting with their website, and Defendants intentionally installed the Meta Pixel tool on their websites to capture and monetize this benefit conferred by Plaintiffs and Patient Subclass Members.

501.    Plaintiffs and the Patient Subclass Members would not have used the Defendants' services if they had known that Defendants would collect, use, and disclose this information to Facebook, Google, and other third parties. The services that Plaintiffs and Patient Subclass Members ultimately received in exchange for the monies paid to Defendants were worth quantifiably less than the services that Defendants promised to provide, which included Defendants' promise that any patient communications with Defendants would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

502.    The medical services that Defendants offer are available from many other health care systems that do protect the confidentiality of patient communications. Had Defendants

disclosed that they would allow third parties to secretly collect Plaintiffs' and Patient Subclass Members' Private Health Information without consent, neither Plaintiffs, the Patient Subclass Members, nor any reasonable person would have purchased healthcare from Defendants and/or their affiliated healthcare providers.

503.    Defendants unjustly retained those benefits at the expense of Plaintiffs and Patient Subclass Members because Defendants' conduct damaged Plaintiffs and Patient Subclass Members, all without providing any commensurate compensation to Plaintiffs and Patient Subclass Members.

504.    The benefits that Defendants derived from Plaintiffs and Patient Subclass Members rightly belong to Plaintiffs and Patient Subclass Members. It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

505.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Patient Subclass Members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

**COUNT VIII—VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 *ET. SEQ.***

506.    Plaintiffs re-allege and incorporate all preceding paragraphs.

507.    Plaintiffs bring this claim on behalf of themselves and all members of the Patient Subclass.

508.    Plaintiffs, Patient Subclass Members, and Defendants are each a "person" under Cal. Bus. & Prof. Code § 17201.

509.    California Business and Professions Code §§ 17201, *et seq.* prohibits acts of unfair competition, which includes unlawful business practices.

510.    Defendants' business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. Seq.* (the "UCL") because, as alleged

1    above, Defendants violated California common law, the California Constitution, and other statutes

2    and causes of action alleged herein.

3        511.   Defendants engaged in unlawful acts and practices by imbedding the Pixel on their

4    websites, which tracks, records, and transmits Plaintiffs' and Patient Subclass Members' Personal

5    Health Information they disclose to Defendants in confidence via the Website to third parties

6    without Plaintiffs' and Subclass Members' knowledge and/or consent, in violation of the

7    California Invasion of Privacy Act ("CIPA"), CAL. PENAL CODE §§ 630, et seq.; the California

8    Confidentiality of Medical Information Act ("CMIA"), CAL. CIVIL CODE §§ 56.06, 56.10, 56.101;

9    the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), CAL. PENAL CODE § 502;

10    and by representing that their services have characteristics, uses, or benefits that they do not have

11    in violation of Civil Code § 1770.

12        512.   When using Defendants' websites and services, Plaintiffs and Subclass Members

13    relied on Defendants' status as healthcare providers.

14        513.   Inconsistent with its roles as a healthcare provider, Defendants disclosed Plaintiffs'

15    and Subclass Members' Personal Health Information to third parties without their consent and for

16    marketing purposes. Thus, Defendants represented that their services have characteristics, uses,

17    or benefits that they do not have and represented that its services are of a particular standard,

18    quality, or grade when they were not, which violates California Civil Code Section 1770.

19        514.   Plaintiffs and Subclass Members were reasonable to assume, and did assume, that

20    Defendants would take appropriate measures to keep their Personal Health Information secure

21    and not share it with third parties without their express consent.  Defendants also had a duty to

22    disclose that it was sharing its patients' Personal Health Information with third parties. However,

23    Defendants did not disclose at any time that they were sharing this Personal Health Information

24    with third parties via the Tracking Pixel and other third-party tracking software.

25

26

27

28

515.    Had Plaintiffs and Patient Subclass Members known that Defendants would intercept, collect, and transmit their Personal Health Information to Facebook and other third parties, Plaintiffs and Patient Subclass Members would not have used Defendants' services.

516.    Plaintiffs and Patient Subclass Members have a property interest in their Personal Health Information. By surreptitiously collecting and otherwise misusing Plaintiffs' and Patient Subclass Members' Personal Health Information, Defendants have taken property from Plaintiffs and Patient Subclass Members without providing just (or indeed *any*) compensation.

517.    By deceptively collecting, using, and sharing Plaintiffs' and Patient Subclass Members' Personal Health Information with Facebook and other third parties, Defendants have taken money or property from Plaintiffs and Patient Subclass Members. Accordingly, Plaintiffs seek restitution on behalf of themselves and the Patient Subclass.

518.    Defendants' business acts and practices also meet the unfairness prong of California's Unfair Competition Law ("UCL") according to all three theories of unfairness.

519.    First, Defendants' business acts and practices are "unfair" under the UCL pursuant to the three-part test articulated in *Camacho v. Automobile Club of Southern California* (2006) 142 Cal. App. 4th 1394, 1403: (a) Plaintiffs and Subclass Members suffered substantial injury due to Defendants' disclosure of their Private Health Information; (b) Defendants' disclosure of Plaintiffs' and Subclass Members' Private Health Information provides no benefit to consumers, let alone any countervailing benefit that could justify Defendants' disclosure of Private Health Information without consent for marketing purposes or other pecuniary gain; and (c) Plaintiffs and Subclass Members could not have readily avoided this injury because they had no way of knowing that Defendants were implementing the Tracking Pixel. Thus, Plaintiffs and Subclass Members did not know to ask Defendants to stop the practice of disclosing their Private Health Information and did not know that they should stop using Defendants' services to avoid disclosing their Private Health Information.

520.    Second, Defendants' business acts and practices are "unfair" under the UCL because they are "immoral, unethical, oppressive, unscrupulous, or substantially injurious" to Plaintiffs and Patient Subclass Members, and "the utility of [Defendants'] conduct," if any, does not "outweigh the gravity of the harm" to Plaintiffs and Subclass Members. *Drum v. San Fernando Valley Bar Ass'n*, (2010) 182 Cal. App. 4th 247, 257. Defendants secretly collected, disclosed, and otherwise misused Plaintiffs' and Subclass Members' Personal Health Information by bartering it to Facebook and other third parties in return for access to the Pixel tool. This surreptitious, willful, and undisclosed conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious. Moreover, no benefit inheres in this conduct, the gravity of which is significant.

521.    Third, Defendants' business acts and practices are "unfair" under the UCL because they run afoul of "specific constitutional, statutory, or regulatory provisions." *Drum*, 182 Cal. App. 4th at 256 (internal quotation marks and citations omitted). California has a strong public policy of protecting consumers' privacy interests, including consumers' and patients' personal data. This public policy is codified in California's Constitution in Article I, section 1; the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq.*; the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civil Code §§ 56.06, 56.10, 56.101; the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, among other statutes. Defendants violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise exploiting Plaintiffs' and Subclass Members' Personal Health Information by sharing that information with Facebook and other third parties via the Tracking Pixel and other third-party tracking software without Plaintiffs' and/or Subclass Members' consent.

522.    Defendants' business acts and practices are also "unfair" under the UCL because they violate multiple federal laws, including 15 U.S.C. 45 and 42 U.S.C. 1320d-6.

523.    Had Plaintiffs and Patient Subclass Members known Defendants would intercept, collect, and transmit their Personal Health Information to Facebook and other third parties, Plaintiffs and Subclass Members would not have used Defendants' services.

524.    Plaintiffs and Subclass Members were reasonable to assume, and did assume, that Defendants would take appropriate measures to keep their Personal Health Information secure and not share it with third parties without their express consent. Defendants were in sole possession of and had a duty to disclose the material information that Patient Plaintiffs' and Subclass Members' Personal Health Information would be shared with third parties via the Tracking Pixel and other third-party tracking software. Defendants did not disclose at any time that they were sharing this Personal Health Information with third parties via the Tracking Pixel and other third-party tracking software.

525.    Plaintiffs and Patient Subclass Members have a property interest in their Personal Health Information. By surreptitiously collecting and otherwise misusing Plaintiffs' and Patient Subclass Members' Personal Health Information, Defendants have taken property from Plaintiffs and Patient Subclass Members without providing just (or indeed *any*) compensation.

526.    Plaintiffs and Patient Subclass Members have lost money and property due to Defendants' conduct in violation of the UCL. Personal Health Information such as the Personal Health Information Defendants collected and transmitted to third parties has objective monetary value. Companies are willing to pay for Personal Health Information, like the information Defendants unlawfully collected and transmitted to third parties, such as Facebook. For example, Pfizer annually pays approximately $12 million to purchase health data from various sources.[115]

527.    Consumers also value their personal health data. According to the annual Financial Trust Index Survey conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent of survey participants would not share their health data with a digital

---

[115]    https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/

platform for free. Half of the survey participants would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[116]

528.    By deceptively collecting, using, and sharing Plaintiffs' and Patient Subclass Members' Personal Health Information with Facebook and other third parties, Defendants have taken money or property from Plaintiffs and Patient Subclass Members. Accordingly, Plaintiffs seek restitution on behalf of themselves and the Patient Subclass.

529.    Plaintiffs and the Patient Subclass Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health information both because such information remains within Defendants' control and because anytime that Plaintiffs and/or Patient Subclass Members interact with the Website to make appointments, submit information about their medical conditions, search for doctors, or otherwise seek assistance with their medical conditions, Plaintiffs and Patient Subclass Members risk further disclosure of their Personal Health Information. Plaintiffs also continue to want to search for health information on the Website. Plaintiffs will continue to suffer harm if the Website is not redesigned. If the Website is redesigned to comply with applicable laws, Plaintiffs and Subclass Members would use it to search for health information in the future. Plaintiffs and Patient Subclass Members are therefore also entitled to injunctive relief requiring Defendants to cease all website operations that allow for the third-party capture of Private Health Information.

530.    As a direct and proximate result of Defendants' unfair and unlawful methods and practices of competition, Plaintiffs and Subclass Members suffered actual damages, including, but not limited to, the loss of the value of their Private Health Information.

531.    As a direct and proximate result of their unfair and unlawful business practices, Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and Subclass Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendants because of their unlawful and unfair

---

[116]    https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html

business practices, declaratory relief, attorney fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

## COUNT IX—VIOLATION OF CAL. CIVIL CODE § 1798.82

532.    Plaintiffs re-allege and incorporate all preceding paragraphs.

533.    Plaintiffs bring this claim on behalf of themselves and all members of the Patient Subclass.

534.    California Civil Code § 1798.82(a) provides that "[a] person or business that conducts business in California, and that owns or licenses computerized data that includes personal information, shall disclose a breach of the security of the system following discovery or notification of the breach in the security of the data to a resident of California … whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person."

535.    For purposes of the statute, "personal information" means "[a]n individual's first name or first initial and last name in combination with any one or more of the following data elements, when either the name or the data elements are not encrypted: … (D) Medical information."  CAL. CIVIL CODE § 1798.82.

536.    For purposes of the statute, "medical information" means "any information regarding an individual's medical history, mental or physical condition, or medical treatment or diagnosis by a health care professional."

537.    Any customer who is injured by a violation of the statute may institute a civil action to recover damages. CAL. CIVIL CODE § 1798.84(b).  Further, any business that violates, proposes to violate, or has violated this statute may be enjoined. CAL. CIV. CODE § 1798.84(e).

538.    Defendants failed to disclose to Plaintiffs and the Patient Subclass that they were regularly collecting, transmitting, and sharing patients' unencrypted medical information with Facebook so that Facebook could target them with advertising.  Along with their patients' medical information, Defendants also disclosed their patients' first names (or first initial and last name) to

Facebook via encrypted data transmissions, including the unauthorized transmission of patients' Facebook IDs to Facebook, which permitted Facebook to link the medical information provided with the personal identities of Plaintiffs and the Patient Subclass Members.

539.    Defendants willfully, intentionally, and/or recklessly failed to provide the disclosures required by California Civil Code section 1798.82 as part of a scheme to barter Plaintiffs' and Patient Subclass Members' Personal Health Information to Facebook in return for access to the Meta Pixel tool.

540.    Plaintiffs and Patient Subclass Members conferred a benefit on Defendants in the form of valuable sensitive medical information that Defendants collected from Plaintiffs and Patient Subclass Members under the guise of keeping this information private. Defendants collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from Facebook and other third parties. Defendants had knowledge that Plaintiffs and Patient Subclass Members had conferred this benefit on Defendants by interacting with their website, and Defendants intentionally installed the Meta Pixel tool on their websites to capture and monetize this benefit conferred by Plaintiffs and Patient Subclass Members.

541.    Plaintiffs and Patient Subclass Members also conferred a benefit on Defendants by paying Defendants for health care services, which included Defendants' obligation to protect Plaintiffs' and Subclass Members' Personal Health Information. Defendants were aware of receiving these payments from Plaintiffs and Patient Subclass Members and demanded such payments as a condition of providing treatment.

542.    Plaintiffs and Patient Subclass Members would not have used the Defendants' services if they had known that Defendants would collect, use, and disclose this information to Facebook. The services that Plaintiffs and Patient Subclass Members ultimately received in exchange for the monies paid to Defendants were worth quantifiably less than the services that Defendants promised to provide.

543.    The medical services that Defendants offer are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendants disclosed that it would allow third parties to secretly collect Plaintiffs' and Patient Subclass Members' medical information without consent, neither Plaintiffs, the Patient Subclass Members, nor any reasonable person would have purchased healthcare from Defendants and/or their affiliated healthcare providers.

544.    Defendants unjustly retained those benefits at the expense of Plaintiffs and Patient Subclass Members because Defendants' conduct damaged Plaintiffs and Patient Subclass Members, all without providing any commensurate compensation to Plaintiffs and Patient Subclass Members.

545.    Plaintiffs and Patient Subclass Members were damaged by Defendants' failure to inform them that their Personal Health Information was being shared with Facebook, resulting in, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiffs and Patient Subclass Members intended to remain private is no longer private;

(b)    Defendants eroded the essential confidential nature of the doctor-patient relationship;

(c)    Defendants took something of value from Plaintiffs and Patient Subclass Members and derived benefit therefrom without Plaintiffs' and Patient Subclass Members' knowledge or informed consent and without sharing the benefit of such value;

(d)    Plaintiffs and Patient Subclass Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality; and

(e)    Defendants' actions diminished the value of Plaintiffs' and Patient Subclass Members' personal information.

546.    Plaintiffs also continues to desire to search for health information on Defendants' websites. They will continue to suffer harm if Defendants do not make adequate disclosures regarding which third party marketing companies are receiving Plaintiffs' and Patient Subclass Members' protected health information. Plaintiffs and the Patient Subclass Members are therefore also entitled to injunctive relief requiring Defendants to comply with CAL. CIV. CODE § 1798.82.

**COUNT X—VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT 18 U.S.C. § 2510 *ET SEQ.***

547.    Plaintiffs re-allege and incorporate all preceding paragraphs.

548.    Plaintiffs bring this claim on behalf of themselves and all members of the Tenet Healthcare Class.

549.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the contents of any electronic communication.  18 U.S.C. § 2511.

550.    The ECPA protects both the sending and receipt of communications.

551.    The ECPA provides a private right of action to any person whose electronic communications are intercepted.  18 U.S.C. § 2520(a).

552.    A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

553.    "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

554. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

555. "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

556. An "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

557. Plaintiffs and Class Members' interactions with Tenet Healthcare's Web Properties, including their patient portals, and their online communications with Tenet Healthcare are electronic communications under the ECPA.

558. Whenever Plaintiffs and the Class Members interacted with Tenet Healthcare's Web Properties, including Tenet Healthcare's patient portal, Tenet Healthcare, through the source code it imbedded and ran on its Web Properties and servers, contemporaneously and intentionally intercepted, and endeavored to intercept Plaintiffs' and Class Members' electronic communications without authorization or consent.

559. Whenever Plaintiffs and Class Members interacted with Tenet Healthcare's Web Properties, including Tenet Healthcare's patient portal, Tenet Healthcare, through the source code it embedded and ran on its Web Properties and servers, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiffs' and Class Members' electronic communications to third parties, including Facebook and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

560. Whenever Plaintiffs and Class Members interacted with Tenet Healthcare's Web Properties, including Tenet Healthcare's patient portal, Tenet Healthcare, through the source code

it imbedded and ran on its Web Properties and servers, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiffs' and Class Members' electronic communications, for purposes other than providing health care services to Plaintiffs and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

561.    Whenever Plaintiffs and Class Members interacted with Tenet Healthcare's Web Properties, including Tenet Healthcare's patient portal, Tenet Healthcare, through the source code it embedded and ran on its Web Properties and servers, contemporaneously and intentionally redirected the contents of Plaintiffs' and Subclass Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

562.    Whenever Plaintiffs and Class Members interacted with Tenet Healthcare's Web Properties, including Tenet Healthcare's patient portal, Tenet Healthcare, through the source code it embedded and ran on its Web Properties and servers, contemporaneously and intentionally divulged the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

563.    Tenet Healthcare intentionally intercepted and used the contents of Plaintiffs' and Class Members' electronic communications for the unauthorized purpose of disclosing and, on information and belief, profiting from, Plaintiffs' and Class Members' communications by selling the contents to third parties including Facebook and Google.

564.    Plaintiffs and Class Members did not authorize Tenet Healthcare to acquire the content of their communications for purposes of sharing and selling the personal information contained therein.

565.   The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

566.   Tenet Healthcare is a "party to the communication" with respect to patient communications.

567.   Tenet Healthcare's acquisition of patient communications that were used and disclosed to Facebook, Google, and others was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and of California, including:

(a)   Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

(b)   Violation of California's Constitution, Art. 1, § 1;

(c)   Violation of 15 U.S.C. § 45;

(d)   A knowing intrusion upon Plaintiffs' and Class Members' seclusion;

(e)   Trespass upon Plaintiffs' and Class Members' personal and private property via the placement of an _fbp cookie associated with the domains and patient portals for their health care provider on Plaintiffs' and Class Members' personal computing devices;

(f)   Violation of the California Consumer Legal Remedies Act;

(g)   Violation of Cal. Penal Code § for statutory larceny;

(h)   Violation of California's Confidentiality of Medical Information Act, Civil Code §§ 56, *et seq.*;

(i)   Violation of the federal wire fraud statutes at 18 U.S.C. §§ 1343 (fraud by wire, radio, or television) and 1349 (attempt and conspiracy), which prohibit any person from "devising or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate … commerce, any

1   writings, signs, signals, pictures, or sounds for purpose of executing such

2   scheme or artifice."

3   (j)    Violation California Comprehensive Computer Data Access and Fraud Act,

4          Cal. Penal Code § 502;

5   (k)    Violation of California's Online Privacy Protection Act, Cal. Bus. & Prof. Code

6          §§ 22575, *et seq*;

7   (l)    Violation of Cal. Civil Code § 1798.82; and

8   (m)    Violation of California's Unfair Competition Law, CAL. BUS. & PROF.

9          CODE §§ 17200, et seq;

10  568.    Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or

11  cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health

12  information to another person … without authorization" from the patient.

13  569.    The penalty for violation is enhanced where "the offense is committed with intent

14  to sell, transfer, or use individually identifiable health information for commercial advantage,

15  personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

16  570.    Tenet Healthcare's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused

17  to be used fbp, ga, and gid cookies associated with specific patients without patient authorization

18  and disclosed individually identifiable health information to Facebook, Google, and others.

19  571.    Tenet Healthcare's conduct would be subject to the enhanced provisions of 42

20  U.S.C. § 1320d-6 because Tenet Healthcare's use of the Facebook and Google source code was

21  for Tenet Healthcare's commercial advantage to increase revenue from existing patients and gain

22  new patients. The unauthorized disclosure of individually identifiable health information is a

23  criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the

24  individually identifiable health information.  Tenet Healthcare intentionally violated 42 U.S.C.

25  1320d-6 by intentionally disclosing individually identifiable health information without

26  authorization.

27

28

572.    Tenet Healthcare's conduct also constituted a violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a criminal offense punishable by fine or imprisonment with *increased penalties* where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain."  Tenet Healthcare intentionally violated the enhanced penalty provision of 42 U.S.C. § 1320d-6 by acquiring the individually identifiable health information "with intent to sell transfer or use" it for "commercial advantage [or] personal gain."

573.    Tenet Healthcare's conduct violated the California Confidentiality of Medical Information Act in that:

(a)    Tenet Healthcare accessed Plaintiffs' and Class Members' computing devices and data as part of a deception and without their authorization, including through placement of the fbp, ga, and gid cookies as well as use of source code that commanded Plaintiffs' and Class Members' computing devices to send identifiers and the content of communications with Tenet Healthcare simultaneously to Tenet Healthcare and Facebook, Google, and others;

(b)    Tenet Healthcare obtained use of or and removed data from Plaintiffs' and Class Members' computing devices as part of a deception and without their authorization, including through placement, use, and removal of the fbp, ga, and gid cookies as well as use of source code that commanded Plaintiffs' and Class Members' computing devices to send identifiers and the content of communications with Tenet Healthcare simultaneously to Tenet Healthcare and Facebook, Google, and others;

(c)    Tenet Healthcare accessed or caused to be accessed the Plaintiffs' and Class Members' computing devices and data, and thereby obtained control over the Plaintiffs' and Class Members' property in the form of their computing devices and right to control access and use of their personal health information as part

of a deception and without their authorization, including through placement of the fbp, ga, and gid cookies as well as the use of source code that commanded Plaintiffs' and Class Members' computing devices to send identifiers and the content of communication with Tenet Healthcare simultaneously to Facebook, Google, and others.

574.    Tenet Healthcare's conduct violated the California Comprehensive Computer Data Access and Fraud Act when it when it knowingly and without Plaintiffs' or Class Members' authorization inserted the fbp, ga, and gid cookies on Plaintiffs' and Class Members' computing devices.

575.    The fbp, ga, and gid cookies, which constitute programs, commanded Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Tenet Healthcare to Google, Facebook, and others.

576.    Tenet Healthcare knew or had reason to know that the fbp, ga, and gid cookies would command Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Tenet Healthcare to Google, Facebook, and others.

577.    Tenet Healthcare knew or had reason to know that its use of the fbp, ga, and gid cookies would cause Plaintiffs and Class Members to suffer a loss, including:

(a)    The interruption or preclusion of Plaintiffs' and Class Members' ability to communicate with their health care providers on their health care providers' or websites;

(b)    The diminution in value of Plaintiffs' and Class Members' protected health information;

(c)    Plaintiffs' and Class Members' inability to use their computing devices for the purpose of communicating with their health care providers;

(d)     The loss of privacy due to Tenet Healthcare making sensitive and confidential information such as patient status, test results, and appointments that Plaintiffs and Class Members intended to remain private no longer private; and

578.    Tenet Healthcare took something of value from Plaintiffs and Class Members and derived benefits therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value.

579.    Tenet Healthcare's acquisition of patient communications that Tenet Healthcare used and disclosed to Facebook, Google, and others was done in violation of California's Unfair Competition Law, as alleged above in Count VIII.

580.    Tenet Healthcare's acquisition of patient communications that Tenet Healthcare used and disclosed to Facebook, Google, and others was done for purposes of committing trespass to chattels, as alleged below, in that it was accomplished through source code that cause Facebook and Google cookies (including but not limited to the fbp, ga, and gid cookies) to be deposited on Plaintiffs' and Class Members' computing devices as "first-party" cookies that are not blocked.

581.    The federal wire fraud statute, 18 U.S.C. § 1343, has four elements: (1) that the Defendants voluntarily and intentionally devised a scheme to defraud another out of money or property; (2) that the Defendants did so with the intent to defraud; (3) that it was reasonably foreseeable that interstate wire communications would be used; and (4) that interstate wire communications were in fact used.  The attempt version of the wire fraud statute provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object or conspiracy."  18 U.S.C. § 1349.

582.    Tenet Healthcare's scheme to defraud consisted of making false and misleading statements to its patients on its Web Properties as described above.  The "property" consists of Plaintiffs' and Class Members' property rights to the confidentiality of their individually identifiable health information and their right to determine whether such information remains

confidential and the exclusive right to determine who may collect and/or use such information for marketing purposes. Tenet Healthcare acted with the intent to defraud in that it willfully deceived its patients regarding how Tenet Healthcare would treat their personal health information, including deceiving its patients into believing that Tenet Healthcare would never share their personal health information for "marketing" purposes without their written consent. It was reasonably foreseeable to Tenet Healthcare that its scheme and artifice to defraud would involve interstate wire communications and, in fact, interstate wire communications were used in carrying out Tenet Healthcare's scheme and artifice to defraud.

583.    Courts around the country have uniformly held that a health care provider's use of the Meta Pixel on its website without patient authorization is actionable in tort or contract or a statutory violation. *See Doe v. Mercy Health*, Case No. A 2002633 (Hamilton County, Ohio); *Doe v. Partners Health*, Case No. 1984-CV-01651 (Suffolk County, Massachusetts); *Doe v. Sutter Health*, Case No. 34-2019-00258072-CU-BT-GDS (Sacramento County, California); *Doe v. University Hospitals*, Case No. CV-20-9333357 (Cuyahoga County, Ohio); *Doe v. Sutter Health*, Case No. 34-2019-00258072-CU-BT-GDS (Sacramento County, California).

584.    As a direct and proximate result of Tenet Healthcare's violation of the ECPA, Plaintiffs and Class Members were damaged by Tenet Healthcare's conduct in that:

(a)    Tenet Healthcare harmed Plaintiffs' and Class Members' interest in privacy;

(b)    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no more;

(c)    Tenet Healthcare eroded the essential confidential nature of the provider-patient relationship;

(d)    Tenet Healthcare took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

(e)    Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Tenet Healthcare's duty to maintain confidentiality; and

(f)    Tenet Healthcare's actions diminished the value of Plaintiffs' and Class Members' personal information.

585.    Plaintiffs, individually, on behalf of the Class Members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## COUNT XI—TRESPASS TO CHATTELS

586.    Plaintiffs reallege and incorporate by reference each allegation in the preceding and succeeding paragraphs.

587.    Plaintiffs bring this claim on behalf of themselves and the Patient Subclass.

588.    Plaintiffs and Patient Subclass Members owned, leased, or controlled their computing devices from which they communicated with Tenet Healthcare.

589.    As set forth below, Tenet Healthcare intentionally used, intermeddled, interfered with, and dispossessed Plaintiffs and Patient Subclass Members of their computing devices without their consent by placing the fbp, ga, and gid cookies on Plaintiffs' and Patient Subclass Members' computing devices, which caused Plaintiffs and Patient Subclass Members to suffer damages.

590.    For security purposes, Plaintiffs and other Patient Subclass Members must enable first-party cookies to use the Tenet Healthcare patient portal.

591.    Tenet Healthcare abuses this security purpose of first-party cookies for its patient portal by deploying source code that facilitates tracking through first-party cookies, which are *required* by Tenet Healthcare for any patient to use its patient portal.

592.    The source deployed by Tenet Healthcare on its Web Properties is designed such that, when Plaintiffs and other Patient Subclass Members visit the Tenet Healthcare Web

Properties, cookies associated with Facebook and Google are deposited on their communications devices.

593. For Facebook, the source code that Tenet Healthcare has deployed on its Web Properties deposits a cookie named "_fbp" on the patients' device.

594. For Google, the source code that Tenet Healthcare has deployed on its Web Properties deposits cookies named "_ga" and "_gid" on the patients' device.

595. Although they are cookies associated with the third-parties Facebook and Google, respectively, the fbp, ga, and gid cookies are deposited on the patients' communications device as "first-party" cookies associated with Tenet Healthcare. By depositing the fbp, ga, and gid cookies as first-party cookies, Tenet Healthcare ensures that it is able to share each Plaintiffs and Patient Subclass Members' identification numbers with Facebook and Google even if a patient attempted to block third-party cookies. The Facebook "fbp" cookies are used to track Plaintiffs and patient communications on Defendants' websites and to log-in to the Tenet Healthcare patient portal.

596. The Google "ga" and "gid" cookies are used to track Plaintiffs and patient communications on Defendants' websites and to log-in to the Tenet Healthcare patient portal.

597. Plaintiffs and Patient Subclass Members did not consent to Tenet Healthcare using source code that places cookies associated with Facebook and Google on their devices as "first-party" cookies.

598. Tenet Healthcare's placement of the Facebook and Google cookies as first-party cookies is the modern equivalent of placing a bug in someone's telephone or on the desk where their computer sits. The Facebook and Google source code and cookies deployed by Tenet Healthcare have taken the place of the "bug," which is why these tools are often called "web bugs."

599.    Plaintiffs and Patient Subclass Members' computing devices derive substantial value from their ability to facilitate communications with their health care providers or covered entities, which is integral to the intended function of their devices.

600.    Tenet Healthcare's setting of Facebook and Google cookies results in the persistent and unavoidable interception of Plaintiffs' and Patient Subclass Members' communications, which deprives Plaintiffs and Patient Subclass Members of the full value of using their computing devices for those communications.

601.    Plaintiffs' and Patient Subclass Members' devices are useless for exchanging private communications with Tenet Healthcare, which substantially impairs the condition, quality, and value of Plaintiffs' and Patient Subclass Members' computing devices.

602.    Tenet Healthcare's trespass onto Plaintiffs' and Patient Subclass Members' computing devices caused them the following damages:

(a)    Nominal damages for trespass;

(b)    The total deprivation of their use of their computing devices to privately communicate with Tenet Healthcare.

603.    For Tenet Healthcare's trespass, Plaintiffs and Patient Subclass Members seek nominal damages, actual damages, general damages, unjust enrichment, punitive damages, and any other relief the Court deems just.

## VII. DEMAND FOR JURY TRIAL

604.    Plaintiffs hereby demand a trial by jury on all issues so triable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the proposed Class and Subclass respectfully requests that the Court enter an order:

A.    Certifying the Classes and appointing Plaintiffs as the Classes' representative;

B.    Appointing the law firms of Caddell & Chapman, Ahmad, Zavitsanos, & Chapman, & Mensing PLLC and Turke & Strauss, LLP as class counsel;

C.    Finding that Defendants' conduct was unlawful, as alleged herein;

1

     D.      Awarding such injunctive and other equitable relief as the Court deems just and proper;

2

     E.      Awarding Plaintiffs and the Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

3

4

     F.      Awarding Plaintiffs and the Class Members pre-judgment and post-judgment interest;

5

6

     G.      Awarding Plaintiffs and the Class Members reasonable attorneys' fees, costs, and expenses; and

7

     H.      Granting such other relief as the Court deems just and proper.

8

Dated: October 10, 2023,          Respectfully submitted,

9

By: */s/ Michael A. Caddell*

10

Michael A. Caddell (SBN 249469)
mac@caddellchapman.com

11

Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com

12

Amy E. Tabor (SBN 297660)
aet@caddellchapman.com

13

CADDELL & CHAPMAN

14

628 East 9th Street
Houston TX 77007-1722

15

Tel.: (713) 751-0400

16

Fax: (713) 751-0906

17

18

Foster C. Johnson (SBN 289055)
Joseph Amhad*

19

Nathan Campbell*
AHMAD, ZAVITSANOS, & MENSING, PLLC

20

1221 McKinney Street, Suite 3460
Houston TX 77010

21

(713) 655-1101

22

fjohnson@azalaw.com
ahmad@azalaw.com

23

ncampbell@azalaw.com

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Samuel J. Strauss*
Raina C. Borrelli*
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
Telephone: (608) 237-1775
Facsimile: (608) 509-4423
sam@turkestrauss.com
raina@turkestrauss.com

* Motions for Admission to be filed

*Attorneys for Plaintiffs*

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1

**CERTIFICATE OF SERVICE**

2

I, Foster Johnson, hereby certify that on October 10, 2023 this document was filed with the

3

Court using the CM/ECF system and thereby served on all counsel of record.

4

5

*/s/Foster Johnson*
Foster Johnson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28