1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JANE DOE, et al.,                        No.  1:23-cv-01106-DC-CKD

12              Plaintiffs,

13         v.                                   ORDER GRANTING IN PART AND
                                                DENYING IN PART DEFENDANTS'
14    TENET HEALTHCARE                          MOTION TO DISMISS PLAINTIFFS' FIRST
      CORPORATION, et al.,                      AMENDED COMPLAINT
15
                                                (Doc. Nos. 30, 31, 42)
16              Defendants.

17         This matter is before the court on Defendants' motion to dismiss Plaintiffs' first amended

18   class action complaint. (Doc. No. 30.) Pursuant to Local Rule 230(g), the pending motion was

19   taken under submission to be decided on the papers. (Doc. No. 32.) For the reasons explained

20   below, the court will grant in part and deny in part Defendants' motion to dismiss.

21                                   **BACKGROUND**

22         On October 10, 2023, Plaintiffs Jane Doe, Jan Doe, John Doe, and James Doe filed the

23   operative first amended class action complaint ("FAC") against Defendants Tenet Healthcare

24   Corporation ("Tenet"), Doctors Medical Center of Modesto, Inc. ("DMC"), Desert Regional

25   Medical Center, Inc. ("DRMC"), and Twin Cities Community Hospital, Inc. ("TCC") for

26   allegedly intercepting and transmitting their protected health information ("PHI") and personally

27   /////

28   /////

                                            1

identifiable information ("PII") to Meta Platforms, Inc. ("Meta"), formerly known as Facebook,[1] Google, and other third parties for marketing and advertising purposes, without their knowledge or consent.[2] (Doc. No. 19 at 1–4.)

Plaintiffs bring eleven causes of action against Defendants: (1) violation of the California Invasion of Privacy Act ("CIPA"), California Penal Code §§ 630 *et seq*.; (2) violation of the California Confidentiality of Medical Information Act ("CMIA"), California Civil Code § 56.06; (3) violation of the CMIA, California Civil Code § 56.101; (4) violation of the CMIA, California Civil Code § 56.10; (5) invasion of privacy and violation of the California Constitution, Art. I § 1; (6) violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), California Penal Code § 502; (7) quasi-contract/restitution/unjust enrichment; (8) violation of California's Unfair Competition Law, California Business & Professions Code §§ 17200 *et seq*.; (9) violation of California's Consumer Records Act ("CRA"), California Civil Code § 1798.82; (10) violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510 *et seq*.; and (11) trespass to chattels. (*Id.* at 95–133.)

Plaintiffs bring this data privacy action against Defendants on behalf of themselves and the following classes:

> **The Tenet Healthcare Class:** For the period July 21, 2018, to the present, all individuals who are, or were, patients or prospective patients of Tenet Healthcare or any of its affiliates and who exchanged communications at Defendants' websites, including Defendants' patient portals.
>
> **The California Subclass:** For the period July 21, 2018, to the present, all California citizens who are, or were, patients or prospective patients of Tenet Healthcare or any of its affiliates and who exchanged communications at Defendants' websites, including Defendants' patient portals.

---

[1] Plaintiffs refer to Meta as both "Meta" and "Facebook" throughout their complaint. For clarity in this order, the court uses "Meta" to refer to the corporation and "Facebook" to refer only to Meta's social media platform.

[2] Plaintiffs filed their original complaint on July 24, 2023. (Doc. No. 1) Defendants filed a motion to dismiss that original complaint on September 29, 2023 (Doc. No. 13), which the court denied as moot because Plaintiffs timely filed a first amended complaint as a matter of course pursuant to Federal Rule of Civil Procedure 15(a)(1) (Doc. No. 20).

> **The Patient Subclass:** For the period July 21, 2018, to the present, all California citizens who are, or were, patients of Tenet Healthcare or any of its affiliates and who exchanged communications at Defendants' websites, including Defendants' patient portals.

(*Id.* at ¶ 398.) Plaintiffs bring Counts 1–6 on behalf of themselves and the California Subclass, Counts 7–9 and 11 on behalf of themselves and the Patient Subclass, and Count 10 on behalf of themselves and the Tenet Healthcare Class. (*Id.* at 95–133.)

## A.    Factual Background

Plaintiffs allege the following in their FAC. Defendant Tenet is a Nevada corporation that owns more than 465 ambulatory surgery centers and surgical hospitals, 61 hospitals, and 110 additional outpatient centers across the United States. (*Id.* at ¶ 24.) Defendant Tenet owns and operates hospitals and medical systems in California, including Defendants DMC, DRMC, and TCC. (*Id.*) Defendant Tenet also owns and operates multiple websites and patient portals offering services in California (hereinafter, "Web Properties"). (*Id.* at ¶¶ 24–25, 34.)

Defendant DMC is a "full-service, comprehensive healthcare facility" in Modesto, California. (*Id.* at ¶ 29.) Defendant DMC is the largest hospital between the California cities of Stockton and Fresno and treats more than 100,000 emergency patients each year. (*Id.*) Defendant DMC operates a public-facing website located at https://www.dmc-modesto.com/, as well as a patient portal which may be accessed at https://www.dmcmodesto.com/portal. (*Id.*)

Defendant DRMC operates a hospital in Palm Springs, California. (*Id.* at ¶ 31.) Defendant DRMC offers medical services including emergency care, bariatric surgery, cardiovascular treatment, gastroenterology, and gynecology services. (*Id.*) Defendant DRMC advertises its services on a public-facing website for the Desert Care Network located at https://www.desertcare network.com/locations/detail/desert-regional-medical-center. (*Id.*) Defendant DRMC also operates a patient portal which may be accessed at https://www.desertcarenetwork.com/portal. (*Id.*)

Defendant TCC, a branch of Tenet Health Central Coast Primary & Specialty Care, operates a 122-bed acute care hospital in Templeton, California. (*Id.* at ¶¶ 26, 30.) Defendant TCC offers medical, surgical, and outpatient services including emergency care, obstetrics,

1    orthopedics, wound care, and stroke treatment. (*Id.* at ¶ 30.) Defendant TCC operates a public-

2    facing website at https://www.tenethealthcentralcoast.com/locations/detail/twin-cities-

3    community- hospital, as well as a patient portal which may be accessed at https://www.tenethealt

4    hcentralcoast.com/portal. (*Id.*)

5        Through their Web Properties, Defendants sell medical services to California citizens, and

6    the Web Properties include interactive features "designed to encourage users to provide [Tenet]

7    with PHI and PII that [Tenet] then barters to third parties." (*Id.* at ¶ 34.) Defendants' websites

8    "contain numerous interactive features," meaning "a user can exchange information with the host

9    computer." (*Id.*) These interactive features include "scheduling appointments, searching for

10   physicians, paying bills, requesting medical records, learning about medical issue treatment

11   options, and joining support groups." (*Id.* at ¶ 52.) Defendants' patient portals "allow patients to

12   make appointments, access medical records, view lab results and exchange communications with

13   health care providers." (*Id.* at ¶ 53.)

14           1.    Defendants' Use of Meta Pixel

15       Defendants deploy "various digital marketing and automatic software tools" on their Web

16   Properties that disclose information to Meta, Google, and other third parties for "advertising

17   purposes." (*Id.* at ¶ 8–9.) Specifically, Defendants have installed source code known as "tracking

18   pixels" on their Web Properties to share user information with third parties. (*Id.* at ¶¶ 34–35, 55–

19   56, 79, 184, 233.) Meta Pixel ("Pixel") is among the tracking pixels Defendants have installed on

20   their Web Properties. (*Id.* at ¶¶ 42–43, 71, 111, 184, 233.) Pixel was developed by Meta as "a

21   new way to report and optimize for conversions, build audiences and get rich insights about how

22   people use [] website[s]." (*Id.* at ¶ 208.) Pixel enables Defendants to "measure the effectiveness

23   of their advertising by understanding the actions people take on their websites." (*Id.*)

24       Pixel is a "snippet of code embedded on a third-party website that tracks users' activities

25   as users navigate through a website." (*Id.* at ¶ 192.) When a user visits a webpage containing

26   Pixel, the code tracks and log each page the user visits, what buttons they click, as well as specific

27   information that users input into a website. (*Id.*) Pixel functions by monitoring for an "event" that

28   triggers the code on Defendants' Web Properties, including their websites and patient portals. (*Id.*

4

at ¶¶ 98, 130.) On Defendants' Web Properties, Pixel is triggered each time a user interacts with new webpages, enters search terms in the search bar, engages with the "Find A Doctor" function, fills out forms, completes assessments, logs into the patient portal, or uses the patient portal. (*Id.* at ¶¶ 110, 130, 236, 242, 245–248, 273.) When an event occurs, Pixel "send[s] the information it collects to [Meta] through scripts running in a user's internet browser, similar to how a 'bug' or wiretap can capture audio information." (*Id.* at ¶¶ 213, 233.) In other words, Pixel redirects the content of the users communications to Meta simultaneously in "real time" while the exchange of information between the user and Defendants' Web Properties is still occurring. (*Id.* at ¶¶ 232, 239.)

Pixel transmits data to Meta as a "full-string, detailed URL" consisting of information regarding a user's browsing history, the name of the web page visited, and the search terms that the user used to find the web page. (*Id.* at ¶¶ 202, 255.) The information Meta receives via Pixel may include "the kinds of treatments that patients research on the hospital's website, . . . patients' past and future medical conditions, their past and future medical treatment, [] when and where they are receiving treatment for those conditions," "the patient's home address, their name, their search location, as well as their doctor's specialty, name, and gender." (*Id.* at ¶ 83.)

Pixel also sends Meta a user's PII, including their internet protocol (IP) address, name, email, phone number, cookies, and browsing fingerprint (i.e., information that can be used to identify the specific device). (*Id.* at ¶¶ 204, 211, 215.) If the user has a Facebook account, Meta also receives the user's Facebook ID ("FID"). (*Id.* at ¶¶ 215–217.) "A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details." (*Id.* at ¶¶ 117, 120.) A user's PII is sent to Meta in a "data packet" alongside information on the user's interactions with Defendants' Web Properties, allowing Meta to "link" a user's activity on Defendants' Web Properties to their Facebook profile. (*Id.* at ¶¶ 82–84, 239, 263.)

In addition to Pixel, Defendants installed and implemented Meta's Conversions Application Programming Interface ("CAPI") on their Web Properties' servers. (*Id.* at ¶ 58.) Unlike Pixel, which causes a user's browser to transmit information directly to Meta, "CAPI

1  tracks the user's website interaction . . . records and stores that information on the website

2  owner's servers and then transmits the data to [Meta] from the website owner's servers." (*Id.* at ¶

3  59.) CAPI is located on "the website owner's servers (rather than a bug placed on the website

4  users' browsers)," meaning website owners can "circumvent any ad blockers or similar

5  technologies." (*Id.* at ¶ 61.) CAPI captures information submitted by users to Defendants' Web

6  Properties, including "the type of medical treatment sought, the individual's particular health

7  condition and the fact that the individual attempted to or did book a medical appointment." (*Id.* at

8  ¶ 64.)

9      Finally, Defendant Tenet "discloses the same kind of patient data" that it provides to Meta

10  to other third parties involved in internet marketing, including Google, via tracking software

11  installed on its websites. (*Id.* at ¶ 258.) Namely, Defendants deploy Google tracking tools, such as

12  Google Analytics, Google DoubleClick, and Google AdWords, on "nearly every page of their

13  websites, resulting in the disclosure of communications exchanged with patients to be transmitted

14  to Google." (*Id.* at ¶¶ 259, 262.) Transmissions of information to Google "occur simultaneously

15  with patients' communications" with Defendants' Web Properties and include data on "specific

16  medical providers, treatments, conditions, appointments, payments, and registrations and logins to

17  Defendants' patient portal." (*Id.* at ¶ 262.) Google also receives a user's PII, including their IP

18  address, cookies, geolocation, and other identifiers. (*Id.* at ¶ 259.)

19      2.    Allegations Specific to Plaintiffs

20      Plaintiffs are residents of California, patients of Defendant Tenet, and have received

21  treatment at Defendant Tenet's facilities, including Defendants DMC, DRMC, and TCC. (*Id.* at

22  ¶¶ 13–23, 39–40.) Plaintiffs have visited and used Defendants' Web Properties, including their

23  websites and patient portals, to research medical treatments, search for doctors, make

24  appointments, and review their medical records. (*Id.*) Plaintiffs are also Facebook users. (*Id.*)

25  Plaintiffs allege that when they used Defendants' Web Properties, tracking pixels intercepted and

26  disclosed their sensitive medical information alongside their PII to Meta, Google, and other third

27  parties without their consent. (*Id.* at ¶¶ 3, 34, 55.)

28      Specifically, Plaintiffs allege the following individual interactions with Defendants' Web

6

Properties:

a.    *Plaintiff Jane Doe*

Plaintiff Jane Doe has been a patient of Defendant Tenet since 2018 and has received treatment at Defendant DMC's facility. (*Id.* at ¶ 39.) Plaintiff Jane Doe has used Defendant DMC's website and patient portal regularly since 2018, and as recently as May 2023. (*Id.* at ¶¶ 39, 265.) Specifically, Plaintiff Jane Doe has used Defendant DMC's website to find OB/GYN doctors and other healthcare professionals to obtain medical care for her pregnancy and for childbirth. (*Id.* at ¶¶ 39, 266.) She has used the following features on Defendant DMC's website: the "Find A Doctor" function, the "Search" function, and the "Services" function. (*Id.* at ¶¶ 265–266.) When interacting with the website, Plaintiff Jane Doe entered information including "her name, her patient status, the name of her specific treating physician, her browsing history, and the name of the specific medical conditions (pregnancy and childbirth) she was seeking treatment for." (*Id.* at ¶ 267.) Plaintiff Jane Doe has also used Defendant DMC's patient portal to review her medical records and test results. (*Id.* at ¶¶ 268–274.) When interacting with the patient portal, Plaintiff Jane Doe entered information related to her pregnancies. (*Id.* at ¶ 268.)

Plaintiff Jane Doe maintains a Facebook account. (*Id.* at ¶ 265.) After conducting searches on Defendant DMC's website, Plaintiff Jane Doe "began receiving advertisements on her Facebook related to searches for medical information that she conducted on Doctors Medical Center of Modesto's website, including advertisements that related to her child's birth." (*Id.* at ¶ 275.)

b.    *Plaintiff Jan Doe*

Plaintiff Jan Doe has been a patient of Defendant Tenet since 2016 and has received treatment for lung health and gastroenterology-related issues at Hi-Desert Medical Center, which Tenet operates alongside Defendant DRMC. (*Id.* at ¶¶ 28, 276.) Plaintiff Jan Doe has used Defendant Tenet's Desert Care Network website at https://www.desertcarenetwork.com/ and patient portals 3–4 times a year since 2016. (*Id.* at ¶¶ 28, 276.) Plaintiff Jan Doe most recently used the website and portal for the Desert Care Network and Hi-Desert Medical Center in 2023. (*Id.* at ¶ 276.) Specifically, Plaintiff Jan Doe has used the Desert Care Network website to "search

1  for doctors, make emergency room appointments, and research details about potential medical

2  treatments." (*Id.* at ¶ 277.) When interacting with the website, Plaintiff Jan Doe entered

3  information relating to her inflammation issues and searches for ophthalmologists, orthopedic

4  surgeons, and rheumatologists. (*Id.*) Plaintiff Jan Doe has also used two different patient portals

5  in the Desert Care Network—the Hi-Desert patient portal and the Desert Care Network/Hi-Desert

6  Medical Center patient portal. (*Id.* at ¶ 280.) Plaintiff Jan Doe used these portals to review her

7  medical records. (*Id.*) When interacting with the patient portals, Plaintiff Jan Doe entered

8  information related to her lung health and gastrointestinal issues. (*Id.* at ¶ 282.)

9      Plaintiff Jan Doe has had a Facebook account since 2009. (*Id.* at ¶ 276.) After visiting the

10  Desert Care Network website and patient portals, Plaintiff Jan Doe "began receiving targeting

11  advertising on her Facebook page directed towards her medical conditions." (*Id.* at ¶ 283.)

12              *c.      Plaintiff John Doe*

13      Plaintiff John Doe has been a patient of Defendant Tenet since 2023 and has received

14  treatment at Defendant TCC's facility. (*Id.* at ¶ 284.) Plaintiff John Doe has used Defendant

15  Tenet's website for Tenet Health Central Coast facilities located at

16  www.tenethealthcentralcoast.com since 2023 to search for billing options and wound care

17  treatment for a foot ulcer. (*Id.*) Plaintiff John Doe has also used Defendant TCC's patient portal

18  1–2 times a month since April 2023. (*Id.*) Specifically, Plaintiff John Doe has used the Tenet

19  Health Central Coast website's "Search Box function" to search for billing and treatment options.

20  (*Id.* at ¶ 286.) When interacting with the website's "Search Box function," Plaintiff John Doe

21  entered terms including "Bills," "Billing," and "wound care." (*Id.*) Plaintiff John Doe has also

22  used the patient portal to pay and review bills. (*Id.* at ¶ 287.) When interacting with the patient

23  portal, Plaintiff John Doe entered information relating to his wound care and foot ulcer issues.

24  (*Id.*)

25      Plaintiff John Doe maintains a Facebook account. (*Id.* at ¶ 284.) After visiting the Tenet

26  Health Central Coast website and patient portal, Plaintiff John Doe "began receiving targeted

27  advertising on his Facebook page related to his treatment for wound care." (*Id.* at ¶ 290.)

28  /////

*d.*     *Plaintiff James Doe*

Plaintiff James Doe has been a patient of Defendant Tenet since 2020 and has received treatment at Defendant DRMC's facility for a stomach virus and anxiety related issues. (*Id.* at ¶¶ 291-292.) Plaintiff James Doe has used the Desert Care Network website multiple times a year, as recently as January 2022. (*Id.* at ¶ 292.) Specifically, Plaintiff James Doe has used the Desert Care Network website "to search for doctors, look up emergency room information, and research treatment options." (*Id.*) When using the website, Plaintiff James Doe entered information related to his anxiety-related issues for which he sought treatment. (*Id.*) Plaintiff James Doe used the Desert Care Network's "Search Box feature" on multiple occasions to enter terms including "IHP," "ER Insurance," and "Emergency Room." (*Id.* at ¶ 293.)

Plaintiff James Doe maintains a Facebook account. (*Id.* at ¶ 291.) After visiting the Desert Care Network website and patient portal, Plaintiff James Doe "began receiving targeted advertising on his Facebook page, including advertisements for clinical trials and for the specific medication he had been prescribed by Tenet Healthcare (Clonazepam) related to the anxiety issues for which he had sought information on the Desert Care Network website." (*Id.* at ¶ 295.)

## B.     Procedural Background

On October 3, 2023, the court issued an order relating this action to two other actions pending in this district: (1) *Beltran, et al. v. Doctors Medical Center of Modesto, et al.*, No. 2:23-cv-01670-DC-CKD, and (2) *Harrill v. Emanuel Medical Center, et al.*, No. 2:23-cv-01672-DC-CKD. (Doc. No. 17.)

On December 1, 2023, Defendants filed the pending motion to dismiss Plaintiffs' claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Doc. No. 30.) On June 28, 2024, Defendants filed a notice of supplemental authority in support of their motion to dismiss. (Doc. No. 38.) On July 5, 2024, Plaintiffs filed an opposition to the pending motion. (Doc. No. 39.) On July 19, 2024, Defendants filed their reply thereto. (Doc. No. 41.) On August 20, 2024, Plaintiffs filed a motion for administrative relief to file a sur-reply in opposition to Defendants' motion to dismiss. (Doc. No. 42.) On August 26, 2024, Defendants filed an opposition to Plaintiffs' motion for administrative relief to file a sur-reply. (Doc. No. 43.)

9

1                              **LEGAL STANDARD**

2          Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a claim

3   based on a lack of subject matter jurisdiction. Article III standing is a species of subject matter

4   jurisdiction. *Chandler v. State Farm Mut. Auto. Ins. Co.,* 598 F.3d 1115, 1121–22 (9th Cir. 2010).

5   In the context of a Rule 12(b)(1) motion, a plaintiff bears the burden of establishing Article III

6   standing to assert the claims. *Id.* at 1122.

7          Under Federal Rule of Civil Procedure 12(b)(6), a party may challenge the sufficiency of

8   allegations set forth in the complaint. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001).

9   "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal

10  theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple,*

11  *Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). "To survive a motion to dismiss, a complaint must

12  contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

13  face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

14  544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2) (a complaint must contain a short and plain

15  statement of the claim showing that the pleader is entitled to relief). "A claim has facial

16  plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

17  inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing

18  *Twombly*, 550 U.S. at 556).

19         For purposes of a motion to dismiss, the court accepts as true the allegations in the

20  complaint and construes the allegations in the light most favorable to the plaintiff. *Manzarek v. St.*

21  *Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008). If a court dismisses certain

22  claims, "[l]eave to amend should be granted unless the district court 'determines that the pleading

23  could not possibly be cured by the allegation of other facts.'" *Knappenberger v. City of Phoenix*,

24  566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)).

25                                 **ANALYSIS**

26         Defendants move to dismiss all of Plaintiffs' claims brought against them. (Doc. No. 30.)

27  Defendants contend that: (1) Plaintiff Jan Doe's and Plaintiff James Doe's claims should be

28  dismissed pursuant to the first-to-file rule, (2) Plaintiffs lack Article III standing with respect to

1   claims regarding websites they did not visit, (3) Plaintiffs' allegations are deficient with respect to

2   each claim, and (4) Plaintiffs' claims are wholly or partly time-barred by the applicable statute of

3   limitations. (*Id.*) The court addresses each argument in turn.

4   **A.    First-to-File Rule**

5           The first-to-file rule is a "recognized doctrine of federal comity which permits a district

6   court to decline jurisdiction over an action when a complaint involving the same parties and

7   issues has already been filed in another district." *Pacesetter Sys., Inc. v. Medtronic, Inc*., 678 F.2d

8   93, 94–95 (9th Cir. 1982) (citation omitted). "The first-to-file rule allows a district court to

9   dismiss a complaint or claim that is duplicative, transfer all or part of the case to the first-filed

10  district, or stay all or part of the case pending a decision in the prior-related action." *Heinz v.*

11  *Mazda Motor of Am., Inc*., No. 2:22-cv-02058-TLN-CKD, 2023 WL 4305118, at *1 (E.D. Cal.

12  June 30, 2023) (citing *Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1239–

13  40 (9th Cir. 2015)). The rule is intended to "serve[] the purpose of promoting efficiency well and

14  should not be disregarded lightly." *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 625 (9th

15  Cir. 1991) (citation omitted). "When applying the first-to-file rule, courts should be driven to

16  maximize 'economy, consistency, and comity.'" *Kohn*, 787 F.3d at 1240 (citation omitted).

17          To determine whether the first-to-file rule applies, courts look to three factors: (1) the

18  chronology of the two actions; (2) the similarity of the parties; and (3) the similarity of the issues.

19  *Id.* Exceptions to the rule include cases of bad faith, anticipatory suit, forum shopping, or where

20  the balance of convenience favors the later-filed action. *Alltrade*, 946 F.2d at 628. The first-to-file

21  rule "is not a rigid or inflexible rule to be mechanically applied, but rather is to be applied with a

22  view to the dictates of sound judicial administration." *Pacesetter Sys., Inc.*, 678 F.2d at 95; *see*

23  *also Alltrade, Inc*., 946 F.2d at 628 ("The most basic aspect of the first-to-file rule is that it is

24  discretionary.").

25          In their motion, Defendants urge the court to dismiss the claims asserted by Plaintiff Jan

26  Doe and Plaintiff James Doe against Defendants Tenet and DRMC arising out of their use of the

27  Desert Care Network website based on the first-to-file rule. (Doc. No. 30 at 15–16.) Defendants

28  contend that there is a risk of inconsistent judgments because Plaintiff Jan Doe's and Plaintiff

1    James Doe's allegations and claims are virtually identical to those raised in an earlier filed action

2    in the United States District Court for the Central District of California, *B.K., et al. v. Desert Care*

3    *Network, et al.*, No. 2:23-cv-05021-SPG-PD (C.D. Cal. 2023) ("Desert Care Action").[3] (*Id.* at 10,

4    15–16.) The court will address the parties' respective arguments with regard to each of the factors

5    courts consider in determining whether the first-to-file rule applies.

6            1.    Chronology of the Actions

7            As to the first factor, chronology of the lawsuits, Plaintiffs do not dispute that the *Desert*

8    *Care Action* was filed before this action. Indeed, the *Desert Care Action* was filed on June 23,

9    2023, before this case was filed on July 24, 2023. (*See* Doc. No. 1); *B.K., et al. v. Desert Care*

10   *Network, et al.*, No. 2:23-cv-05021-SPG-PD, Compl., Doc. No. 1 (C.D. Cal. June 23, 2023).

11   Therefore, the *Desert Care Action* is the first-filed action. Thus, consideration of this factor

12   weighs in favor of applying the first-to-file rule.

13           2.    Similarity of the Parties

14           Next, the court considers the similarity of the parties in both actions. Consistent with its

15   purpose, the first-to-file rule "does not require exact identity of the parties." *Kohn*, 787 F.3d at

16   1240. Instead, the rule "requires only substantial similarity of parties." *Id.* When analyzing the

17   first-to-file rule in putative class actions, a court considers the similarity between the classes, not

18   the class representatives. *See Adoma v. Univ. of Phoenix, Inc.*, 711 F. Supp. 2d 1142, 1147 (E.D.

19   Cal. 2010). Courts have found classes to be substantially similar where "both classes seek to

20   represent at least some of the same individuals." *Id.* at 1148; *see also Tompkins v. Basic Rsch. LL*,

21   No. 2:08-cv-00244-LKK-DAD, 2008 WL 1808316, at *6 (E.D. Cal. Apr. 22, 2008) (applying the

22   first-to-file rule where there was a "risk of inconsistent judgments" because the same consumers

23   ───────────────
     [3] Defendants request that the court take judicial notice of the first amended complaint filed in the
24   *Desert Care Action*. (Doc. No. 31 at 2.) Federal Rule of Evidence 201(b) provides that a court
     "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally
     known within the trial court's territorial jurisdiction; or (2) can be accurately and readily
25   determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).
     Courts regularly take judicial notice of court filings and other matters of public record. *See Reyn's*
26   *Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). Therefore, the court
     will take judicial notice of the first amended complaint filed in the *Desert Care Action.* The court
27   will also take judicial notice of plaintiffs' second amended complaint in the *Desert Care Action*,
     which was filed after Defendants in this action filed their pending motion to dismiss and request
28   for judicial notice.

1    were represented by two class actions).

2        In their motion, Defendants argue there is substantial overlap between the parties in this

3    action and the *Desert Care Action*. Specifically, Defendants assert that both actions name

4    Defendants Tenet and DRMC, and Plaintiffs Jan Doe and James Doe fall within the definition of

5    the classes proposed in the *Desert Care Action.* (Doc. No. 30 at 15–16.) In their opposition,

6    Plaintiffs argue that each case involves defendants that are not parties to the other case and the

7    named plaintiffs in each case are dissimilar. (Doc. No. 39 at 7.) Plaintiffs further argue that this

8    case concerns different classes because the *Desert Care Action* is brought on behalf of "all

9    individuals," whereas in this action, Plaintiffs restrict their proposed classes to "patients or

10   prospective patients." (*Id* at 8.)

11       The court finds Defendants' arguments to be persuasive. There is substantial similarity

12   between the defendants in the *Desert Care Action* and the instant action. The *Desert Care Action*

13   involves claims against Tenet, DRMC, Desert Care Network, and JFK Memorial Hospital, Inc.

14   (Doc. No. 31-1.) Plaintiffs in this action similarly bring claims against Tenet and DRMC, in

15   addition to claims against DMC and TCC. (Doc. No. 19). In other words, at least two of the same

16   parties are named as defendants in both actions. The fact that Plaintiffs do not also bring claims

17   against Desert Care Network and JFK Memorial Hospital, Inc. in this action is not a barrier to

18   applying the first-to-file rule. *See Pac. Coast Breaker, Inc. v. Conn. Elec., Inc.*, No. 2:10-cv-

19   03134-KJM-EFB, 2011 WL 2073796, at *3 (E.D. Cal. May 24, 2011) ("The [first-to-file] rule is

20   satisfied if some [of] the parties in one matter are also in the other matter, regardless of whether

21   there are additional, unmatched parties on one or both matters.") (citation omitted).

22       Further, Plaintiffs' argument that the named plaintiffs in both actions differ is irrelevant to

23   determining whether the first-to-file rule is applicable. As noted above, for purposes of the first-

24   to-file rule, the court considers similarities between the proposed classes in both actions, not the

25   named plaintiffs. *See Adoma*, 711 F. Supp. 2d at 1147. In the *Desert Care Action*, plaintiffs bring

26   claims on behalf a "nationwide class" and a "California subclass," and those classes are defined

27   as "[a]ll individuals residing in [either the United States or State of California] whose [p]rivate

28   [i]nformation was disclosed to a third party without authorization or consent through the Meta

13

Pixel on Defendants' [w]eb [p]roperties." *B.K., et al. v. Desert Care Network, et al*., No. 2:23-cv-05021-SPG-PD, First Am. Compl., Doc. No. 50 at 3–4, 72 (C.D. Cal. Feb. 22, 2024). The plaintiffs in the *Desert Care Action* define "web properties" as including the Desert Care Network website and patient portal. *Id.* Likewise, Plaintiffs in this action seek to represent classes of "patients or prospective patients of Tenet [] or any of its affiliates [] who exchanged communications at Defendants' websites" and "Defendants' patient portals," including the Desert Care Network website and patient portal that Plaintiffs Jan Doe and James Doe allegedly visited. (Doc. No. 19 at ¶¶ 277, 292, 398.) Because the proposed classes in the *Desert Care Action* are broadly defined to include "all individuals" whose information was collected and disclosed from the Desert Care Network website and portal, the *Desert Care Action* classes necessarily incorporate the individuals Plaintiffs seek to represent in this action—"patients or prospective patients" who "exchanged communications" with the Desert Care Network website and portal. Therefore, the court finds the proposed classes in the *Desert Care Action* and the instant action are substantially similar.

Thus, consideration of this second factor (similarly of the parties) also weighs in favor of applying the first-to-file rule. *See Bellone v. First Transit, Inc*., No. 4:21-cv-09617-HSG, 2022 WL 4292964, at *3 (N.D. Cal. Sept. 16, 2022) (determining the application of the first-to-file rule was warranted where the class proposed was subsumed by the classes proposed in earlier filed actions); *Bazrganian v. Mercedes-Benz USA, LLC*, No. 2:17-cv-06521-ODW-JPR, 2017 WL 4990517, at *3 (C.D. Cal. Oct. 31, 2017) (applying the first-to-file rule where there was "substantial overlap in potential class members" in two actions).

3.     Similarity of the Issues

As to the third and final factor, "[t]he first-to-file rule does not require identical issues or 'exact parallelism,' but requires substantial similarity of the issues." *De La Cruz v. Target Corp.*, No. 3:18-cv-0867-DMS-WVG, 2018 WL 3817950, at *2 (S.D. Cal. Aug. 8, 2018) (quoting *Kohn*, 787 F.3d at 1240). "Cases are sufficiently similar 'where key issues overlap and the resolution of one case could affect the resolution of the other.'" *Carrera v. First Am. Home Buyers Prot. Co*., No. 1:11-cv-0242-GHK-FFM, 2012 WL 13012698, at *5 (C.D. Cal. Jan. 24, 2012). The first-to-

1    file rule can apply even if one action includes claims not included in the other action. *See*

2    *Swangler v. Cherne Contracting Corp.*, 4:20-cv-00611-HSG, 2021 WL 6332532, at *3 (N.D. Cal.

3    Jan. 22, 2021) ("the inclusion of additional causes of action [did] not prevent application of

4    the first-to-file rule" where the actions were substantially similar); *Bazrganian*, 2017 WL

5    4990517, at *3 (applying first-to-file rule where one action included some claims that were not

6    alleged in the other action).

7        Defendants argue that Plaintiff Jan Doe's and Plaintiff James Doe's claims raise the same

8    issues as those raised in the *Desert Care Action*. (Doc. No. 30 at 16.) Specifically, Defendants

9    assert both actions bring claims for violations of the CMIA, ECPA, CIPA, UCL, invasion of

10   privacy, and unjust enrichment claims. (*Id.*)  Plaintiffs counter that the first-to-file rule does not

11   apply because "Plaintiffs' case is hardly 'identical' with the [*Desert Care Action*]," emphasizing

12   that each action involves some claims that are not brought in the other action. (Doc. No. 39 at 7–

13   8.)

14       Having reviewed the operative complaints in both actions, the court agrees with

15   Defendants. Plaintiffs in both actions have raised CMIA, ECPA, CIPA, UCL, invasion of privacy,

16   and unjust enrichment claims against Defendants Tenet and DRMC based on their use of tracking

17   technology, including Pixel and CAPI, on the Desert Care Network website and patient portal,

18   resulting in the unauthorized collection and disclosure of users PHI and PII to Meta, Google, and

19   other third parties. (*See* Doc. No. 19 at ¶¶ 17–18, 24, 28, 31, 276–83, 292–95); *B.K., et al. v.

20   Desert Care Network, et al*., No. 2:23-cv-05021-SPG-PD, First Am. Compl., Doc. No. 50 at ¶¶ 3–

21   4, 29, 235–65 (C.D. Cal. Feb. 22, 2024).[4]

22       Further, Plaintiffs' argument that the first-to-file rule is not applicable because the claims

23   brought in both actions are not identical is misplaced. (Doc. No. 39 at 8.) Plaintiffs contend that

24   the *Desert Care Action* includes claims for negligence and breach of confidence not asserted in

25

26   [4] The court in the *Desert Care Action* granted defendants' motions to dismiss plaintiffs' CIPA,
     UCL, and unjust enrichment claims with leave to amend. *See B.K., et al. v. Desert Care Network,
27   et al*., No. 2:23-cv-05021-SPG-PD, Order, Doc. No. 49 (C.D. Cal. Feb. 1, 2024); *B.K., et al. v.
     Desert Care Network, et al*., No. 2:23-cv-05021-SPG-PD, Order, Doc. No. 60 (C.D. Cal. Aug. 22,
28   2024). Plaintiffs in the *Desert Care Action* did not file a third amended complaint.

1    this action, and Plaintiff Jan Doe and Plaintiff James Doe bring claims for violation of CDAFA,

2    CRA, and trespass to chattels that are not asserted in the *Desert Care Action*. (*Id.*) Although both

3    actions include claims not presented in the other, the core allegations are the same. *See Zepeda v.*

4    *Ulta Salon, Cosms. & Fragrance, Inc*., No. 8:17-cv-2184-DOC-JDE, 2018 WL 6981842, at *5

5    (C.D. Cal. June 1, 2018) (first-to-file rule applied where claims were not identical, but "both

6    actions involve[d] the same theories of liability and primary rights"). The *Desert Care Action*

7    plaintiffs allege that they received healthcare services from DRMC and JFK Memorial Hospital,

8    Inc. (which are a part of the Desert Care Network owned by Tenet), they used the Desert Care

9    Network website and patient portal, and their PHI and PII was disclosed without their consent to

10   Meta, Google, and other third parties. *B.K., et al. v. Desert Care Network, et al*., No. 2:23-cv-

11   05021-SPG-PD, First Am. Compl., Doc. No. 50 at ¶¶ 2–4, 29, 235–65 (C.D. Cal. Feb. 22, 2024).

12   Similarly, in this action, Plaintiff Jan Doe and Plaintiff James Doe allege they were patients of

13   Defendant Tenet who visited Defendant DRMC's facility, they used both the Desert Care

14   Network website and patient portal, and their PHI and PII was disclosed without consent to Meta,

15   Google, and other third parties. (Doc. No. 19 at ¶¶ 276–83, 291–95.) The issues raised by Plaintiff

16   Jan Doe's and Plaintiff James Doe's claims are thus substantially similar to those raised in the

17   *Desert Care Action.* Therefore, consideration of this third factor, similarity of the issues, also

18   weighs in favor of applying the first-to-file rule. *See Wallerstein v. Dole Fresh Vegetables, Inc*.,

19   967 F. Supp. 2d 1289, 1297 (N.D. Cal. 2013) (applying the first-to-file rule where the "thrust of

20   the lawsuits [was] identical," even though the claims were not identical).

21        Given the analysis of the factors above, the court concludes that application of the first-to-

22   file rule is warranted for purposes of judicial economy, consistency, and comity.[5] The court has

23   the discretion to transfer, stay, or dismiss a complaint or claim that is duplicative. *Heinz*, 2023

24   WL 4305118, at *1. Defendants argue the court should dismiss the claims asserted by Plaintiff

25   Jan Doe and Plaintiff James Doe and any other claims asserted against Defendants Tenet and

26

27   _____

     [5] The court notes that Plaintiffs do not invoke any equitable exception to the first-to-file rule, such
     as bad faith, anticipatory suits, forum shopping, or the balance of convenience. *Alltrade*, 946 F.2d
28   at 638. In any event, the court finds that none of these exceptions apply here.

1    DRMC. (Doc. No. 30 at 10, 15.) The fact that Plaintiff Jan Doe and Plaintiff James Doe present

2    claims not presented in the *Desert Care Action*—namely, CDAFA, CRA, and trespass to chattels

3    claims—weighs against outright dismissal of all of their claims. Further, the court is not inclined

4    to transfer Plaintiff Jan Doe's and Plaintiff James Doe's CDAFA, CRA, and trespass to chattels

5    claims because those claims are not duplicative, and while Defendants' motion has been pending

6    in this court, the *Desert Care Action* has progressed through the pleading stage into discovery.

7           The court does find it appropriate to dismiss the overlapping claims, specifically Plaintiff

8    Jan Doe's and Plaintiff James Doe's CMIA, ECPA, and invasion of privacy claims without

9    prejudice because those claims have been presented in the *Desert Care Action*. As to the

10   overlapping CIPA, UCL, and unjust enrichment claims, because those claims were dismissed

11   with leave to amend by the court in the *Desert Care Action* and the plaintiffs in that case opted to

12   not file a third amended complaint to attempt to cure the pleading deficiencies identified with

13   those claims, the court does not find it appropriate to dismiss or transfer Plaintiff Jan Doe's and

14   Plaintiff James Doe's CIPA, UCL, and unjust enrichment claims.

15          Accordingly, the court will grant Defendants' motion to dismiss Plaintiff Jan Doe's and

16   Plaintiff James Does' CMIA, ECPA, and invasion of privacy claims under the first-to-file rule.

17   *See Location Servs., LLC v. Digital Recognition Network, Inc.*, No. 2:18-CV-00893-KJM-AC,

18   2018 WL 3869169, at *3 (E.D. Cal. Aug. 15, 2018) (dismissing claims in later-filed case that

19   were duplicates of claims in first-filed case); *Wright v. RBC Cap. Mkts. Corp.*, No. 2:09-cv-3601-

20   FCD-GGH, 2010 WL 2599010, at *7 (E.D. Cal. June 24, 2010) (dismissing one of plaintiff's

21   claims under the first-to-file rule because it had been raised in an earlier filed action). But the

22   court will not dismiss Plaintiff Jan Doe's and Plaintiff James Doe's CDAFA, CRA, trespass to

23   chattels, CIPA, UCL, and unjust enrichment claims based on application of the first-to-file rule.

24   **B.    Article III Standing**

25          Defendants move to dismiss Plaintiffs' FAC in part pursuant to Rule 12(b)(1) for lack of

26   Article III standing. (Doc. No. 30 at 28–29.) "[S]tanding is an essential and unchanging part of

27   the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

28   (1992). "[T]he 'irreducible constitutional minimum of standing' requires a plaintiff to have

1    suffered an injury in fact, caused by the defendant's conduct, that can be redressed by a favorable

2    result." *Langer v. Kiser*, 57 F.4th 1085, 1092 (9th Cir. 2023) (quoting *Lujan*, 504 U.S. at 560).

3    The injury in fact prong requires a plaintiff to demonstrate an "invasion of a legally protected

4    interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or

5    hypothetical." *Lujan*, 504 U.S. at 560.

6         "Recognizing the doctrinal tension between standing and class certification analyses, the

7    Ninth Circuit [has] adopted the so-called 'class certification approach,' which holds that 'any

8    issues regarding the relationship between the class representative and the passive class members .

9    . . are relevant only to class certification, not to standing." *Larone v. Metro. Life Ins. Co*., No.

10   2:21-cv-00995-AB-AGR, 2022 WL 3098071, at *3 (C.D. Cal. June 21, 2022) (citing *Melendres*

11   *v. Arpaio*, 784 F.3d 1254, 1261 (9th Cir. 2015)). When a standing issue arises prior to class

12   certification, the court's inquiry focuses on whether the named plaintiffs have standing to bring a

13   claim. *Id.* "[O]nce [a] named plaintiff demonstrates [their] individual standing to bring a claim,

14   the standing inquiry is concluded." *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1176

15   (9th Cir. 2017) (citation omitted).

16        In their motion, Defendants argue that Plaintiffs lack standing to sue over the use of Pixel

17   on Defendants' websites that Plaintiffs do not allege visiting. (Doc. No. 30 at 28.) Defendants

18   argue Plaintiffs reference twelve different websites operated by Defendants in their FAC, but only

19   allege visiting four of those websites. (*Id.* at 29) (citing Doc. No. 19 at ¶¶ 18–19, 22–23, 39.)

20   Defendants contend Plaintiffs cannot pursue claims for "any invasion of another's privacy

21   allegedly caused by Defendants' use of Pixel on a website Plaintiffs did not visit." (*Id.*) In their

22   sur-reply in opposition to Defendants' motion to dismiss, Plaintiffs argue Defendants' standing

23   argument is a "premature attempt to determine what websites will be included in Plaintiffs'

24   proposed class before Plaintiffs' allegations can be tested through discovery."[6] (Doc. No. 42-1 at

25   _____

26   [6] The court grants Plaintiffs' motion for administrative relief to file a sur-reply in opposition to
     Defendants' motion to dismiss and considers Plaintiffs' sur-reply brief. (Doc. No. 42); *see*

27   *Warren v. City of Chico*, No. 2:21-cv-00640-DAD-DMC, 2024 WL 4803960, at *1 (E.D. Cal.
     Nov. 15, 2024) ("A decision to grant or deny leave to file a sur-reply is generally committed to

28   the sound discretion of the court.") (citation omitted).

3.) Plaintiffs argue "the scope of the [c]lass and whether the [c]lass [r]epresentatives' injuries are typical of the [c]lass are questions to be decided on a [m]otion for [c]lass [c]ertification." (*Id.* at 3.)

The court agrees with Plaintiffs' standing arguments. Defendants conflate standing issues with class certification requirements. Each Plaintiff has adequately alleged standing by demonstrating an injury in fact, caused by Defendants' conduct, and redressable by this court. *See Langer*, 57 F.4th at 1092. Namely, Plaintiffs Jane Doe, Jan Doe, John Doe, and James Doe each allege facts showing they used Defendants' Web Properties, submitted personal information, and Defendants invaded their privacy rights by disclosing their information to third parties without consent through the use of tracking technology embedded on Defendants' Web Properties. (*See e.g.*, Doc. No. 19 at ¶¶ 35, 78, 265–99, 319.) At the pleading stage, Plaintiffs allegations are sufficient to establish standing. *See B.K. v. Desert Care Network, et al.*, No. 2:23-cv-05021-SPG-PD, 2024 WL 1343305, at *4 (C.D. Cal. Feb. 1, 2024) (rejecting defendants' argument that plaintiffs lacked standing to sue over the use of Pixel and CAPI on websites plaintiffs did not personally visit because plaintiffs individually satisfied standing requirements). Therefore, the court will deny Defendants' motion to dismiss on Article III standing grounds.

## C.    California Invasion of Privacy Act (Count 1)

Plaintiffs bring a claim for a violation of the CIPA against Defendants on behalf of themselves and the California subclass. (Doc. No. 19 at 95-101.) The CIPA "broadly prohibits the interception of wire communications and disclosure of the contents of such intercepted communications." *Tavernetti v. Superior Ct. of San Diego Cnty.*, 22 Cal. 3d 187, 190 (1978). Section 631(a) of CIPA creates four avenues for relief:

> (1) where a person "by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument";
>
> (2) where a person "willfully and without consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit";
>
> (3) where a person "uses, or attempts to use, in any manner, or for

19

any purpose, or to communicate in any way, any information so obtained"; and

(4) where a person "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above."

*Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 897 (N.D. Cal. 2023). Plaintiffs invoke the fourth avenue of relief, alleging Defendants have violated Section 631(a) of the CIPA by "aiding others (including [Meta] and Google) to secretly record the contents of Plaintiffs' and California [s]ubclass [m]embers' wire communications." (Doc. No. 19 at ¶ 422.)

Defendants contend that Plaintiffs' CIPA claim should be dismissed because Plaintiffs: (1) fail to allege the "contents" of their communications that were allegedly intercepted; (2) fail to allege their communications were intercepted in transit; and (3) fail to plead "aiding and abetting" with specificity. (Doc. No. 30 at 21–23.)

      1.    <u>"Contents" of Communications</u>

A violation of CIPA is analyzed under the same standards applied to a violation of the ECPA, 18 U.S.C § 2510 *et seq*. *See Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1092 (N.D. Cal. 2022). The ECPA defines the term "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510. "Contents" means "the intended message conveyed by the communication" as opposed to "record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). While a URL that includes "basic identification and address information" is not "content," a website "user's request to a search engine for specific information could constitute a communication such that divulging a URL containing that search term to a third party could amount to disclosure of the contents of a communication." *Id.* at 1108–09.

In their motion to dismiss, Defendants argue "routine website tracking tools do not transmit the 'contents' of communications in potential violation of the CIPA." (Doc. No. 30 at 21.) Specifically, Defendants argue that "tracking 'keystrokes, mouse clicks, [and] pages viewed are not 'content' under CIPA." (*Id.* at 22.) Defendants further argue that Plaintiffs do not specify

20

1  what search terms they entered on Defendants' Web Properties that subsequently became part of

2  a "full-string URL." (Doc. No. 41 at 8.)

3      In their opposition to the pending motion, Plaintiffs argue they have pled the "contents" of

4  their communications—personal search queries on Defendants' Web Properties which were sent

5  to Meta as part of a full-string URL. (Doc. No. 39 at 13–14.) Plaintiffs argue the detailed URLs

6  disclosed to Meta included a combination of PHI and PII, such as health information

7  (appointments, medical conditions, diagnoses, treating physicians) and IP addresses, FIDs, and

8  device identifiers. (*Id.* at 13.)

9      The court agrees with Plaintiffs that they have alleged the "contents" of their

10  communications that were allegedly intercepted in violation of CIPA. Plaintiffs' alleged

11  communications with Defendants' Web Properties, which were intercepted and disclosed to Meta,

12  go beyond "keystrokes, mouse clicks, [and] pages viewed" on Defendants' Web Properties.

13  Plaintiffs allege that their search queries were disclosed to Meta in the form of "full-string URLs"

14  containing their PHI and PII, more than "basic identification and address information." (Doc. No.

15  19 at ¶¶ 202–03, 250–55); *In re Zynga Priv. Litig.*, 750 F.3d at 1106. Moreover, Plaintiffs plead

16  facts supporting these allegations. Specifically, in the FAC, Plaintiffs detail the searches they

17  conducted regarding their personal health conditions, treatment options, and doctors. (*Id.* at ¶¶

18  265–295). For example, Plaintiff Jane Doe alleges that she searched for information relating to

19  her pregnancy, childbirth, and her specific treating physician on Defendant DMC's website. (*Id.*

20  ¶¶ 265–275). Several courts have found similar allegations to be sufficient to plead "contents" for

21  a CIPA claim. *See e.g.*, *St. Aubin v. Carbon Health Techs., Inc.*, No. 4:24-cv-00667-JST, 2024

22  WL 4369675, at *4 (N.D. Cal. Oct. 1, 2024) ("Descriptive URLs that reveal specific information

23  about a user's queries reflect the 'contents' of a communication."); *Cousin v. Sharp Healthcare*,

24  702 F. Supp. 3d 967, 976 (S.D. Cal. 2023) ("*Cousin II*") (finding plaintiffs plausibly pled

25  "contents" for their CIPA claim where they alleged that their data included "personal search

26  queries—such as specialty healthcare providers and treatments for medical conditions").

27      Thus, the court finds Plaintiffs' allegations sufficient to plead the "contents" of their

28  communications that were purportedly intercepted by Defendants within the meaning of CIPA.

1          2.          Interception of Communications in Transit

2          To state a claim under the second clause of Section 631(a), a plaintiff must allege that the

3   third party listens to a communication "while the same is in transit or passing over any wire, line,

4   or cable, or is being sent from, or received at any place within this state." *See Valenzuela v.*

5   *Keurig Green Mountain, Inc.*, 674 F.Supp.3d 751, 755 (N.D. Cal. 2023) (citing Cal. Penal Code

6   § 631(a)) (emphasis added). Communications "must be acquired during transmission, not while []

7   in electronic storage." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002).

8          "While a plaintiff must do more than 'merely restate[] the pleading requirement of real

9   time interception,' the standard is not overly burdensome." *Mata v. Zillow Grp., Inc.,* No. 3:24-

10   cv-01095-DMS-VET, 2024 WL 5161955, at *6 (S.D. Cal. Dec. 18, 2024). "[A]llegations that

11   [communications] are intercepted in real time through the use of computer code provides

12   sufficient factual detail to support the 'in transit' requirement." *Esparza v. UAG Escondido A1*

13   *Inc.*, No. 3:23-cv-00102-DMS-KSC, 2024 WL 559241, at *3 (S.D. Cal. Feb. 12, 2024); *see also*

14   *St. Aubin*, 2024 WL 4369675, at *7 (explaining that "the key to the interception analysis is

15   whether the plaintiff alleges that transmission was simultaneous").

16          Defendants argue Plaintiffs fail to allege that any communications were "intercepted"

17   while in transit via the use of Meta Pixel. (Doc. No. 30 at 22.) In Defendants' view, "neither the

18   Defendants, nor [Meta] are 'intercepting' Plaintiffs' communications via Pixel." (*Id.*) Instead,

19   Defendants argue "one communication is occurring between Plaintiffs and their browser, and

20   another between the browser and Facebook." (*Id.*) Defendants further argue Plaintiffs fail to

21   allege which of their communications were intercepted and where the interception occurred.

22   (Doc. No. 41 at 8.) Plaintiffs counter that "simultaneous transmission [is] sufficient to state a

23   wiretapping claim." (Doc. No. 39 at 14.)

24          Here too, the court agrees with Plaintiffs that they have alleged their communications

25   were "intercepted" within the meaning of CIPA. Importantly, the court must accept as true

26   Plaintiffs' allegations that Defendants simultaneously intercepted their data in real time using

27   Meta Pixel. (*See* Doc. No. 19 at ¶ 307) (alleging "Plaintiffs and Class Members had no idea when

28   they interacted with Defendants' websites that their personal data, including sensitive medical

22

1    data, was being collected and simultaneously transmitted to Facebook"). Contrary to Defendants'

2    arguments, Plaintiffs do not allege independent communications occurred between Plaintiffs and

3    their browsers, and their browser and Facebook. Courts have held allegations of simultaneous

4    duplication and interception of communications sufficient to plead "interception" while "in

5    transit" under CIPA at the motion to dismiss stage. *See M.G. v. Therapymatch*, Inc., No. 3:23-cv-

6    04422-AMO, 2024 WL 4219992, at *4 (N.D. Cal. Sept. 16, 2024) (rejecting the defendant's

7    argument that the plaintiff failed to plead "interception" under CIPA because two separate

8    communications occurred because the plaintiff had actually pled that the interception was

9    "simultaneous"); *Mitchell v. Sonesta Int'l Hotels Corp.*, No. 2:24-cv-2603-GW-SSC, 2024 WL

10   4471772, at *8 (C.D. Cal. Oct. 4, 2024), *adopted as modified*, No. 2:24-cv-2603-GW-SSC, 2024

11   WL 4474491, at *8 (C.D. Cal. Oct. 4, 2024) (denying motion to dismiss Section 631(a) CIPA

12   claim on the grounds that plaintiff did not plausibly allege communications were intercepted in

13   transit because plaintiff alleged "simultaneous duplication" via tracking technologies on

14   defendant's website); *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1130–31 (S.D. Cal.

15   2023) ("*Cousin I*") (same). Moreover, "[a]t the motion to dismiss stage, a plaintiff is not required

16   to allege how and when their communications are captured." *St. Aubin*, 2024 WL 4369675, at *6.

17   "A pleading standard to the contrary would require the CIPA plaintiff to engage in a one-sided

18   guessing game because the relevant information about data capture typically resides uniquely in

19   the custody and control of the CIPA defendant and its third-party recorder." *D'Angelo v. Penny

20   OpCo, LLC*, No. 3:23-cv-00981-BAS-DDL, 2023 WL 7006793, at *8 (S.D. Cal. Oct. 24, 2023).

21          Thus, the court concludes Plaintiffs' allegations are sufficient to plead their

22   communications were intercepted in transit within the meaning of CIPA.

23          3.      "Aiding & Abetting"

24          As noted above, Plaintiffs bring their CIPA claim under the fourth clause of Section

25   631(a), which imposes liability on any person "who aids, agrees with, employs, or conspires with

26   any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things

27   mentioned" in clauses one through three. Cal. Penal Code § 631(a).

28          In their motion, Defendants argue Plaintiffs do not plead with particularity how

1    Defendants "aided and abetted" any of Meta's alleged wrongdoing. (Doc. No. 30 at 22–23.)

2    Defendants contend that the FAC includes "no *facts* showing that Defendants (a) knew of any

3    unlawful intent of [Meta], Google, or other third parties to intercept Plaintiffs' communications;

4    (b) possessed any intent to help them intercept any alleged communications; or (c) engaged in

5    conduct that assisted the achievement of the alleged crime." (*Id.* at 23) (emphasis in original).

6          The court finds Defendants arguments to be unavailing. As an initial matter, the plain text

7    of CIPA imposes liability on any person "who aids, agrees with, employs, or conspires" with

8    another party. Cal. Penal Code § 631(a). The statute "does not require that a party aid *and* abet."

9    *Tate v. VITAS Healthcare Corp.*, 762 F. Supp. 3d 949, 959 (E.D. Cal. 2025) (citation omitted);

10    *see also Cousin I*, 681 F. Supp. 3d at 1130 (explaining that the "contention that 'aids' means

11    'aiding and abetting' ignores the 'agrees with, employs, or conspires with' language of the

12    clause"). Because "[t]he statute as worded does not include an intent standard," the court

13    considers whether Plaintiffs have alleged that Defendants "aided, agreed with, employed, or

14    conspired with [Meta]." *See St. Aubin*, 2024 WL 4369675, at *7. Plaintiffs allege that Defendants

15    chose to install Meta Pixel on their Web Properties and by installing Meta Pixel, Defendants

16    assisted Meta with intercepting the PHI and PII of Defendants' patients without their

17    authorization. (*See e.g.*, Doc. No. 19 at ¶¶ 8, 71, 263, 430.) At the motion to dismiss stage,

18    Plaintiffs' allegations are sufficient to plead that Defendants' either aided, agreed, employed, or

19    conspired with Meta in the alleged interception of their information and data without their

20    consent within the meaning of CIPA. *Cousin I*, 681 F. Supp. 3d at 1130 (finding plaintiffs

21    allegations that defendant intentionally procured Pixel from Meta and installed it on their website

22    was sufficient to state a claim under CIPA's fourth avenue for relief); *St. Aubin*, 2024 WL

23    4369675, at *7 (finding allegations that defendant chose to install Meta Pixel for advertising

24    benefits, assisted Meta with intercepting the identities and online activities of patients, and did so

25    without consent was sufficient to state a claim under CIPA's fourth avenue for relief).

26          Therefore, the court finds Plaintiffs have adequately pled a claim under Section 631(a) of

27    CIPA. The court will deny Defendants' motion to dismiss Plaintiffs' CIPA claim.

28    **D.**    **California Confidentiality of Medical Information Act (Counts 2, 3, and 4)**

Plaintiff Jane Doe and Plaintiff John Doe assert claims for violations of the California CMIA, California Civil Code sections 56.06, 56.101, and 56.10, against Defendants on behalf of themselves and the California subclass.[7] (Doc. No. 19 at 101–05.) Section 56.06 defines "provider of health care," while Section 56.10 states that "[a] provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization." Cal. Civ. Code § 56.10(a)–(c). Section 56.101 specifies that if a health care provider "creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information," they "shall do so in a manner that preserves the confidentiality of the information contained therein." Cal. Civ. Code § 56.101(a). A health care provider "who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information" is subject to liability under the CMIA. *Id.*

The CMIA defines medical information as "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental health application information, reproductive or sexual health application information, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(i). "'Individually identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." *Id.* "This definition does not encompass demographic or numeric information that does not reveal medical history, diagnosis, or care." *Eisenhower Med. Ctr. v. Superior Ct.*, 226 Cal. App. 4th 430, 435 (2014).

In their motion, Defendants argue that Plaintiffs' claims for violations of the CMIA fail because they do not plead that their "medical information" was disclosed to Meta via Pixel. (Doc.

---

[7] Because the court has already dismissed Plaintiff Jan Doe's and Plaintiff James Doe's CMIA claims, the court only considers whether Plaintiff Jane Doe and Plaintiff John Doe have pled CMIA claims.

1   No. 30 at 19–20.) Defendants contend that "only substantive information about a patient's

2   medical history, diagnoses, or care qualifies" as "medical information." (*Id.* at 20.) In

3   Defendants' view, Plaintiffs have not alleged what information was entered regarding the medical

4   conditions they were experiencing. (Doc. No. 41 at 7.) Defendants further argue that Plaintiffs do

5   not allege that any PII was disclosed such that their identity was revealed. (*Id.*)

6        In their opposition to the pending motion, Plaintiffs argue that the information disclosed

7   by Defendants conveyed their "medical history . . . mental or physical condition, or treatment,"

8   such as search terms they entered when they researched their medical conditions. (Doc. No. 39 at

9   10–11.) Plaintiffs further allege that Defendants disclosed a variety of PII to Meta, revealing their

10  identities. (*Id.* at 10.)

11       The court finds Plaintiffs' FAC adequately alleges that the information Plaintiff Jane Doe

12  and Plaintiff John Doe submitted on Defendants' Web Properties, which was subsequently

13  disclosed to Meta, was "medical information" as defined by the CMIA. Plaintiff Jane Doe and

14  Plaintiff John Doe assert Defendants transmitted their PHI, including information concerning

15  their specific medical conditions, diagnoses, treatment, and treating physicians. (Doc. No. 19 at

16  ¶¶ 438, 450, 458.) Specifically, Plaintiff Jane Doe alleges Defendants disclosed information she

17  entered related to her pregnancy and childbirth, the name of her treating physician, and her patient

18  status. (*Id.* at ¶¶ 266–68.) Plaintiff Jane Doe also alleges she logged into her patient portal to

19  review her personal medical records and test results. (*Id.* at ¶¶ 268–74.) Likewise, Plaintiff John

20  Doe alleges Defendants disclosed information he entered related to wound care treatment for a

21  foot ulcer and his patient status. (*Id.* at ¶¶ 284–286.) Plaintiff John Doe also alleges he logged into

22  his patient portal to review and pay his medical bills. (*Id.* at ¶ 287.)

23       Further, Plaintiff Jane Doe and Plaintiff John Doe assert that Defendants transmitted their

24  PII alongside their communications with Defendants' Web Properties to Meta via Pixel, making

25  their communications individually identifiable. (*Id.* at ¶¶ 270–73, 288–89, 441.) The PII allegedly

26  disclosed by Defendants included Plaintiff Jane Doe's and Plaintiff John Doe's name, date of

27  birth, phone number, IP address, FID, and browser fingerprint. (*Id.*) According to Plaintiff Jane

28  Doe and Plaintiff John Doe, the combined disclosure of their PII and communications with

Defendants' Web Properties allowed Meta to link their data to their Facebook profile and target them with advertisements on Facebook relating to their specific medical conditions. (*Id.* at ¶¶ 84, 215, 275, 290.) Thus, Plaintiff Jane Doe and Plaintiff John Doe sufficiently allege that the information Defendants disclosed to Meta is "individually identifiable" information that "reveal[s] [their] medical history, diagnosis, or care" within the meaning of the CMIA. *See Eisenhower*, 226 Cal. App. 4th at 435.

Moreover, several courts have found similar allegations sufficient to sustain a CMIA claim. For example, in *Doe v. Regents of the University of California*, 672 F. Supp. 3d 813, 818–19 (N.D. Cal. 2023), the defendant moved to dismiss the plaintiff's CMIA claim on the ground that she failed to plead facts showing "what *specific* medical information [she] entered . . . [and] which of that alleged medical information actually was transmitted to Meta." The court disagreed, finding it sufficient that plaintiff alleged she entered "information relating to her heart issues and high blood pressure" in her patient portal, and defendant disclosed that information to Meta alongside her FID, leading to targeted advertisements regarding high blood pressure. *Regents*, 672 F. Supp. 3d at 819. Likewise, in *Desert Care Network*, the court denied a motion to dismiss a CMIA claim where the plaintiffs alleged they used the defendants' "patient portals to schedule appointments, refill prescriptions, and to view their test results and appointment notes." 2024 WL 1343305, at *9; *see also St. Aubin*, 2024 WL 4369675 at *9 (denying motion to dismiss plaintiff's CMIA claim where the plaintiff alleged defendants transmitted the reason patients booked a medical appointment and patients' identifiable information including their device IDs, IP addresses, and FIDs to Meta and Google). Accordingly, the court finds that Plaintiff Jane Doe's and Plaintiff John Doe's allegations that Defendants transmitted their "medical information" to Meta are sufficient to survive a motion to dismiss.

For this reason, the court will deny Defendants' motion to dismiss Plaintiff Jane Doe's and Plaintiff John Doe's CMIA claims.

## E.    Invasion of Privacy Under the California Constitution (Count 5)

Plaintiff Jane Doe and Plaintiff John Doe bring a claim for invasion of privacy in violation

1   of the California Constitution on behalf of themselves and the California subclass.[8] (Doc. No. 19

2   at 105–09.) To state a claim for invasion of privacy under the California Constitution, Plaintiffs

3   must show that "(1) they possess a legally protected privacy interest, (2) they maintain a

4   reasonable expectation of privacy, and (3) the intrusion is 'so serious . . . as to constitute an

5   egregious breach of the social norms' such that the breach is 'highly offensive.'" *In re Facebook,*

6   *Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020) (citing *Hernandez v. Hillsides*, 47

7   Cal. 4th 272, 287 (2009)).

8       "The existence of a reasonable expectation of privacy, given the circumstances of each

9   case, is a mixed question of law and fact." *Id.* at 601. "[C]ourts consider a variety of factors" in

10  determining whether a reasonable expectation of privacy exists, "including the customs, practices,

11  and circumstances surrounding a defendant's particular activities." *Id.* (citation omitted).

12  "Determining whether a defendant's actions were 'highly offensive to a reasonable person'

13  requires a holistic consideration of factors such as the likelihood of serious harm to the victim, the

14  degree and setting of the intrusion, the intruder's motives and objectives, and whether

15  countervailing interests or social norms render the intrusion inoffensive." *Id*. at 606. "While

16  analysis of a reasonable expectation of privacy primarily focuses on the nature of the intrusion,

17  the highly offensive analysis focuses on the degree to which the intrusion is unacceptable as a

18  matter of public policy." *Id.*

19      Defendants move to dismiss Plaintiffs' invasion of privacy claims on the grounds that

20  Plaintiffs fail to plead both a reasonable expectation of privacy and a highly offensive intrusion.

21  (Doc. Nos. 30 at 17–19; 41 at 6–7.) Defendants contend that there is no reasonable expectation of

22  privacy "where information is collected only while the user is visiting the site (and does not

23  continue to track them after they leave the website), and the collection is then disclosed." (Doc.

24  No. 30 at 19.) Defendants further contend that Plaintiffs' allegations that they "visited and

25  performed a search on a public website and then possibly received advertising related in some

26

27  _____

    [8] Because the court has already dismissed Plaintiff Jan Doe's and Plaintiff James Doe's invasion
28  of privacy claim, the court only considers whether Plaintiff Jane Doe and Plaintiff John Doe have
    pled an invasion of privacy claim.

1  way to that search" does not rise to the level of a serious invasion of privacy. (*Id.* at 18.)

2          Plaintiffs contend they have sufficiently alleged they had a reasonable expectation of

3  privacy in their communications with Defendants' Web Properties because their communications

4  involved "personal, sensitive medical information, decision, and medical diagnoses." (Doc. No.

5  19 at ¶¶ 468–70.) Plaintiffs also argue that Defendants' disclosure of their information was a

6  "highly offensive" intrusion because it is "a gross deviation from acceptable behavior" for

7  medical providers to disclose personal medical information about their patients without consent.

8  (Doc. No. 39 at 9–10.)

9          The court agrees with Plaintiffs that they have alleged a reasonable expectation of privacy

10  with respect to the PHI that they provided on Defendants' Web Properties. Courts have held

11  "[t]here is a reasonable expectation of privacy in one's private health information." *Doe I v.*

12  *Google LLC*, No. 3:23-cv-02431-VC, 2023 WL 6882766, at *2 (N.D. Cal. Oct. 18, 2023)

13  (citation omitted). "Personal medical information is understood to be among the most sensitive

14  information that could be collected about a person. . . ." *Regents*, 672 F. Supp. 3d at 820; *see also*

15  *Desert Care Network*, 2024 WL 1343305, at *9 ("Patients' right to privacy in their medical

16  records is 'well-settled.'") (citation omitted). Further, courts recognize that "individuals maintain

17  a reasonable expectation of privacy in detailed URLs." *In re Meta Pixel Healthcare Litig.*, 647 F.

18  Supp. 3d 778, 800 (N.D. Cal. 2022) (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d

19  at 605–06). As discussed above, Plaintiff Jane Doe and Plaintiff John Doe allege that their

20  communications with Defendants' Web Properties divulged information relating to their specific

21  medical conditions, diagnoses, treatment, treating physicians, and patient status. (Doc. No. 19 at

22  ¶¶ 265–75, 284–90.) Plaintiff Jane Doe and Plaintiff John Doe also allege their medical

23  information was disclosed to Meta via Pixel without their authorization in the form of "full-

24  string" URLs containing details such as their search terms and page views. (*Id.* at ¶¶ 202–03,

25  250–55.) Based on these allegations, the court finds Plaintiff Jane Doe and Plaintiff John Doe

26  have sufficiently pled a reasonable expectation of privacy in their communications with

27  Defendants' Web Properties.

28          Contrary to Defendants' argument, Plaintiff Jane Doe and Plaintiff John Doe are not

1    required to allege that Defendants continued tracking their health information after they left

2    Defendants' Web Properties in order to establish a reasonable expectation of privacy. In support

3    of their argument, Defendants cite *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182 (N.D. Cal.

4    2020), a case that is readily distinguishable. In *Heeger*, plaintiffs alleged that Meta collected their

5    location data through their location services or Facebook app settings without permission for

6    targeted advertising purposes. *Id.* at 1186. The court dismissed plaintiffs' invasion of privacy

7    claim because their location data was not sensitive or confidential information and Meta did not

8    collect plaintiffs' location data after they logged out of their Facebook account, which might

9    otherwise violate social norms. *Id.* at 1193–94. Here, by contrast, Plaintiff Jane Doe and Plaintiff

10   John Doe allege their personal health information was disclosed by Defendants. As courts have

11   previously held with respect to invasion of privacy claims, analyses regarding the interception of

12   location data are "not directly applicable to intrusions concerning personal health information."

13   *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 892 (C.D. Cal. 2024).

14          Finally, the court finds Plaintiff Jane Doe and Plaintiff John Doe have sufficiently alleged

15   facts to show the intrusion of their privacy was "highly offensive." Although Defendants

16   characterize Plaintiffs' conduct as being limited to "visit[ing] and perform[ing] a search on a

17   public website" (Doc. No. 30 at 18), Plaintiff Jane Doe's and Plaintiff John Doe's allegations

18   regarding their interactions with Defendants' Web Properties go beyond general web browsing. In

19   particular, Plaintiff Jane Doe and Plaintiff John Doe allege they submitted personal health

20   information while using Defendants' websites and patient portals to search for information related

21   to their specific medical conditions, treatments, and doctors, and review their medical records and

22   appointment notes. (Doc. No. 19 at ¶¶ 265–75, 284–90.) Plaintiffs Jane Doe and John Doe further

23   allege that the disclosure of their information to Meta led to targeted advertisements related to

24   their medical conditions and/or treatments on Facebook. (*Id.* at ¶¶ 275, 290.) These allegations

25   are sufficient to plead the "highly offensive" element of an invasion of privacy claim. *See*

26   *Walgreen Co.*, 733 F. Supp. 3d at 893–94 (finding allegations that defendants' disclosure of

27   plaintiffs' private health information sufficient to survive a motion to dismiss based on the

28   "highly offensive" element); *Gaige v. Exer Holding Co., LLC*, No. 2:24-cv-06099-AH-AJR, 2025

30

WL 559719, at *8 (C.D. Cal. Mar. 2, 2025) (plaintiff pled a "highly offensive" intrusion where plaintiff used defendant's website to "search for medical treatments, information, and diagnoses for his medical conditions," and defendants disclosed plaintiffs' searches to third parties for targeted advertising).

For these reasons, the court concludes Plaintiff Jane Doe and Plaintiff John Doe state a cognizable invasion of privacy claim. Therefore, the court will deny Defendants' motion to dismiss Plaintiff Jane Doe's and Plaintiff John Doe's invasion of privacy claim.

**F.    Comprehensive Computer Data Access and Fraud Act (Count 6)**

Plaintiffs bring a claim for violation of the CDAFA on behalf of themselves and the California subclass. (Doc. No. 19 at 109–11). The CDAFA "prohibits certain computer-based conduct such as '[k]nowingly and without permission access[ing] or caus[ing] to be accessed any computer, computer system, or computer network.'" *Cottle v. Plaid Inc*., 536 F. Supp. 3d 461, 487 (N.D. Cal. 2021) (citation omitted). The CDAFA defines "access" to mean "cause output from" the "logical, arithmetical, or memory function resources of a computer" and requires such access to be "without permission." Cal. Penal Code §§ 502(b)(1), 502(c)(1)–(2). To bring a private civil cause of action under the CDAFA, plaintiffs must allege that they "suffer[ed] damage or loss by reason of a violation" of the statute. Cal. Penal Code § 502(e)(1). The CDAFA does not define "damage" or "loss." *Cottle*, 536 F. Supp. 3d at 487. CDAFA permits recovery of "[c]ompensatory damages [that] include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access." Cal. Penal Code § 502(e)(1).

In their motion, Defendants argue Plaintiffs' CDAFA claim should be dismissed because Plaintiffs fail to plead "damage" or "loss." (Doc. No. 30 at 23.) Specifically, Defendants argue Plaintiffs do not allege they are unable to use their computer device as a result of their use of Defendants' Web Properties. (*Id.*) In their opposition to the pending motion, Plaintiffs argue they have alleged "damage" or "loss" because their medical information has economic value that Defendants unjustly profited from, and Defendants' source code altered their devices by placing "the fbp cookie" on the devices themselves. (Doc. No. 39 at 16.)

31

Courts have disagreed as to whether a theory of economic loss based on the misappropriation of personal data is sufficient to plead "damage" or "loss" under CDAFA. Some courts have held that plaintiffs may allege damage or loss under the CDAFA by alleging a loss in value of misappropriated data, namely general browsing data. *See Brown v. Google LLC*, 685 F. Supp. 3d 909, 940 (N.D. Cal. 2023) (finding plaintiffs alleged CDAFA loss when they alleged Google had a program where it paid users $3/day for their browsing history); *Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS, 2025 WL 50425, at *10 (N.D. Cal. Jan. 7, 2025) (allowing CDAFA claim to proceed where plaintiffs alleged they suffered damage or loss because Google profited from the misappropriation of their app and activity data). Other courts, however, have held that "CDAFA's private right of action contemplates some damage to the computer system, network, program, or data contained on that computer, as opposed to data generated by a plaintiff while engaging with a defendant's website." *Heiting v. Taro Pharms. USA, Inc.*, 709 F. Supp. 3d 1007, 1021 (C.D. Cal. 2023); *see Cottle*, 536 F. Supp. 3d at 488 (finding damage or loss under CDAFA did not include "loss of the right to control [Plaintiffs'] own data, the loss of the value of their data, and the loss of the right to protection of the data"); *Doe v. Cnty. of Santa Clara*, No. 3:23-cv-04411-WHO, 2024 WL 3346257, at *9 (N.D. Cal. July 8, 2024) (rejecting plaintiff's argument that damages based on the value of personal health data that defendant intercepted using "tracking pixels" suffices under CDAFA). The court agrees with the latter approach. Where, as here, "plaintiffs allege that their privacy has been invaded because of the disclosure of sensitive and private healthcare information—plaintiffs cannot base their CDAFA damages on a theory that they lost a benefit to sell that data themselves." *Doe*, 2024 WL 3346257, *9 n.7. Instead, Plaintiffs must allege "some damage to the computer system, network, program, or data contained on that computer." *Heiting*, 709 F. Supp. 3d at 1020.

The court is also not persuaded by Plaintiffs' contention that they suffered loss and damage because Defendants' source code altered their devices by placing "the fbp cookie" on the devices themselves. As discussed in more detail below with respect to Plaintiffs' trespass to chattels claim, Plaintiffs have failed to plead any measurable decrease in storage, memory, or any other impairment to their computing devices' functioning. *See Doe I v. Google LLC*, 741 F. Supp.

1    3d 828, 846 (2024) (dismissing CDAFA claim based on placement of cookies on devices).

2        Therefore, the court will grant Defendants' motion to dismiss Plaintiffs' CDAFA claim.

3    Because Plaintiffs may be able to allege additional facts to support this claim, the court will grant

4    Plaintiffs leave to amend their CDAFA claim.

5    **G.    Quasi-Contract/Restitution/Unjust Enrichment (Count 7)**

6        Plaintiffs bring a quasi-contract/restitution/unjust enrichment claim against Defendants on

7    behalf of themselves and the patient subclass. (Doc. No. 19 at 111–13.) "California courts are

8    divided as to whether a plaintiff can assert unjust enrichment as a standalone cause of action."

9    *Doe v. Microsoft Corp.*, No. 2:23-cv-0718-JCC, 2023 WL 8780879, at *12 (W.D. Wash. Dec. 19,

10   2023). "Some California courts allow a plaintiff to state a cause of action for unjust enrichment,

11   while others have maintained that California has no such cause of action." *ESG Cap. Partners,*

12   *LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) (collecting cases). "In the absence of clear

13   guidance from California courts, the Ninth Circuit 'has construed the common law to allow an

14   unjust enrichment cause of action through quasi-contract.'" *Desert Care Network*, 2024 WL

15   1343305, at *11. "To allege unjust enrichment as an independent cause of action, a plaintiff must

16   show that the defendant received and unjustly retained a benefit at the plaintiff's expense." *ESG*

17   *Cap. Partners*, 828 F.3d 1023 at 1038.

18        Defendants move to dismiss Plaintiffs' quasi-contract/restitution/unjust enrichment claim

19   on the basis that Plaintiffs have not alleged Defendants obtained a benefit which they were not

20   entitled to retain. (Doc. No. 30 at 20.) The court disagrees because Plaintiffs allege that their

21   payments for medical services constitutes benefits Defendants received and unjustly retained.

22   (Doc. Nos. 19 at ¶¶ 499–500, 39 at 12–13.) Specifically, Plaintiffs allege they would not have

23   purchased medical services from Defendants if Defendants had disclosed their transmission of

24   patient information to third parties for advertising purposes. (Doc. No. 19 at ¶ 502.) These

25   allegations are sufficient to state a cognizable unjust enrichment claim. *See e.g.*, *A.J. v. LMND*

26   *Med. Grp.*, No. 3:23-cv-03288-RFL, 2024 WL 4579143, at *4 (N.D. Cal. Oct. 25, 2024) (finding

27   the plaintiffs' allegation that defendant benefitted from their information by exchanging it without

28   their consent and that plaintiffs failed to receive the benefit of their bargain was sufficient to

preclude dismissal of an unjust enrichment claim); *Castillo v. Costco Wholesale Corp*., No. 2:23-cv-01548-JHC, 2024 WL 4785136, at *16 (W.D. Wash. Nov. 14, 2024) (plaintiffs pled an unjust enrichment claim where they alleged defendants received a benefit in the form of plaintiffs' personal health data and money for services, and they alleged the existence of a market for personal health data and cited sources estimating the value of such data).

Therefore, the court will deny Defendants' motion to dismiss Plaintiffs' unjust enrichment claim.

**H.    Unfair Competition Law (Count 8)**

Plaintiffs bring a California UCL claim against Defendants on behalf of themselves and the patient subclass. (Doc. No. 19 at 113.) The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The UCL "requires that a plaintiff have 'lost money or property' to have standing to sue," which requires the plaintiff to "demonstrate some form of economic injury." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 323 (2011). A plaintiff may demonstrate economic injury through a "benefit of the bargain" theory by establishing he or she "surrender[ed] in a transaction more, or acquire[d] in a transaction less, than he or she otherwise would have." *Id.*

Defendants argue Plaintiffs lack statutory standing under the UCL because they do not allege an economic injury, they only allege that their data was shared without authorization. (Doc. No. 30 at 26.) Plaintiffs counter that they have sufficiently alleged economic injury under a "benefit of the bargain" theory because they did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality. (Doc. No. 39 at 20.)

Several of Plaintiffs' allegations support their benefit-of-the bargain theory to establish UCL standing. In particular, Plaintiffs allege that when using Defendants' Web Properties, they relied on Defendants' status as healthcare providers and reasonably assumed Defendants "would take appropriate measures to keep their [PHI] secure." (Doc. No. 19 at ¶¶ 512–14.) Plaintiffs also allege Defendants embedded Pixel on their Web Properties, allowing patients' communications to be "surreptitiously" duplicated and sent to third parties without their

34

1    consent. (*Id.* at ¶¶ 514–16.) Further, Plaintiffs allege that Pixel's presence on Defendants' Web

2    Properties was concealed from patients as "Defendants did not disclose at any time that they were

3    sharing patients' [PHI] with third parties via the tracking Pixel and other third-party tracking

4    software." (*Id.* at ¶ 514.) According to Plaintiffs, they would not have sought medical services

5    from Defendants had they known of Defendants' collection and transmission of their PHI and PII

6    on Defendants' Web Properties. (*See id.* at ¶¶ 502, 543.) Thus, the court finds Plaintiffs'

7    allegations show they surrendered more in a transaction than they otherwise would have, which is

8    a form of economic injury. *See Kwikset*, 51 Cal. 4th at 323; *see also Desert Care Network*, 2024

9    WL 1343305, at *8 (statutory standing satisfied under the UCL where plaintiffs alleged that they

10   would not have bought medical services from defendants had they known of defendants' data

11   collection practices).

12       Thus, the court will deny Defendants' motion to dismiss Plaintiffs' UCL claim on

13   standing grounds.

14   **I.    California Consumer Records Act, California Civil Code § 1798.82 (Count 9)**

15       Plaintiffs bring a claim for violation of the California CRA against Defendants on behalf

16   of themselves and the patient subclass. (Doc. No. 19 at 119–22.) The CRA "regulates businesses

17   with regard to treatment and notification procedures relating to their customers' personal

18   information." *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp.

19   3d 1284, 1300 (S.D. Cal. 2020) (citation omitted). Section 1798.82 of the CRA requires a

20   business "that owns or licenses computerized data that includes personal information [to] disclose

21   a breach of the security of the system following discovery or notification of the breach . . .

22   without unreasonable delay." Cal. Civ. Code § 1798.82(a). "Breach of the security of the system"

23   is defined as the "unauthorized acquisition of computerized data that compromises the security,

24   confidentiality, or integrity of personal information maintained by the person or business." *Id.*

25   § 1798.82(g). "Because a claim under [Section] 1798.82(a) is actionable not for the breach itself,

26   but for the harms resulting from unreasonably delayed notification, a plaintiff must state when a

27   defendant learned of the relevant breach." *Chen v. JPMorgan Chase Bank*, *N.A.*, 745 F. Supp. 3d

28   1025, 1034 (C.D. Cal. 2024).

Defendants argue Plaintiffs' CRA claim should be dismissed because Plaintiffs do not allege a security breach. (Doc. No. 30 at 24.) Defendants contend that Plaintiffs' allegations about the collection and transmission of patients' information for targeted advertising is not an intrusion into Defendants' computer systems. (*Id.* at 25.) Plaintiffs counter that they have pled a valid CRA claim because Defendants caused the unauthorized disclosure of their PHI and have "refused to notify their patients or take any responsibility for the breach." (Doc. No. 39 at 17–18.)

The court finds Defendants arguments to be persuasive because Plaintiffs have not alleged a "breach" of security as required by the CRA. Plaintiffs' argument that Defendants transmitted their information to third parties without authorization and failed to disclose it is unavailing because the CRA "is concerned with how companies respond to intrusions into their computer systems, not how the companies themselves choose to use information their customers have provided." *Cottrell v. AT&T Inc.*, No. 3:19-cv-07672-JCS, 2020 WL 4818606, at *3 (N.D. Cal. Aug. 19, 2020) (holding that the plaintiff failed to plead a claim under Section 1798.82 of the CRA where he did not allege that anyone accessed his personal information without defendant's permission, but rather alleges defendant used his information to sign him up for a subscription); *see also Shah v. Cap. One Fin. Corp.*, No. 3:24-cv-05985-TLT, 2025 WL 714252, at *9 (N.D. Cal. Mar. 3, 2025) (dismissing section 1798.82 claim even though the plaintiffs alleged defendant knew that their information was acquired by unauthorized persons and failed to disclose it to plaintiffs, because defendant's use of third-party tracking technology on its website did not constitute a "breach of security"). Thus, Plaintiffs have failed to plead a CRA claim.

Accordingly, the court will grant Defendants' motion to dismiss Plaintiffs' CRA claim. Because Plaintiffs may be able to allege additional facts to support this claim, the court will grant Plaintiffs leave to amend their CRA claim.

## J.    Electronic Communications Privacy Act (Count 10)

Plaintiff Jane Doe and Plaintiff John Doe bring a claim for violation of the ECPA against

/////

/////

/////

1  Defendants on behalf of themselves and the Tenet Healthcare Class.[9] The ECPA authorizes a

2  private right of action against any person who "intentionally intercepts, endeavors to intercept, or

3  procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic

4  communication." 18 U.S.C. § 2511(1)(a). Pursuant to the "party exception," however, "[i]t shall

5  not be unlawful . . . for a person not acting under color of law to intercept a wire, oral, or

6  electronic communication where such person is a party to the communication." *Id.* at

7  § 2511(2)(d).

8        Here, Defendants move to dismiss Plaintiff Jane Doe's and Plaintiff John Doe's ECPA

9  claim on the basis that they were the intended recipients of Plaintiff Jane Doe's and Plaintiff John

10  Doe's alleged communications. (Doc. No. 30 at 25.) Defendants argue that as owners and

11  operators of the Web Properties, they constitute "part[ies] to the communication" and

12  "consent[ed] to [their] own 'wiretapping.'" (*Id.*) Plaintiff Jane Doe and Plaintiff John Doe do not

13  dispute this contention. It is clear from Plaintiffs' FAC that Defendants were parties to Plaintiffs'

14  communications with Defendants' Web Properties. Because Defendants were parties to Plaintiff

15  Jane Doe's and Plaintiff John Doe's communications, "any alleged interception of the

16  communications is not actionable" under the ECPA's "party exception." *B.K. v. Eisenhower Med.*

17  *Ctr.*, 721 F. Supp. 3d 1056, 1065 (C.D. Cal. 2024) (citation omitted).

18        However, the ECPA's "party exception" has its own carve-out known as the "crime-tort

19  exception." 18 U.S.C. § 2511(2)(d). Under the "crime-tort" exception, a party to a communication

20  is still liable under the ECPA when a communication "is intercepted for the purpose of

21  committing any criminal or tortious act in violation of the Constitution or laws of the United

22  States or of any State." *Id.* "[T]he focus is not upon whether the interception itself violated

23  another law; it is upon whether the *purpose* for the interception—its intended use—was criminal

24  or tortious." *Sussman v. Am. Broad. Cos., Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999). To invoke

25  the "crime-tort exception," a plaintiff must allege the defendant acted with a "criminal or tortious

26

27  _____

[9] Because the court has already dismissed Plaintiff Jan Doe's and Plaintiff James Doe's ECPA
claim, the court only considers whether Plaintiff Jane Doe and Plaintiff John Doe have pled an
28  ECPA claim.

purpose [that is] separate and independent from the act of the recording." *Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1136 (9th Cir. 2022). Courts have applied the ECPA's "crime-tort exception" where the "intentional *disclosure*" of private information constituted a "'further impropriety' independent and separate from [the] *interception*" of private information. *R.S. v. Prime Healthcare Servs., Inc*., No. 5:24-cv-00330-ODW-SP, 2025 WL 103488, at *6 (C.D. Cal. Jan. 13, 2025) (applying the "crime-tort exception" where plaintiff alleged defendant intercepted her private data using Meta Pixel with the intention to disclose that information in violation of the Health Insurance Portability and Accountability Act); *see also Castillo*, 2024 WL 4785136, at *5 (collecting cases).

In their opposition to Defendants' motion to dismiss, Plaintiffs argue that the ECPA's "crime-tort exception" applies because they have alleged Defendants intercepted their communications for the purpose of violating the Health Insurance Portability and Accountability Act ("HIPAA"). (Doc. No. 39 at 18.) HIPAA makes it a federal crime to disclose "individually identifiable health information." 42 U.S.C. § 1320d-6(a)(3). Information is "individually identifiable health information" for purposes of HIPAA if it (1) is "created or received by" a healthcare provider, (2) "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual," and (3) either "identifies the individual" or provides a reasonable basis to identify the individual. *Id.* at § 1320d(6)(A)–(B).

As discussed throughout this order, Plaintiff Jane Doe and Plaintiff John Doe allege Defendants were their healthcare providers, received their communications with Defendants' Web Properties, and transmitted their PHI and PII to Meta without their authorization. (*See e.g.*, Doc. No. 19 at ¶¶ 265–73, 284–89, 438, 450, 458.) Because Plaintiff Jane Doe and Plaintiff John Doe allege that the information Defendants disclosed can be used to identify individuals and "relates to . . . the provision of health care," they have plausibly alleged Defendants intercepted their information with the purpose of violating HIPAA. 42 U.S.C. § 1320d(6). Therefore, Plaintiff Jane Doe and Plaintiff John Doe have sufficiently alleged the ECPA's "crime-tort exception" applies. *See Castillo*, 2024 WL 4785136, at *6–7 (denying motion to dismiss ECPA claim where

38

plaintiffs "plausibly allege[d] that [defendant] intercepted data to violate HIPAA" using Meta Pixel); *Strong v. LifeStance Health Grp. Inc.*, No. 2:23-cv-00682-PHX-KML, 2025 WL 317552, at *5 (D. Ariz. Jan. 28, 2025) (holding that the ECPA's "crime-tort exception" applied where plaintiffs sufficiently pled defendant received and disclosed individually identifiable health information in violation of HIPAA through its use of Meta Pixel).

Defendants do not address Plaintiff's allegations regarding HIPAA, but nevertheless argue the ECPA's "crime-tort exception" is inapplicable because Plaintiffs Jane Doe and Plaintiff John Doe allege that Defendants' motivation for intercepting their communications was for marketing benefits, not to commit a crime or tort. (Doc. No. 41 at 9–10.) "Courts are divided as to whether a primary financial motivation shields an intercepting party from liability under the ECPA." *Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *6–7. Some courts have held that "the crime-tort exception is inapplicable where a defendant's primary motivation is to make money rather than to injure plaintiffs tortiously or criminally." *Roe v. Amgen Inc.*, No. 2:23-cv-07448-MCS-SSC, 2024 WL 2873482, at *6 (C.D. Cal. June 5, 2024)); *see also In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 797 ("Multiple courts . . . have found that the crime-tort exception . . . is inapplicable where the defendant's primary motivation was to make money, not to injure plaintiffs tortiously.") Other courts have held that "the crime-tort exception applies even when a defendant intercepts data for the purpose of financial gain." *Castillo*, 2024 WL 4785136, at *6; *Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *6–7 (holding that defendant's "financial motivation for disclosing [plaintiff's] [p]rivate [i]nformation does not immunize it from liability under the ECPA"); *Walgreen Co.*, 733 F. Supp. 3d at 901 ("[E]ven where a defendant is arguably motivated by monetary gain, the crime-tort exception may nonetheless apply if plaintiffs have adequately alleged that the defendant's conduct violated state law, including state law privacy claims."); *Mekhail v. N. Mem'l Health Care*, No. 0:23-cv-00440-KMM-TNL, 2024 WL 1332260, at *5 n.4 (D. Minn. Mar. 28, 2024) ("[T]he [c]ourt has serious doubts that a pecuniary purpose and an injurious purpose can always be so clearly distinguished. And it defies common sense that a clearly harmful act could escape liability as long as it was done for profit.").

The court joins those courts that have held a monetary purpose does not insulate a party

1  from liability under the ECPA. Indeed, "there is no bright-line rule insulating financial motives

2  from the [ECPA's] crime-tort exception." *Castillo*, 2024 WL 4785136, at *6. Plaintiffs'

3  allegations that Defendants were financially motivated to disclose their information to Meta do

4  not immunize Defendants from liability under the ECPA. At this pleading stage, Plaintiff Jane

5  Doe and Plaintiff John Doe have plausibly alleged that Defendants intercepted their

6  communications with the purpose of violating HIPAA, sufficient to satisfy the ECPA's "crime-

7  tort exception."

8       Therefore, the court will deny Defendants' motion to dismiss Plaintiff Jane Doe's and

9  Plaintiff John Doe's ECPA claim.

10  **K.     Trespass to Chattels (Count 11)**

11       Plaintiffs bring a trespass to chattels claim against Defendants on behalf of themselves and

12  the patient subclass. (Doc. No. 19 at 131–33.) Under California law, a trespass to chattels claim

13  exists "where an intentional interference with the *possession* of personal property causes injury."

14  *Best Carpet Values, Inc. v. Google, LLC*, 90 F.4th 962, 96 (9th Cir. 2024) (quoting *Intel Corp. v.*

15  *Hamidi*, 30 Cal. 4th 1342, 1350–51 (2003)). "Short of dispossession, personal injury, or physical

16  damage," an actionable trespass to chattels occurs "only if the chattel is impaired as to its

17  condition, quality, or value" or "the possessor is deprived of the use of the chattel for a substantial

18  time." *Hamidi*, 30 Cal.4th at 1357 (citation omitted). "[A]n actionable deprivation of use 'must be

19  for a time so substantial that it is possible to estimate the loss caused thereby.'" *Id.* (citation

20  omitted).

21       "[D]ecisions finding electronic contact to be a trespass to computer systems have

22  generally involved some actual or threatened interference with the computers' functioning."

23  *Hamidi*, 30 Cal. 4th at 1353. Trespass to chattels "does not encompass, and should not be

24  extended to encompass, an electronic communication that neither damages the recipient computer

25  system nor impairs its functioning." *Id.* at 1347. "Such an electronic communication does not

26  constitute an actionable trespass to personal property, i.e., the computer system, because it does

27  not interfere with the possessor's use or possession of, or any other legally protected interest in,

28  the personal property itself." *Id.*

In their motion, Defendants contend that Plaintiffs do not plausibly allege a claim for trespass to chattels because Plaintiffs fail to allege "what intended functioning was impaired or what damage to any computer resulted from Defendants' actions." (Doc. No. 30 at 26.) In their opposition to the pending motion, Plaintiffs counter that they must only plead a "minor interference" resulting in "some damage" to support a trespass to chattels claim. (Doc. No. 39 at 19.) Plaintiffs believe they have done so by alleging both that Defendants "intentionally used, intermeddled, interfered with, and dispossessed [them] of their computing devices without their consent by placing the fbp, ga, and gid cookies on [their] computing devices," and that as a result, their devices "are useless for exchanging private communications with Tenet [], which substantially impairs the condition, quality, and value of [their] computing devices." (Doc. No. 19 at ¶¶ 589, 601.)

Here, the court finds Plaintiffs' arguments to be unavailing for several reasons. First, Plaintiffs' allegation that Defendants placed cookies on their devices is insufficient, on its own, to show any actual injury was caused by Defendants. *See Hamidi*, 30 Cal. 4th at 1351 ("[S]ome actual injury must have occurred in order for a trespass to chattels to be actionable."). To support their position, Plaintiffs rely on the decision in *In re Meta Healthcare Pixel Litigation*, 713 F. Supp. 3d 650 (N.D. Cal. 2024), a case that also involved the placement of cookies on devices, but the plaintiffs in that case alleged actual injuries flowing from those cookies. Specifically, those plaintiffs brought a trespass to chattels claim on the grounds that Meta impaired their phones through the "placement of the _fbp cookie/tracking tool," which utilized storage and slowed the speed of their devices, creating a measurable impact on the functioning of their devices' memory. 713 F. Supp. 3d at 657–59. Meta moved to dismiss the plaintiffs' claim, arguing that the "*de minimis* nature of the resource usage and slowed communications" could not support a trespass to chattels claim. *Id.* The court questioned whether the slowing of communications for a matter of seconds was significant enough for an actionable "loss of use," but nonetheless found that the plaintiffs sufficiently alleged Meta's "placement of the _fbp cookie" was "*not* a temporary trespass (as the cookies stays until it is discovered or removed) and creates a measurable impact on the functioning of the systems' memory sufficient to satisfy damages for the trespass." *Id.* at

658–59 (emphasis in original). Accordingly, the court allowed plaintiffs' trespass to chattels claim based on the "placement of the _fbp cookie on plaintiffs' devices, resulting in a measurable decrease in the storage plaintiffs' [had] on their phone[s]" to proceed. *Id.* at 659. In so doing, the court cautioned that it made a "close call involving thorny and evolving issues of state law" and discovery could establish that the "impact of the _fbp cookie cannot rise to a sufficient level of harm" for a trespass to chattels claim. *Id.* Unlike the plaintiffs in *In re Meta Healthcare Pixel Litigation*, here Plaintiffs do not allege that the placement of cookies led to a measurable decrease in storage, memory, or any other impairment to their computing devices' functioning. In the absence of allegations that Defendants' alleged trespass caused measurable damage or impairment to the functioning of Plaintiffs' devices, Plaintiffs' trespass to chattels claim is not sufficiently pled. *See Doe I v. Google LLC*, 741 F. Supp. 3d 828, 846 (N.D. Cal. 2024) ("[I]t is not obvious how the presence on one's computer of the cookies from the providers' websites would result in any cognizable reduction in storage, disk space, or performance."); *Fields v. Wise Media*, LLC, No. 3:12-cv-05160-WHA, 2013 WL 5340490, at *5 (N.D. Cal. Sept. 24, 2013) ("Allowing plaintiffs to assert a claim for trespass to chattels absent actual physical harm or impairment to their phones would vastly expand tort law and this order will not do so absent binding Ninth Circuit authority.").

Second, Plaintiffs allege in conclusory fashion that they were "dispossessed" of their computing devices. (Doc. No. 19 at ¶ 589.) But Plaintiffs offer no factual allegations to support this conclusion.

Third, Plaintiffs contend that their devices were rendered useless for exchanging private communications with Defendant Tenet. But "nothing about . . . the existence of cookies physically impairs the functioning of the plaintiffs' computing devices" and "the decision not to use one's computer to communicate with a specific entity is not the same as actually being deprived of the ability to use one's computer." *Doe I*, 741 F. Supp. 3d at 846 (dismissing trespass to chattels claim where plaintiffs alleged that defendant's source code lodged cookies on their computing devices to collect data, making their devices useless for exchanging private communications with their health care providers).

1    Therefore, the court will grant Defendants' motion to dismiss Plaintiffs' trespass to

2    chattels claim. Because Plaintiffs may be able to allege additional facts to support this claim, the

3    court will grant Plaintiffs leave to amend their trespass to chattels claim.

4    **L.    Statute of Limitations**

5    Defendants contend Plaintiffs' FAC should be dismissed in its entirety because all claims

6    are wholly or partly time barred. (Doc. No. 30 at 27.) "A claim may be dismissed as untimely

7    pursuant to a 12(b)(6) motion only when the running of the statute [of limitations] is apparent on

8    the face of the complaint." *U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F.3d

9    1174, 1178 (9th Cir. 2013) (internal quotation marks and citation omitted). The court may grant a

10    motion to dismiss based on the statute of limitations "only if the assertions in the complaint, read

11    with the required liberality, would not permit [Plaintiffs] to prove that the statute was tolled."

12    *Pisciotta v. Teledyne Indus.*, 91 F.3d 1326, 1331 (9th Cir. 1996). A plaintiff may allege

13    application of the delayed discovery rule to toll the statute of limitations, which requires plaintiffs

14    to plead facts which show "(1) the time and manner of discovery and (2) the inability to have

15    made earlier discovery despite reasonable diligence." *Yumul v. Smart Balance, Inc.*, 733 F. Supp.

16    2d 1117, 1130 (C.D. Cal. 2010) (citation omitted).

17    Each of Plaintiffs' eleven claims against Defendants is subject to a statute of limitations,

18    ranging from one to four years. *See* Cal. Civ. Proc. Code § 340 (statute of limitations for a CIPA

19    claim is one year); Cal. Civ. Proc. Code § 335.1 (statute of limitations for an invasion of privacy

20    claim under the California constitution is two years); Cal. Penal Code § 502(e)(5) (statute of

21    limitations for a CDAFA claim is three years); Cal. Bus. & Prof. Code § 17208 (statute of

22    limitations for a UCL claim is four years); Cal. Civ. Code § 1798.96 (statute of limitations for a

23    claim under Cal. Civ. Code § 1798.82 is four years); 18 U.S.C. § 2520 (statute of limitations for a

24    ECPA claim is two years); Cal. Civ. Code § 338, subd. (c) (statute of limitations for a trespass to

25    chattels claim is three years); *Ramirez v. Dean Foods Co. of Cal.*, No. 8:11-cv-1292-DOC-AN,

26    2012 WL 3239959, at *8 (C.D. Cal. Aug. 6, 2012) ("There is some controversy as to whether the

27    statute of limitations for [a CMIA] claim is two or three years."); *Fed. Deposit Ins. Corp. v.*

28    *Dintino*, 167 Cal. App. 4th 333, 348 (2008) (statute of limitations for a quasi-contract claim is

1    three years).

2         In their motion, Defendants argue Plaintiffs' FAC should be dismissed because Plaintiffs

3    do not specify when Defendants' purportedly harmful conduct occurred, making it unclear

4    whether Plaintiffs' claims accrued, in whole or in part, outside the applicable statute of limitations

5    periods. (Doc. No. 30 at 28.) Because Plaintiffs Jane Doe, John Doe, and James Doe filed their

6    FAC on October 10, 2023, Defendants argue they are "time-barred from bringing: (1) any CIPA

7    claim that accrued prior to October 10, 2022; (2) any claims subject to a two-year statute of

8    limitations that accrued prior to October 10, 2021; (3) any claims subject to a three-year statute

9    that accrued prior to October 10, 2020; and (4) any claims subject to a four-year statute that

10   accrued prior to October 10, 2019." (*Id.* at 27–28.) In their opposition, Plaintiffs argue the

11   discovery rule tolls the accrual of any statute of limitations period because Defendants' conduct

12   was "surreptitious," such that Plaintiffs did not know, nor have any reason to suspect, that their

13   sensitive medical information was being disclosed to third parties. (Doc. No. 39 at 21.)

14        Before turning to Defendants' arguments, the court notes Plaintiffs' FAC sufficiently

15   alleges claims within the appliable statute of limitations periods. With the exception of Plaintiff

16   James Doe,[10] Plaintiffs allege that they last visited the Defendants' Web Properties after October

17   10, 2022, within the applicable statute of limitations period for all claims. (Doc. No. 19 at ¶¶ 265,

18   276, 284, 292.) Specifically, Plaintiffs Jane Doe, Jan Doe, and John Doe last visited Defendants'

19   Web Properties in 2023. (*Id.* at ¶¶ 265, 276, 284.) Although Plaintiffs' FAC only specifies the

20   year that Plaintiffs Jane Doe, Jan Doe, John Doe, and James Doe began using the Website rather

21   than the exact date, the FAC "does not indicate on its face that Plaintiffs' interactions ceased

22   before the [statutes of limitations expired]." *See Desert Care Network*, 2024 WL 1343305, at *5;

23   *see also Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 625 (N.D. Cal. 2021) ("The Ninth Circuit

24   and California Supreme Court have held that separate, recurring invasions of the same right each

---

[10] Plaintiffs' FAC alleges Plaintiff James Doe used the Website as recently as January 2022, which is outside the statute of limitations period for a CIPA claim. (Doc. No. 19 at ¶ 292.) However, as discussed below, the court does not find that assertions in the FAC would prevent Plaintiff James Doe from proving the statute of limitations was tolled by delayed discovery. *See Pisciotta*, 91 F.3d at 1331. Therefore, the court will not dismiss Plaintiff James Doe's CIPA claim on the basis of the statute of limitations.

1    trigger their own separate statute of limitations.")

2    In any event, Plaintiffs have also pled facts sufficient to demonstrate application of the

3    delayed discovery rule is appropriate. In particular, Plaintiffs allege that when they visited

4    Defendants' Web Properties, they did not know and had no way of knowing that Defendants were

5    intercepting and unlawfully disclosing their PHI and PII to Meta, Google, and other third parties

6    through the use of hidden tracking pixels. (*See* Doc. No. 19 at ¶¶ 71, 110, 130, 270–73, 281, 288–

7    89, 294). That is, Defendants allegedly "secretively incorporated Meta Pixel and other trackers

8    into their websites, providing no indication to users that they were interacting with a website

9    enabled by Meta Pixel." (*Id.* at ¶ 390). According to Plaintiffs, the earliest they could have

10    reasonably discovered Defendants' conduct was June 16, 2022, following the release of an

11    investigative article by the "The Markup" which reported that Meta was receiving sensitive

12    information from hospital websites through the use of Pixel. (*Id.* at ¶¶ 371, 374, 392); *see Desert*

13    *Care Network*, 2024 WL 1343305, at *5 (holding that a delayed discovery argument posed a

14    "barrier to dismissal" when the plaintiff alleged that the defendants secretly incorporated Pixels

15    into their web properties and patient portals). Based on these allegations, Plaintiffs' FAC does not

16    present a statute of limitations issue that is facially apparent. Therefore, the court will deny

17    Defendants' motion to dismiss Plaintiffs' claims on the basis that they are time barred by the

18    applicable statute of limitations.

19                                    **CONCLUSION**

20    For the reasons explained above:

21    1.    Defendants' request for judicial notice (Doc. No. 31) is GRANTED;

22    2.    Plaintiffs' motion for administrative relief to file a sur-reply in opposition to

23          Defendants' motion to dismiss (Doc. No. 42) is GRANTED;

24    3.    Defendants' motion to dismiss (Doc. No. 30) is GRANTED in part and DENIED

25          in part as follows:

26          a.    Plaintiff Jan Doe's CMIA, ECPA, and invasion of privacy claims are

27                dismissed without prejudice due to the first-filed action in the United States

28                District Court for the Central District of California, *B.K., et al. v. Desert*

1               *Care Network, et al*., No. 2:23-cv-05021-SPG-PD (C.D. Cal. 2023), where

2               those claims are presently being litigated;

3        b.      Plaintiff James Doe's CMIA, ECPA, and invasion of privacy claims are

4               dismissed without prejudice due to the first-filed action in the United States

5               District Court for the Central District of California, *B.K., et al. v. Desert*

6               *Care Network, et al*., No. 2:23-cv-05021-SPG-PD (C.D. Cal. 2023), where

7               those claims are presently being litigated;

8        c.      Plaintiffs' CDAFA claim is dismissed with leave to amend;

9        d.      Plaintiffs' CRA claim is dismissed with leave to amend;

10       e.      Plaintiffs' trespass to chattels claim is dismissed with leave to amend; and

11       f.      Defendants' motion to dismiss all other claims is denied.

12    4.      Within twenty-one (21) days of the date of entry of this order, Plaintiffs shall file a

13       second amended complaint, or alternatively, file a notice of their intent not to file a

14       second amended complaint; and

15    5.      Plaintiffs are cautioned that their failure to comply with this order may result in an

16       order dismissing this case due to their failure to prosecute.

17

18       IT IS SO ORDERED.

19 Dated:   **June 9, 2025**

20                                         Dena Coggins

                                            United States District Judge